**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **NCLN20, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 02-1282C** |
| | ) | **(Judge Braden)** |
| **UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S STATUS REPORT**

The United States respectfully submits this status report informing the Court that the Defense Contract Audit Agency ("DCAA") has completed its audit of NCLN20's request for equitable adjustment ("REA"). As a result of the audit, the contracting officer for the Federal Protective Service ("FPS"), Arthur Dobbs, has issued his determinations and findings.

As the Court is aware, on August 19, 2005, the parties submitted briefs discussing the Court's jurisdiction in this case. Subsequent to these filings, NCLN20 submitted a new REA to the contracting officer. The REA was undated, but it was submitted via facsimile to the contracting officer after close of business on August 31, 2005, and a hard copy was delivered via Federal Express on September 12, 2005. On September 23, 2005, a teleconference was held in which the parties agreed that NCLN20's new REA could affect the dispositive motions that are currently pending in this case. Accordingly, on October 3, 2005, the Court issued an order that stayed this matter pending a final decision by the contracting officer upon NCLN20's new request for equitable adjustment.

In December 2005, NCLN20's counsel at that time, Malyszek & Malyszek, wrote that much of NCLN20's $4,904,073 in claimed damages were based upon anticipated profits and cost of money damages. Upon reviewing the documents submitted by NCLN20 to substantiate

NCLN20's claims for those damages, the contracting officer determined additional information was still required before he could fully adjudicate NCLN20's claims. However, shortly after NCLN20 submitted the supporting information to the contracting officer, NCLN20 changed counsel.

On or about November 1, 2006, the FPS, acting together with the General Services Administration ("GSA") Office of Regional Counsel, received a supplemental REA from NCLN20. The FPS contracting officer subsequently forwarded NCLN20's supplemental REA with its supporting material to DCAA for inclusion in DCAA's audit.

On March 29, 2007, DCAA finalized its audit of NCLN20's claim.[1] The contracting officer for the FPS has reviewed the audit and NCLN20's REAs, and issued his determinations and findings regarding NCLN20's claims. A letter was sent NCLN20's counsel on April 18, 2007 announcing the contracting officer's decision.

A copy of that letter, the contracting officer's determination and findings, and DCAA's audit are attached to this status report.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/ Jeanne E. Davidson
JEANNE E. DAVIDSON
Director

[1] As we explained in our last status report, DCAA had originally expected to complete its audit by February 28, 2007. This originally scheduled completion date was altered when Kenneth Fung, the auditor originally assigned to conduct the NCLN20 audit for DCAA, left the Government on February 2, 2007. A new auditor, Don Stephens, did not begin working upon the NCLN20 audit until the week of February 26, 2007.

OF COUNSEL:

JOEL MALKIN
General Services Administration
Office of Regional Counsel
Chicago, IL

s/ Douglas K. Mickle

DOUGLAS K. MICKLE
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 307-0383
Fax: (202) 353-7988
Attorneys for Defendant

DATED: April 23, 2007

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on April 23, 2007, a copy of the foregoing **"DEFENDANT'S STATUS REPORT"** was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Douglas K. Mickle
Douglas K. Mickle

Federal Protective Service
**U.S. Department of Homeland Security**
230 South Dearborn, Room 3540
Chicago, IL 60604

**U.S. Immigration and Customs Enforcement**

April 18, 2007

Mr. Clarence B. Tucker, Sr., PLLC
Attorneys and Counselors at Law
615 Griswold Street, Suite 920
Detroit, Michigan 48226

Subject: GSA contract no. GS05P01GCD0009; conversion of prior termination for default to termination for convenience

Dear Mr. Tucker:

This pertains to terminated Contract #GS05P01GCD0009 for the provision of Armed and Unarmed Security Guard Services at GSA owned and supported facilities in the State of Michigan. This also is in response to your Request for Equitable Adjustment (REA) in amount of $4,904,074. The REA is undated but was electronically submitted via facsimile to this office after close of business on August 31, 2005 and a hard copy was delivered via FedEx on September 12, 2005.

The contract was terminated for default on September 28, 2001 based upon anticipatory breach of contract because of the following reasons:

a) Lack of preparation (adequate weapons, uniforms and supplies) to start performance on October 1, 2001;
b) Lack of weapons permits.
c) Lack of State of Michigan license to operate as a security guard business.
d) Refusal to reply to Contractor Officer questions about preparations.
e) Failure to respond to order for additional guards made necessary by the terrorism of September 11, 2001.

Failure to respond to the Cure Notice issued on September 26, 2001.Subsequent to the termination and prior to submission of the REA, NCLN20 sued the Government to convert the termination for default to a termination for convenience. In response to the REA, the Defense Contract Audit Agency (DCAA) was requested to audit NCLN20's claim. The audit concluded that NCLN20 incurred $46,856.00 in expenses leading up to the termination for default. Without admitting any fault on the part of the Government, but acting in what I believe is the sake of fairness, I have decided to convert the termination for default to a termination for convenience. I therefore authorize the payment to NCLN20 of $46,856.00 in accordance with the DCAA audit.

This is the final decision of the Contracting Officer. You may appeal this decision to the Civilian Board of Contract Appeals (CBCA), 1800 F Street, N.W., Washington, D.C. 20405. If you decide to appeal, you must within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the CBCA and provide a copy to the Contracting Officer from whose decision this appeal is taken. The notice shall indicate that an appeal is intended, reference this decision, and identify the contract by number. You may, solely at your election, proceed under the CBCA small claims procedure for claims of $50,000.00 or less or its accelerated procedure for claims of $100,000.00 or less. Instead of appealing to the CBCA, you may bring an action directly in the United States Court of Federal Claims within 12 months of the date you receive this decision.

Sincerely,

ARTHUR S. DOBBS
Contracting Officer

cc:
Mr. Steven Jones, President

# CONTRACTING OFFICER'S DETERMINATION AND FINDING

## Authority to Terminate Blanket Purchase Agreement (BPA) for Convenience

I hereby find that:

The General Services Administration (GSA) issued an Invitation for Bid (IFB) GS05P01GCD0009 on August 20, 2001 for armed and unarmed uniformed security guard services in the State of Michigan for a base period of October 1, 2001 through September 30, 2002, with four one-year option periods.

Bids were received from eight bidders and were opened on Tuesday, August 21, 2001. The lowest bidder was NCLN20 with a five-year total bid price at $32,962,000.00. NCLN20 was sent a facsimile at 2:47 pm CST Wednesday, August 22, 2001 requesting they verify their bid price. Mr. Steven Jones, NCLN20's Chief Executive Officer, telephoned me at approximately 11:00 am CST on Thursday, August 23, 2001 to report that NCLN20's bid price could not be verified. Mr. Jones stated the bid was in error, or a Mistake in Bid (MIB). Mr. Jones further stated NCLN20's bid preparer, an outside firm, incorrectly computed the annual labor cost of Post #50 GAV by transferring the hourly rate for that post at a rate of $15.55 to the column reflecting the post's annual labor cost, rather than multiplying the $15.55 hourly rate by the post's annual labor hours of 8,760. The incorrect average labor cost of $14.88 rather than $15.40, resulted in a mistake of $184,600 on an annual basis and $932,000 computed over the anticipated five year life of this BPA. It should be noted that the alleged MIB did not displace NCLN20 from having the lowest bid. The revised price was still under that of the second lowest bidder, the incumbent contractor, Unlimited Security, Inc. (USI). I informed Mr. Jones that submission of a bid that was not checked for accuracy was not a clerical error but a mistake in business judgment,. I sought and received concurrence with this opinion from the Office of Regional Counsel.

On the morning of Friday, August 24, 2001 I received a call from Mr. Jones stating he will revoke any statements regarding a MIB. He further stated NCLN20 could perform the BPA at the bid price originally submitted and requested award be made at the bid price and to proceed promptly with a work start-up meeting. I asked that he put his statements in writing, which he did, in a facsimile letter dated August 24, 2001. I sent Mr. Jones a facsimile response letter in mid afternoon on August 24, 2001 stating Accord and Satisfaction regarding any MIB, which was countersigned by Mr. Jones and returned within an hour.

With the MIB issue cleared up, I had a telephone conversation with Mr. Jones stating award of the BPA would proceed with a formal Notice of Award. A preliminary Notice of Award letter was then issued to NCLN20 late in the day of August 24, 2001. This form of notification is not contained in the Federal Acquisition Regulation (FAR) or other GSA agency regulation. I wrote it as a matter of expediency to get the award

accomplished. The letter simply states that the Michigan IFB was awarded to NCLN20. It was essentially an abbreviated format of the usual Notice of Award. It did not contain pricing information or Department of Labor regulatory information, rather it clearly stated that award was made to NCLN20 and that work could proceed. It should be noted that NCLN20 was a small business and my intent was to provide them as much time as possible to start up required actions. The preliminary Notice of Award was unconditional and gave NCLN20 the right to take any action required to prepare for timely performance.

Later that day Mr. Jones called me to seek my opinion regarding a contract or project manager. I recommended that he hire Mr. Randy McKay as his Contract Manager in Detroit who had distinguished himself as an effective Contract Manager for the incumbent contractor and could also provide NCLN20 with valuable advice on how to prepare for their upcoming performance. Apparently Mr. Jones hired Mr. McKay immediately—probably over the weekend of August 25 and August 26, 2001. On Monday, August 27, 2001, Mr. Jones and I telephonically conversed several times throughout the day regarding a time and place for a BPA start-up meeting. There was a problem with Mr. Jones and his staff obtaining plane reservations for flights from San Francisco to Detroit. A meeting was scheduled in Detroit, MI on August 30, 2001 but airline problems caused Mr. Jones to miss the meeting with FPS District/field personnel. It was agreed that the BPA start-up meeting would be accomplished via teleconference on August 29, 2001. The meeting agenda contained 38 essential items of discussion, also outlined in the BPA Statement of Work.

As this meeting progressed, NCLN20 personnel provided repeated assurances that the 30 day lead time would not be an impediment to a successful contract start up on October 1, 2001. I prepared a Memorandum for the Record documenting this teleconference meeting. At no point in this teleconference was any condition stipulated that the BPA award was tentative or dependent upon any outside circumstance. This was a post award start-up meeting. Later allegations by NCLN20 that this teleconference was a pre-award meeting are false. Regulation prohibits having a pre-award meeting with one bidder. Controversy with NCLN20 over the award date of the BPA is referenced in a subsequent update on the 38 start-up topics and identifies the August 29, 2001 teleconference as the start-up meeting for the award. FPS personnel explained in detail what preparations were needed to start contract performance and these preparations for contract performance were also clearly stated in the solicitation document. One of the decisions made at the kick-off teleconference was that Mr. John Thibault, NCLN20's Director of Operations was to travel to Detroit, MI to take charge of preparations. Mr. Thibault arrived in Detroit, MI on September 10, 2001 - twelve days after the start-up meeting.

On the afternoon of September 5, 2001 I received a telephone call from Mr. Jones that his attorney may have issued a document to GSA regarding the pre-award MIB. Mr. Jones stated that he did not want his attorney to take any action regarding NCLN20's submitted bid.

After business hours on September 6, 2001, Mr. Jones sent a facsimile memo informing me that he had changed his mind regarding his position on the MIB. He stated that prior to executing the BPA, NCLN20 would like to proceed with the MIB process. I conferred with GSA Regional Acquisition Management and Regional Counsel and determined that Mr. Jones could not change his position because of his prior affirmations to the contrary. Also in this September 6, 2001 facsimile letter, Mr. Jones refers to a telephone conversation I had with a representative of the Wells-Fargo Bank, Mr. Steve Bissel – who was considering a loan to NCLN20. Mr. Bissel inquired about things that did not seem appropriate for a Contracting Officer to discuss about another company and I referred him back to NCLN20. Mr. Bissel reportedly told NCLN20 that I made a statement that the award to NCLN20 was tentative. I did not make any such statement to Mr. Bissel. My intent was to direct Mr. Bissel back to NCLN20 regarding any loan and financial information, not to me. I learned about Mr. Bissel's comment from a later telephone call from Mr. Jones. At that time I informed Mr. Jones that Mr. Bissel's accusation was unfounded.

On September 7, 2001 I sent a letter to NCLN20 citing FAR 14.407-3(g)(2) that their bid had been verified and will be considered as originally submitted. Later, on September 7, 2001, a second letter confirmed the award. Accompanying this letter was a countersigned Standard Form 33, also dated September 7, 2001. This letter was delayed until September 7, 2001 because of the amount of work I was handling at that time. Contract preparations appeared to be in evidence when NCLN20 hired Randy McKay on or about August 25 or 26, 2001; in milestone reports provided by NCLN20 in the start up call on teleconference on August 29, 2001; and also in a letter dated September 6, 2001 to me where Mr. Jones wrote: "As far as your request regarding the October 1, 2001 start date, that is what our bid is based on per the solicitation specifications. We are capable to perform the guard services on the required start date."

After business hours on September 8, 2001, I received a 31-page facsimile document from Mr. Jones describing an alleged MIB. It reiterated his earlier information that the mistake should be treated as a clerical error. On September 10, 2001, Mr. Thibault arrived in Detroit, MI for meetings with FPS district personnel and various others concerned with start up activities. It was unclear why NCLN20 waited 12 days after the August 29, 2001 initial start-up meeting to have Mr. Thibault work with Mr. McKay on preparations and transition of business. During this five day visit I did not have any indication that Mr. Thibault had difficulty in getting information. Months after the NCLN20 T4D, we sought information from the FPS District Director, Mr. Steven Johnson, who commented that Mr. Thibault had very few questions and had little to say. On September 11, 2001 the terrorist acts in New York City and Washington DC occurred resulting in FPS operating around the clock in a high threat environment for several weeks. Despite the increased workload, FPS personnel made themselves continuously available to Mr. Thibault who remained in Detroit, MI until he could secure a means of transportation back to CA. On September 17, 2001. I received a report from Mr. Karin Abercrombia, identified as NCLN20's senior lead supervisor in the NCLN20 bid, who re-scheduled most start-up activities to be completed in the final week of September, 2001. This led me to suspect that little progress was being made thus far.

On September 14, 2001 Mr. Jones made a comment in a telephone conversation "that he had to consult with others regarding the MIB." This comment struck me as unusual since it originated from the individual who was the sole owner of the corporation, if NCLN20 was free of outside interests. On this day I also learned that incumbent contractor USI had declined an offer to sell its' weapons used on the Michigan guard contract to NCLN20. I immediately notified Mr. Jones of this fact which was a reversal on the part of USI who previously declared interest in doing so. It became clear after the T4D that USI may have heard that NCLN20 was having difficulty in preparing for start up. USI was the second lowest bidder and if NCLN20 could not start, there was a chance that USI could replace them as the awardee. On September 15, 2001 I telephoned Mr. Jones to give him advance notice that about 20 additional posts were added by the Social Security Administration (SSA) at its offices throughout Michigan that needed to take effect in October, 2001, NCLN20's first month of performance.

On September 17, 2001 at 6:10 pm CST I received a 78-page document via facsimile that NCLN20 filed a protest with the General Accounting Office (GAO). It appealed the September 7, 2001 letter stating that the verified bid would stand, as awarded. On September 18, 2001 discussions were held with other regional personnel regarding information about apparent lack of BPA start-up preparations. On September 19, 2001 Mr. Abercrombia telephoned another staff Contracting Officer, Mr. Roger Pinnau regarding the new SSA posts and sought extra payment. Mr. Pinnau refused the request because this was an Indefinite Delivery Requirements BPA with fixed hourly prices. Mr. Pinnau followed this up with a letter asking NCLN20 to identify potential problems with their start-up, but NCLN20 did not reply directly to his question. On September 20, 2001, NCLN20 sent FPS a list of emergency contacts for its Michigan staff. It identified Mr. Randy McKay as Contract Manager and Ms. Kai Moore and Mr. Bill Westgate as Alternate Contract Managers. In another telephone conversation to me, Mr. Bissel of Wells Fargo Bank inquired if payments to NCLN20 could be made twice a month rather than the SOW required standard practice of once a month. I stated no exceptions could be made to GSA's policy. Mr. Pinnau sent an e-mail message on September 20, 2001 asking about financial stability of NCLN20 due to repeated inquiries from Wells Fargo Bank, which obviously concerned us. Mr. Pinnau sent a second e-mail later that day inquiring about progress and the current state of preparations as he received an evasive reply from Mr. Abercrombia in response to his e-mail message of September 19, 2001. A direct response to his questions in the September 20, 2001 memo was requested and a third memo from Mr. Pinnau was sent cautioning NCLN20 to read and abide by the terms and conditions of the contract.

On September 21, 2001 FPS Inspector Ronald Sheffield was killed in the line of duty at the Patrick V. McNamara Federal Building lobby in Detroit, MI. The assailant was wounded by return gunfire from an on-duty USI contract guard, preventing further casualties and facilitating his apprehension.

On September 24, 2001 I received a telephone call from Mr. McKay, incumbent Contract Manager of USI and intended Contract Manager of NCLN20. Mr. McKay expressed

concern that required handgun registrations by NCLN20 were untimely. He explained that the needed finances, approximately $550, to obtain the permits had not yet been sent by Mr. Jones and that time was running out to have the permits processed by the State of Michigan authorities. This call from Mr. McKay triggered further concerns from FPS management about the readiness of NCLN20 to begin performance as required on October 1, 2001. I contacted District Director Johnson in Detroit, MI to ascertain his opinion on start-up preparations. District Director Johnson expressed concerned that things were not going well and said Mr. Thibault, nor any other NCLN20 personnel had much contact with him nor had NCLN20 mentioned any problems to him. Milestone due dates for start-up activities were slipping further and further behind NCLN20's own self imposed and acknowledged due dates. In other words, due dates were being re-scheduled and pushed back to the final week of September, 2001. I telephoned Mr. Jones and asked him to clarify the situation regarding required State of Michigan and SOW required handgun permits. Mr. Jones subsequently faxed a letter to me requesting that the requirement for armed guards throughout the State of Michigan be waived until such time that the weapons permits could be obtained. A response letter was sent to NCLN20 on September 25, 2001 that the request for waiver was denied. It should be noted that the FPS was on a heightened state of alert based on the recent terrorist activities of September 11 and also immediately following an FPS line of duty death as mentioned previously, on September 21, 2001. A waiver request for degraded levels of security was not credible, and not in line with the mission of FPS in securing and protecting federally owned and controlled property, federal workers and the general public who frequent these facilities on a day to day basis. It should be stressed that NCLN20 asked for a waiver for the entire State of Michigan which includes industrial cities, border stations and the highest Muslim population in the United States. As a result of local and national incidents that were occurring on a daily basis, FPS got requests from other client agencies throughout the 6 states to add more armed guards to facilities and perimeters. This request from NCLN20 clearly illustrated their lack of understanding of the work requirements in providing armed guards, which is the work requirement that they competitively bid on.

On September 26, 2001 I issued a Cure Notice requesting NCLN20 demonstrate their ability to start up the contract in a timely manner and in accordance with the solicitation requirements on October 1, 2001 when their work period began. This demonstration was due to me by close of business September 27, 2001. No response was received from NCLN20 on the cure notice request. However, on September 27, 2001 a letter was sent by facsimile from NCLN20 to Mrs. Nadine Rouse, Chief of the Support Services Branch requesting a meeting. A copy of this letter was provided to me on Friday, September 28, 2001. In that letter NCLN20 proposed that all posts in Michigan would be unarmed until such time that permits and weapons were obtained over a period of time, which was an unacceptable and unreasonable request. NCLN20 clearly could not demonstrate competency in their contract start-up preparations. NCLN20 seem to take little interest in fulfilling their commitments in a timely manner. They did not respond to my questions or those of other key FPS personnel who were involved with this BPA whether NCLN20 was prepared to commence operations. At that time (only two work days prior to the start of performance) small inventory levels of equipment and uniforms had arrived in

Detroit, MI according to Mr. McKay. Allowing NCLN20 more time would dilute the protection of the Michigan facilities and cost the Government more money to retain the incumbent for a period of time. The pressure upon FPS was significant in the increase and maintenance of facility security here in Region 5 and across the nation.

On September 28, 2001 I terminated for default the NCLN20 BPA and contacted the next lowest bidder, USI, on this solicitation to verify its bid. USI did so immediately and I was able to issue a notice of award and a notice to proceed. I notified the Small Business Administration about the NCLN20 default.

An anticipatory breach of contract existed on the day the cure notice was issued and it should be noted that lack of weapons permits was not the only reason for the T4D. NCLN20 did not possess a Michigan business license, a Michigan security guard firm license, adequate number of weapons, equipment, uniforms and adequate preparation of vehicles. It was also unknown whether NCLN20 possessed a Michigan license as a security guard firm. NCLN20 claimed that it did through its affiliation with Mr. Mark Zerefos, President of B&C Service Company. Mr. Zerefos was listed as an NCLN20 Director, but after the T4D was issued Mr. Zerefos denied such affiliation. NCLN20 also claimed that B&C was a sub-contractor to NCLN20 but that is not borne out in a sworn statement by Mr. Zerefos. FPS checked and confirmed with the State of Michigan that NCLN20 did not have a license. Michigan regulations also do not permit "third party" licenses as NCLN20 should have known – this is common business knowledge.

NCLN20 is responsible for re-procurement costs for the difference between five-year bid price of $32,902,000 and the next higher bidder, USI, with a bid price of $34,619,800, or a difference of $1,657,800.

On October 2, 2001 NCLN20 requested that the GSA Office of Inspector General review the T4D. Mr. Jones alleged that treatment he received from me violated provisions of the SOW and FAR, in that NCLN20 was treated differently than other security guard contractors, there was a lack of progress meetings, and the MIB was mishandled. Mr. Jones also alleged the incumbent contractor was not extended so that NLN20 could start late. All such allegations are denied. FPS offered all its security guard contractors no forbearance for temporarily staffing some newly-created Post-WTC armed guard posts with unarmed guards. FPS never offered more than that, but what it did offer, it offered consistently to all its contractors, including NCLN20. FPS could not and did not offer forbearance to all new and all existing armed guard posts to any contractor. NCLN20 made no progress in obtaining weapons permits from the State of Michigan and proposed to have all of its guards be unarmed. Extending the contract of the incumbent contractor was not a reasonable proposal because hourly rates for this extension would need to be negotiated at a huge added expense to the Government. Such an extension would not have been for a few days, but for months for NCLN20 to obtain licenses and permits to legally operate in Michigan with armed guards. NCLN20 managers refused to respond for several days to repeated requests for information by myself and other FPS personnel. They did respond partially, saying that they intended to start on time, but refused to say if they were ready, willing or able to start. NCLN20 managers stated that they would not

respond further, fearing that GSA might use such statements against them. Another point missed by the IG review was the increase in contracting staff workload in responding to and providing additional armed guards and security systems and equipment at various locations throughout the entire Region – 6 Midwest States with major core cities in the aftermath of the terrorist activities of September 11, 2001.

The speed at which decisions and actions were executed was accomplished in a matter of hours, not days as mandated and required by regulation. The same is true regarding a normal 10 day requirement for a cure notice. We did not have 10 days – in fact we tried to work with NCLN20 and assist them with provision of information relative to State of Michigan contacts, vendors, etc. in order to facilitate a successful start-up. This was not possible; even with our assistance as NCLN20 did not exhibit or display appropriate business sense and organization in the preparation. With this type of behavior being exhibited at the corporate level, how could any responsible federal employee expect that these behaviors would not extend to the field execution level where guard performance in the protection of federal facilities, federal workers and the general public would not be compromised. The fact that only one work day existed between the decision to terminate and for performance to begin for the next new contract period means that the 10 day cure period had to be reduced to fit the available time frame.

On October 28, 2001 the Government Accounting Office (GAO) dismissed an NCLN20 protest regarding the MIB as moot. The GAO ruled that NCLN20 was no longer eligible for contract award because it had been terminated for default.

On May 23, 2002 the GSA Inspector General issued a report that agreed with several of the NCLN20 allegations. FPS and GSA's Regional Counsel objected to the IG report and considered its findings flawed.

On September 10, 2002 NCLN20 filed a lawsuit in the Federal Court of Claims. A copy of the complaint was received by FPS on November 6, 2002. The lawsuit used the flawed GSA IG report as a basis of its lawsuit and sought to show that the Contracting Officer acted in bad faith. In March, 2003, the FPS was transferred from GSA to the Department of Homeland Security. However GSA continues its legal support of the lawsuit.

The lawsuit was filed prior to exhausting all available administrative procedures and led the Government to point out to NCLN20 that it had failed to submit a claim to establish damages. This was done in a request dated August 31, 2005 resulting in a request for Equitable Adjustment based upon breach of contract damages due to the Contracting Officer's actions. Damages were divided into (1) anticipated profits, (2) cost of money damages, actual damages and legal fees. After I rejected the claimed damages, an independent audit was ordered from Defense Contract Audit Agency (DCAA) which was conducted in March, 2007. The DCAA review concentrated upon credits for returned items that had been disclosed, leased vehicles that had been returned for credit, and any other costs not disclosed in their submittal data. The audit revealed that the NCLN20

claimed $49,617 vehicle cost was really $3,000. The actual cost, after deductions for returned items, was found to be $46,856.

The DCAA established a reasonable sum to make NCLN20 whole. There were several reasons why NCLN20 should have been terminated for default, but in order to bring the lawsuit to a close, the Government is justified in changing its T4C to a T4C and to compensate NCLN20 for reasonable costs as determined by the DCAA review. Further, any payments associated with an expired NCLN20 contract for alarm dispatch services at the Battle Creek Mega Center, which expired on September 30, 2001 continues to be on hold regarding close out transactions because this T4D will be released.

DETERMINATION

Based upon the above findings, I hereby determine that Termination for Default be changed to a Termination for Convenience. Accordingly, NCLN20 should be awarded the $46,856.00 in costs the DCAA audit concluded NCLN20 had incurred up to the T4D. I will issue a contracting officer's decision to that effect.

Arthur S. Dobbs — 13 APR 07
Arthur S. Dobbs
Contracting Officer

Lawrence L. Ginder — 13 APR 07
Lawrence L. Ginder
Lead Contract Specialist, Region 5

John E. Quackenbush — 13 APR 07
John E. Quackenbush
Chief, Central Contracting Group

Joel David Malkin — 4/13/07
&L Joel David Malkin
Assistant Regional Counsel -GSA

EAST BAY BRANCH OFFICE
**DEFENSE CONTRACT AUDIT AGENCY**
39510 PASEO PADRE PARKWAY, SUITE 210
FREMONT, CALIFORNIA 94538-4741
E-mail: dcaa-fao4141@dcaa.mil

IN REPLY REFER TO
04141/820.7/04141-2007Z49300001

March 29, 2007

U.S. Department of Homeland Security
Immigration and Customs Enforcement – Federal Protective Service
230 South Dearborn Street, Room 3540
Chicago, IL 60604

ATTENTION: Mr. Roger Pinnau, Contracting Officer
Roger.pinnau@dhs.gov

SUBJECT: Litigation Support for Request for Equitable Adjustment (REA) on
Contract No. GS05P01GCD0009
NCLN20, Inc. (NCLN20), Concord, CA

As requested by your office through U.S. Department Homeland Security – Office of Inspector General in an Interagency Agreement Order (IAO), dated March 7, 2007, we performed financial services related to NCLN20's submitted data to assist your office in completing a qualification matrix (Inventory and Accountability Report) as provided in your January 2, 2007 e-mail.

Our financial services consisted of the following tasks:

- To complete the Qualification Matrix (See Enclosure 1) per your January 2, 2007 request.
- A review of the contractor submitted data for items purchased related to the subject contract. In order to confirm the submitted data, we:
  - examined on a sample basis source documents such as invoices and cancelled checks;
  - conducted inquiries to establish whether or not all credits for returned items had been disclosed;
  - inquired as to why the leases of vehicles had not been terminated and the vehicles returned to mitigate costs; and
  - inquired as to whether or not NCLN20 had incurred any other costs no disclosed in their submitted data.

Based on the information collected, discussions with NCLN20's representatives and our observations we identified the items purchased related to the subject contract including their model make, purchased date and the approximate delivered date and recorded and completed the Qualification Matrix as requested. We also identified additional items were returned and the corresponding credits amounted to $16,408.

04141/820.7/04141-2007Z49300001 March 29, 2007

Further, we established through the contractor's representative that the leases of vehicles had been terminated and the vehicles returned resulting in a net cost for the vehicles of $3,000 instead of the $49,617 in represented in NCLN20's submission and that no other costs were incurred that were not presented in NCLN20's submission. As a result of the additional disclosures made by NCLN20's representatives, the net cost associated with the items presented in NCLN20's submission, net of credits for returned items, is $46,856. (See Enclosure 2)

We discussed our observations with Mr. Clarence Tucker, NCLN20's attorney, on March 29, 2007.

If you have any questions related to this memorandum or need further assistance please contact Ms Doris White, Supervisory Auditor at (510) 713-0586.

Sincerely,

***/s/ Doris M. White***
***/for/*** Ronald Hop
Branch Manager
DCAA East Bay Office

Enclosures:

1. Qualification Matrix (Inventory and Accountability Report)

REA Inventory & Accountability Report

2. Purchased items by Invoice and by Category

Purchased items by invoice and by catego

04141-2007Z49300001

Enclosure 1

**NCLN20 Professional Services, Inc. - Michigan: Request for Equitable Adjustment ("REA") Inventory & Accountability Report**
Instructions: Please complete this report, using additional narrative and pages where needed for completeness, and including support documentation such as receipts. Most, but not all requirements for Contractor - provided property are in RFQ GS05P01GCD009, Section C-11 (also see Section K-17, et al). Your response should be complete in and of itself, and submitted as part of your REA.

| Uniforms, Equipment, Accessories & Supplies | Required Count for 152 incumbent employees | Inventory Quantity, Make, Model & Date Purchased | Quantity & Date Distributed in Michigan | Quantity & Date & Means of Disposal after T4D |
|---|---|---|---|---|
| | | | | |
| Shirts - Long Sleeve (meets state requirements) | 3 x 152 = 456 | Total Quantity Purchased: 386, PO Date: 9/21, 9/22/01 | 66 units delivered on 9/27/01, 311 on 9/28/01 and 9 on 9/29/01 | NA |
| Shirts - Short Sleeve (meets state requirements) | 3 x 152 = 456 | Total Quantity Purchased: 12, P.O. Date : 9/21, 9/22/01 | 12 units delivered on 9/27/01 | NA |
| Trousers - All Season (meets state requirements) | 3 x 152 = 456 | Total Quantity Purchased: 500, P.O. Date: 9/24/01 | 500 units delivered on 9/27/01 | NA |
| Neckties - Clip-on | 2 x 152 = 304 | Total Quantity Purchased: 320, P.O. Date: 9/22, 9/24/01 | 320 units delivered on 9/27/01 | NA |
| Hat - with plastic cover | 1 x 152 = 152 | Total Quantity Purchased: 61, P.O. Date: 9/21, 9/22/01 | 61 units delivered on 9/28/01 | NA |
| Jacket - Winter-weight (meets state requirements) | 1 x 152 = 152 | Total Quantity Purchased: 28, P.O. Date: 9/21, 9/22/01 | 28 units delivered between 9/27 thru 9/29/01 | NA |
| Gloves - Winter Pair | 1 x 152 = 152 | Total Quantity Purchased: None | | |
| Pistol Belt (Duty Belt) | 1 x 152 = 152 | Total Quantity Purchased: 107 P.O. Date: 9/21, 9/22/01 | 107 units delivered between 9/27 & 9/28/01 | NA |
| Holster - Leather (Level 2) | 1 x 152 = 152 | Total Quantity Purchased: 113 P.O. Date: 9/21, 9/22/01 | 113 units shipped on 9/27/01 | NA |
| Keeper/Speed Loader | 1 x 152 = 152 | Belt Keeper: 756 units purchased, Speed Loader: 280 units purchased P.O. Date: 9/21, 9/22 & 9/28/01 | All units shipped between 9/27/01 thru 9/29/01 | NA |
| Ammo/Keeper Pouch/Case | 1 x 152 = 152 | Total Quantity Purchased: 117 P.O. Date: 9/21, 9/22/01 | All units shipped on 9/27/01 | NA |
| Metal Handcuff Pair w/key | 1 x 152 = 152 | Total Quantity Purchased: 73 P.O. Date: 9/21, 9/22/01 | Units shipped either on 9/27 or 9/28/01 | NA |
| Handcuff Case | 1 x 152 = 152 | Total Quantity Purchased: 189 P.O. Date: 9/21, 9/22 & 9/28/01 | All units shipped between 9/27/01 thru 9/29/01 | NA |
| Handcuff Key Strap w/flap | 1 x 152 = 152 | Total Quantity Purchased: None | | |
| Shoulder Patch - Contractor | 8 x 152 = 1,216 | Total Quantity Purchased: 1,400 No Information on when purchased | No information on when delivered | NA |
| Whistle - Metal Police-type | 1 x 152 = 152 | Total Quantity Purchased: None | | |
| Nameplate - shirt/jacket type | 1 x 152 = 152 | Total Quantity Purchased: None | | |
| Gloves - Disposable Pair | 1 x 152 = 152 | Total Quantity Purchased: None | | |
| Mask - Compact CPR Rescue | 1 x 152 = 152 | Total Quantity Purchased: 150 P.O. Date: 9/21/01 | All units shipped on 9/27/01 | NA |
| Badge - Metal Security Type (meets state requirements) | 1 x 152 = 152 | Total Quantity Purchased: 3 P.O. Date: 9/21/01 | All units shipped on 9/27/01 | NA |

04141-2007Z49300001

Enclosure 1

| | | | | |
|---|---|---|---|---|
| Revolver - Double-action, 4" barrel, .357/.38 Caliber, police-type (Model 66, etc.) | 1 x 152 = 152 | Total Quantity Purchased: 110<br>Invoice Date:9/19/01 | Units are delivered on 9/27, 9/28 & 10/01/01, All units are returned In October, 01. | All units are returned in October, 01, resulting a net cancellation charge of $3,333 |
| Baton w/holder - Police-style | 1 x 152 = 152 | Nightstick (Baton): 13 units<br>Nightstick holder, Donut: 144 units<br>P.O. Date: 9/21, 9/22/01 | All units are shipped on 9/27/01 | NA |
| Flashlight w/holder | 1 x 152 = 152 | Total Quantity Purchased: 10<br>P.O. Date: 9/21/01 | All units shipped on 9/27/01 | NA |
| Raincoat (inclement weather) | 1 x 152 = 152 | Total Quantity Purchased: None | | |

| **SEDAN, Patrol-type, with light bar, first-aid kit, fire-extinguisher & patrol vehicle decals/markings** | **REQUIRED COUNT** | **Inventory Quantity, Make & Model & Date Leased or Purchased, w/Receipts** | **Quantity & Date Provided in Michigan, with Location Assignments** | **Quantity & Date & Means of Disposal after T4D, with disposition receipts** |
|---|---|---|---|---|
| 2-wheel Drive | 1 x 2 = 2 | Total Quantity Purchased: None | | |
| 4-wheel Drive | 1 x 1 = 1 | Total Quantity Leased: 3, 4x4 Jeep Cherokee, leased thru Enterprise Rent a Car, Vehicle Buyers Order Date: 9/25/01 | Delivered on Michigan 9/25/01 | NA |

| **Ammunition** | **REQUIRED COUNT** | **Inventory Quantity, Make & Model & Date Purchased, with Receipts** | **Quantity & Date Distributed in Michigan, with distribution receipts** | **Quantity & Date & Means of Disposal after T4D, with disposition receipts** |
|---|---|---|---|---|
| .38 special 110 grain JHP + P | 18 x 152 = 2,736 (plus training ammo & qualification ammo) | Quantity: None | | |

| **Contract Manager's Office Equipment, Supplies & Services (furniture, fax, telephone, -lines, etc.)** | **REQUIRED COUNT** | **Inventory Quantity, Make & Model & Date Purchased, with Receipts** | **Quantity & Date Distributed in Michigan, with distribution receipts** | **Quantity & Date & Means of Disposal after T4D, with disposition receipts** |
|---|---|---|---|---|
| See RFQ Section H-28 | See RFQ Section H-28 | | | |
| Dell Computer and misc. | | Total Quantity leased: 1 | | |
| Camera and Supplies | | Total Quantity Purchased: 1, Transactions charged Date: 9/7/01 | Shipped to Steven Jones, Lafayette Office. No information indicated any delivery to Michigan | NA |

04141-2007Z49300001

Enclosure 1

| Exam Certifications | REQUIRED COUNT | Quantity & Date Purchased or Certified, with Receipts/Certificates | Quantity & Date Earned or Certified in Michigan, with Receipts/Certificates | Quantity & Date & Means of Disposal after T4D, with disposition receipts |
|---|---|---|---|---|
| Drug Screening - SAMHSA | 1 x 152 = 152 | Quantity: None | | |
| Medical - Physical | 1 x @76 = @76 (Est.) | Quantity: None | | |
| Psychological Reliability | 1 x @76 = @76 (Est.) | Quantity: None | | |
| CGIM - Written Exam | 1 x @76 = @76 (Est.) | Quantity: None | | |
| Firearm Live-fire Range Quantification, using same firearm make & model provided by Contractor | 1 x 152 = 152 | Quantity: None | | |

| Licenses & Permits | REQUIRED COUNT | Inventory Quantity, Date Purchased, with Receipts | INVENTORY COUNT | INVENTORY COUNT |
|---|---|---|---|---|
| Michigan Corporate Reg. | 1 x 1 = 1 | Quantity: None | | |
| Michigan Business License | 1 x 1 = 1 | Quantity: None | | |
| Michigan Guard Co. License | 1 x 1 = 1 | Quantity: None | | |
| Michigan Firearm Permits | 1 x 152 = 152 | Total Quantity Obtained: 110 , Invoice from NCLN20's consultant R. Mckay indicated a transaction Date: 9/27/01 | Assumed permits obtained by R. Mckay in Rochester Hills, MI | NA |
| Detroit City Firearm Permits | 1 x @40 = @40 (Est.) | Quantity: None | | |

| Insurance Certificate | REQUIRED COUNT | Inventory Quantity, Date Purchased, with Receipts | INVENTORY COUNT | INVENTORY COUNT |
|---|---|---|---|---|
| Michigan Business Liability | 1 x 1 = 1 | Quantity: None | | |
| Michigan Vehicle | 1 x 3 = 3 | Quantity: None | | |

Notes: The information provided above are based on copy of invoices provided by NCLN20 under the "Start Up Performance Summary and Documentation" Binder submitted along with the Breach of Contract Claim on Oct 26, 2006. Please refer to the detail breakdown by invoices for additional items and costs identified from the invoices.

04141-2007Z49300001 Enclosure 2

**Purchased Items by Invoice**

| Invoice Number | Vendor | Description | Quantity | Amount |
|---|---|---|---|---|
| **P01178960101** | Alpine Trading Co, Inc. | Men - Detroit Pants | 254 | 3,517 |
| PO Date: 09/24/01 | | Tie Clip | 200 | 590 |
| Invoice Date: 09/24/01, UPS 3 day. | | Shipping & Handling | | 477 |
| | | | | 4,584 |
| **P01178990101** | Alpine Trading Co., Inc. | Men - Ann Arbor Pants | 75 | 1,043 |
| PO Date: 09/24/01 | | Shipping & Handling | | 122 |
| Invoice Date: 09/24/01, UPS 3 day. | | | | 1,164 |
| **P01178930101** | Alpine trading Co., Inc. | Men Battle Creek Pants | 171 | 2,327 |
| PO Date: 09/24/01 | | Shipping & Handling | | 281 |
| Invoice/Shipped Date: 09/24/01 | | | | 2,607 |
| **P01178540103** | Alpine trading Co., Inc. | L/S Shirts w Patch | 54 | 1,014 |
| PO Date 9/22/01 | | S/S Shirts w Patch | 12 | 203 |
| Invoice/Shipped Date: 9/27/01 | | Police Jacket | 1 | 45 |
| | | Tie Clip | 2 | 5 |
| | | Belt Keeper | 106 | 212 |
| **Credited Back** | **16408.05** | Sam Browne Belt | 53 | 1,220 |
| | | Nightstick Donut | 60 | 57 |
| | | Handcuff Case | 1 | 12 |
| | | Handcuff Nickel | 48 | 456 |
| | | Speed Loader Case | 17 | 276 |
| | | Nightstick Holder | 4 | 12 |
| | | Hat - Round Top w Badge | 42 | 1,432 |
| | | Holster - Leather | 1 | 60 |
| | | Shipping and Handling | | 2,263 |
| | | Total | | 7,266 |
| **P01178540102** | Alpine Trading Co., Inc. | Tie Clip | 118 | 266 |
| PO Date: 09/22/01 | | Belt Keeper | 134 | 268 |
| Invoice/Shipped Date: 09/27/01 | | Handcuff Case | 59 | 705 |
| | | Speed Loader Case, Double | 43 | 699 |
| | | Holster - Forward Draw | 59 | 3,537 |
| | | Total | | 5,474 |
| **P01178140101** | Alpine Trading Co., Inc. | L/S Shirts w Patch | 72 | 1,121 |
| PO Date: 09/21/01 | | Police Jacket | 13 | 477 |
| Invoice Date: 09/27/01, UPS Next Day | | Handcuff Nickel | 25 | 238 |
| | | Handcuff Case | 25 | 299 |
| | | Nightstick, Plastic | 13 | 129 |
| | | Nightstick, Holder | 25 | 74 |
| | | Nightstick, Donut | 25 | 24 |
| | | Garrison Belt | 16 | 120 |
| | | Hat - Round Top w Badge | 19 | 608 |
| | | Shipping and Handling | | 573 |
| | | | | 3,663 |
| **P01178190101** | Alpine Trading Co., Inc. | L/S Shirts w Patch | 12 | 170 |
| PO Date: 09/21/01 | | Sam Browne Belt | 38 | 893 |
| Invoice/Shipped Date: 09/27/01 | | Nightstick, Donut | 30 | 29 |
| | | Handcuff Case | 80 | 956 |
| | | Speed Loader Case, Double | 57 | 926 |
| | | Police Windbreaker w Badge | 1 | 45 |
| | | Belt Keeper | 480 | 960 |
| | | Guard Breast Badge | 3 | 15 |
| | | Dyna CPR Mask | 150 | 1,838 |
| | | Maglite, 5 Cell 'D" | 10 | 280 |

| | | | | |
|---|---|---|---|---|
| | | Flashlight Holder - Leather | 10 | 80 |
| | | Holster - Leather | 53 | 3,177 |
| | | Shipping and Handling | | 1,954 |
| | | | | 11,320 |
| **P01178190102** | Alpine Trading Co., Inc. | L/S Shirts w Patch | 239 | 3,475 |
| PO Date: 09/21/01 | | Police Jacket | 11 | 409 |
| Invoice/Shipped Date: 09/28/01 | | | | 3,884 |
| **P01181450101** | Alpine Trading Co., Inc. | Belt Keeper | 36 | 72 |
| PO Date: 09/28/01 | | Handcuff Case | 24 | 287 |
| Invoice Date: 09/28/01, UPS Next Day | | Shipping & Handling | | 1,748 |
| | | | | 2,106 |
| **P01178140102** | Alpine Trading Co., Inc. | L/S Shirts w patch | 9 | 181 |
| PO Date 09/21/01 | | Police Windbreaker w Badge | 2 | 89 |
| Invoice Date: 09/28/01, UPS Next Day | | | | 271 |
| Total | | | | **42,341** |

| | | | | |
|---|---|---|---|---|
| **2434** | Double Action | Revolver - S&W, Mod.10, 4" HVY BBL | 69 | 10,701 |
| Invoice Date: 09/19/01 | | Sales tax on Revolver | | 1,284 |
| | | | | 11,985 |
| **2434 Refund Inv.** | | Refund - Revolver | | (10,701) |
| Invoice Date: 09/30/01 | | Refund Sales tax | | (1,284) |
| | | Miscellaneous Charge for Refund | | 539 |
| | | | | (11,446) |
| **Overcharge credit** | | Credit on Refund Charge | | (240) |
| Invoice Date: 09/30/01 | | | | |
| | | Total | | **300** |

| | | | | |
|---|---|---|---|---|
| **62883** | Trader Sports | Revolver - Model 82, 4" Heavy Barrel | 41 | 9,820 |
| Order Date: 09/19/01 | | Sales tax on Revolver | | 786 |
| Delivered to Detroit on 9/27, 9/28 and 10/1/01 | | | | 10,605 |
| **62884** | Trader Sports | Speed Loader | 280 | 1,414 |
| Order Date: 09/19/01 | | Sales tax on Speed Loader | | 113 |
| Delivered to Detroit on 9/27, 9/28 and 10/1/01 | | | | 1,527 |
| **Refund Check Issued** | | Refund | | (12,132) |
| Issue Date: 11/1/01 | | 25% charge on Refund | | 3,033 |
| | | | | (9,099) |
| | | Total | | **3,033** |
| **CU 0283** | Enterprise Car Sales/Leasing | Well's Fargo Finance - Vehicle Price | 1 | 16,539 |
| **CU 1168** | Enterprise Car Sales/Leasing | Well's Fargo Finance - Vehicle Price | 1 | 16,539 |
| **CU 1167** | Enterprise Car Sales/Leasing | Well's Fargo Finance - Vehicle Price | 1 | 16,539 |
| Order Date: 9/25/01 | | | | **49,617** |
| **1762432E2310000285** | UPS | Delivery on Return of Double Action items | | 81 |
| **1762432E2310000294** | | Delivery on Return of Double Action items | | 81 |
| **1762432E2310000301** | | Delivery on Return of Double Action items | | 81 |
| **1762432E2310000310** | | Delivery on Return of Double Action items | | 81 |
| **1762432E2310000329** | | Delivery on Return of Double Action items | | 41 |
| **1762432E2310000338** | | Delivery on Return of Double Action items | | 25 |
| **1762432E0310023806** | | Delivery on Return of Double Action items | | 20 |
| **17450X900102366699** | | Delivery on Return of Emblems | | 31 |
| | | Total | | **442** |
| Loan No. 500 | Dell Financial Services | Outstanding Loan | | 3,457 |
| | | Business Loan - Late Charges | | 25 |
| | | Total | | **3,482** |
| 24321 | Natow Toma Uniforms | Patches shipped to Image First | 600 | 1,200 |
| | | Shipping | | 93 |
| | | | | 1,293 |
| 29194 | Natow Toma Uniforms | Patches shipped to Image First | 400 | 800 |
| | | Shipping | | 48 |
| | | | | 848 |
| N/A | Natow Toma Uniforms | Patches shipped to Image First | 400 | 800 |
| | | Shipping | | 35 |
| | | | | 835 |
| | | Total | | **2,977** |
| 165824 | Camera Mart, Inc. | Carmera and Supplies | 1 | 898 |
| | | tax | | 54 |
| | | | | **952** |
| N/A | Randy Mckay | Weapon Permit cost | 110 | 550 |
| | | Guns Registry | 110 | 1,100 |
| | | Pay for Mckay services | | 2,755 |
| | | Total | | 4,405 |
| | Kay Moore | Services?? | | 2,333 |
| | | Total | | **6,739** |
| Less | Alpine Trading Co., Inc. | Credit for Reurned Items | | **(16,408)** |
| Less | Enterprise Car Sales/Leasing | Credit for Reurned Items | | **(46,617)** |
| | | **Total** | | **46,856** |

**Purchased Items by Category**

| **Matrix Category** | **Quantity** | **Costs** |
|---|---|---|
| Shirts - Long Sleeve | 386 | 5,961 |
| Shirts Short Sleeve | 12 | 203 |
| Trousers - All Season | 500 | 7,766 |
| Neckties - Clip On | 320 | 860 |
| Hat - w/ plastic cover | 61 | 2,040 |
| Jacket - Winter -Weight | 28 | 1,065 |
| Gloves - Winter Pair | - | - |
| Pistol Belt (Duty Belt) | 107 | 2,233 |
| Holster - Leather | 113 | 6,774 |
| Belt Keeper | 756 | 1,512 |
| Speed Loader | 280 | 1,527 |
| Ammo/Keeper Pouch/Case | 117 | 1,901 |
| Metal Handcuff Pair w/key | 73 | 694 |
| Handcuff Case | 189 | 2,259 |
| Hnadcuff Key Strap w/flap | - | - |
| Shoulder Patch - Contractor | 1400 | 2,977 |
| Whistle - Metal Police-type | - | - |
| Nameplate - shirt/jacket type | - | - |
| Gloves - Disposable Pair | - | - |
| Mask - Compace CPR Rescue | 150 | 1,838 |
| Badge - Metal Security Type | 3 | 15 |
| Revolver - Double Action 4" BBL | 110 | 1,806 |
| Baton, Police style | 13 | 129 |
| Nightstick holder, Donut | 144 | 195 |
| Flashlight w/holder | 10 | 359 |
| Raincoat | | |
| Alpine trading Co Items Returned | | (16,408) |
| 2-wheel Drive | - | - |
| 4-wheel Drive | 3 | 3,000 |
| | | |
| .38 special 110 JHP+P | | |
| | | |
| Office Supplies | | |
| Dell Computer and misc. | 1 | 3,482 |
| Camera and Supplies | 1 | 952 |
| | | |
| Drug Screeing - SAMHSA | | |
| Medical - Physical | | |
| Pschological Reliability | | |
| CGIM - Written Exam | | |
| | | |
| Firearm Live-fire Range Qualification, using same firearm make & model provided by Contractor | | |
| | | |
| Michigan Corporate Reg. | | |
| Michigan Business License | | |
| Michigan Guard Co. License | | |
| Michigan Firearm Permits | 110 | 1,650 |
| Detroit City Firearm Permits | | |
| | | |
| Michigan Business Liability | | |
| Michigan Vehicle | 3 | - |
| | | |
| Services for R. Mckay & K.Moore | | 5,089 |
| | | |
| Delivery for return items | | 442 |
| | | |
| Various Shipping not individually identifiable | | 6,538 |
| | | |
| Total | | **46,856** |