## CONTRACTING OFFICER'S DETERMINATION AND FINDING

### Authority to Terminate Blanket Purchase Agreement (BPA) for Convenience

I hereby find that:

The General Services Administration (GSA) issued an Invitation for Bid (IFB) GS05P01GCD0009 on August 20, 2001 for armed and unarmed uniformed security guard services in the State of Michigan for a base period of October 1, 2001 through September 30, 2002, with four one-year option periods.

Bids were received from eight bidders and were opened on Tuesday, August 21, 2001. The lowest bidder was NCLN20 with a five-year total bid price at $32,962,000.00. NCLN20 was sent a facsimile at 2:47 pm CST Wednesday, August 22, 2001 requesting they verify their bid price. Mr. Steven Jones, NCLN20's Chief Executive Officer, telephoned me at approximately 11:00 am CST on Thursday, August 23, 2001 to report that NCLN20's bid price could not be verified. Mr. Jones stated the bid was in error, or a Mistake in Bid (MIB). Mr. Jones further stated NCLN20's bid preparer, an outside firm, incorrectly computed the annual labor cost of Post #50 GAV by transferring the hourly rate for that post at a rate of $15.55 to the column reflecting the post's annual labor cost, rather than multiplying the $15.55 hourly rate by the post's annual labor hours of 8,760. The incorrect average labor cost of $14.88 rather than $15.40, resulted in a mistake of $184,600 on an annual basis and $932,000 computed over the anticipated five year life of this BPA. It should be noted that the alleged MIB did not displace NCLN20 from having the lowest bid. The revised price was still under that of the second lowest bidder, the incumbent contractor, Unlimited Security, Inc. (USI). I informed Mr. Jones that submission of a bid that was not checked for accuracy was not a clerical error but a mistake in business judgment,. I sought and received concurrence with this opinion from the Office of Regional Counsel.

On the morning of Friday, August 24, 2001 I received a call from Mr. Jones stating he will revoke any statements regarding a MIB. He further stated NCLN20 could perform the BPA at the bid price originally submitted and requested award be made at the bid price and to proceed promptly with a work start-up meeting. I asked that he put his statements in writing, which he did, in a facsimile letter dated August 24, 2001. I sent Mr. Jones a facsimile response letter in mid afternoon on August 24, 2001 stating Accord and Satisfaction regarding any MIB, which was countersigned by Mr. Jones and returned within an hour.

With the MIB issue cleared up, I had a telephone conversation with Mr. Jones stating award of the BPA would proceed with a formal Notice of Award. A preliminary Notice of Award letter was then issued to NCLN20 late in the day of August 24, 2001. This form of notification is not contained in the Federal Acquisition Regulation (FAR) or other GSA agency regulation. I wrote it as a matter of expediency to get the award

accomplished. The letter simply states that the Michigan IFB was awarded to NCLN20. It was essentially an abbreviated format of the usual Notice of Award. It did not contain pricing information or Department of Labor regulatory information, rather it clearly stated that award was made to NCLN20 and that work could proceed. It should be noted that NCLN20 was a small business and my intent was to provide them as much time as possible to start up required actions. The preliminary Notice of Award was unconditional and gave NCLN20 the right to take any action required to prepare for timely performance.

Later that day Mr. Jones called me to seek my opinion regarding a contract or project manager. I recommended that he hire Mr. Randy McKay as his Contract Manager in Detroit who had distinguished himself as an effective Contract Manager for the incumbent contractor and could also provide NCLN20 with valuable advice on how to prepare for their upcoming performance. Apparently Mr. Jones hired Mr. McKay immediately—probably over the weekend of August 25 and August 26, 2001. On Monday, August 27, 2001, Mr. Jones and I telephonically conversed several times throughout the day regarding a time and place for a BPA start-up meeting. There was a problem with Mr. Jones and his staff obtaining plane reservations for flights from San Francisco to Detroit. A meeting was scheduled in Detroit, MI on August 30, 2001 but airline problems caused Mr. Jones to miss the meeting with FPS District/field personnel. It was agreed that the BPA start-up meeting would be accomplished via teleconference on August 29, 2001. The meeting agenda contained 38 essential items of discussion, also outlined in the BPA Statement of Work.

As this meeting progressed, NCLN20 personnel provided repeated assurances that the 30 day lead time would not be an impediment to a successful contract start up on October 1, 2001. I prepared a Memorandum for the Record documenting this teleconference meeting. At no point in this teleconference was any condition stipulated that the BPA award was tentative or dependent upon any outside circumstance. This was a post award start-up meeting. Later allegations by NCLN20 that this teleconference was a pre-award meeting are false. Regulation prohibits having a pre-award meeting with one bidder. Controversy with NCLN20 over the award date of the BPA is referenced in a subsequent update on the 38 start-up topics and identifies the August 29, 2001 teleconference as the start-up meeting for the award. FPS personnel explained in detail what preparations were needed to start contract performance and these preparations for contract performance were also clearly stated in the solicitation document. One of the decisions made at the kick-off teleconference was that Mr. John Thibault, NCLN20's Director of Operations was to travel to Detroit, MI to take charge of preparations. Mr. Thibault arrived in Detroit, MI on September 10, 2001 - twelve days after the start-up meeting.

On the afternoon of September 5, 2001 I received a telephone call from Mr. Jones that his attorney may have issued a document to GSA regarding the pre-award MIB. Mr. Jones stated that he did not want his attorney to take any action regarding NCLN20's submitted bid.

After business hours on September 6, 2001, Mr. Jones sent a facsimile memo informing me that he had changed his mind regarding his position on the MIB. He stated that prior to executing the BPA, NCLN20 would like to proceed with the MIB process. I conferred with GSA Regional Acquisition Management and Regional Counsel and determined that Mr. Jones could not change his position because of his prior affirmations to the contrary. Also in this September 6, 2001 facsimile letter, Mr. Jones refers to a telephone conversation I had with a representative of the Wells-Fargo Bank, Mr. Steve Bissel – who was considering a loan to NCLN20. Mr. Bissel inquired about things that did not seem appropriate for a Contracting Officer to discuss about another company and I referred him back to NCLN20. Mr. Bissel reportedly told NCLN20 that I made a statement that the award to NCLN20 was tentative. I did not make any such statement to Mr. Bissel. My intent was to direct Mr. Bissel back to NCLN20 regarding any loan and financial information, not to me. I learned about Mr. Bissel's comment from a later telephone call from Mr. Jones. At that time I informed Mr. Jones that Mr. Bissel's accusation was unfounded.

On September 7, 2001 I sent a letter to NCLN20 citing FAR 14.407-3(g)(2) that their bid had been verified and will be considered as originally submitted. Later, on September 7, 2001, a second letter confirmed the award. Accompanying this letter was a countersigned Standard Form 33, also dated September 7, 2001. This letter was delayed until September 7, 2001 because of the amount of work I was handling at that time. Contract preparations appeared to be in evidence when NCLN20 hired Randy McKay on or about August 25 or 26, 2001; in milestone reports provided by NCLN20 in the start up call on teleconference on August 29, 2001; and also in a letter dated September 6, 2001 to me where Mr. Jones wrote: "As far as your request regarding the October 1, 2001 start date, that is what our bid is based on per the solicitation specifications. We are capable to perform the guard services on the required start date."

After business hours on September 8, 2001, I received a 31-page facsimile document from Mr. Jones describing an alleged MIB. It reiterated his earlier information that the mistake should be treated as a clerical error. On September 10, 2001, Mr. Thibault arrived in Detroit, MI for meetings with FPS district personnel and various others concerned with start up activities. It was unclear why NCLN20 waited 12 days after the August 29, 2001 initial start-up meeting to have Mr. Thibault work with Mr. McKay on preparations and transition of business. During this five day visit I did not have any indication that Mr. Thibault had difficulty in getting information. Months after the NCLN20 T4D, we sought information from the FPS District Director, Mr. Steven Johnson, who commented that Mr. Thibault had very few questions and had little to say. On September 11, 2001 the terrorist acts in New York City and Washington DC occurred resulting in FPS operating around the clock in a high threat environment for several weeks. Despite the increased workload, FPS personnel made themselves continuously available to Mr. Thibault who remained in Detroit, MI until he could secure a means of transportation back to CA. On September 17, 2001. I received a report from Mr. Karin Abercrombia, identified as NCLN20's senior lead supervisor in the NCLN20 bid, who re-scheduled most start-up activities to be completed in the final week of September, 2001. This led me to suspect that little progress was being made thus far.

On September 14, 2001 Mr. Jones made a comment in a telephone conversation "that he had to consult with others regarding the MIB." This comment struck me as unusual since it originated from the individual who was the sole owner of the corporation, if NCLN20 was free of outside interests. On this day I also learned that incumbent contractor USI had declined an offer to sell its' weapons used on the Michigan guard contract to NCLN20. I immediately notified Mr. Jones of this fact which was a reversal on the part of USI who previously declared interest in doing so. It became clear after the T4D that USI may have heard that NCLN20 was having difficulty in preparing for start up. USI was the second lowest bidder and if NCLN20 could not start, there was a chance that USI could replace them as the awardee. On September 15, 2001 I telephoned Mr. Jones to give him advance notice that about 20 additional posts were added by the Social Security Administration (SSA) at its offices throughout Michigan that needed to take effect in October, 2001, NCLN20's first month of performance.

On September 17, 2001 at 6:10 pm CST I received a 78-page document via facsimile that NCLN20 filed a protest with the General Accounting Office (GAO). It appealed the September 7, 2001 letter stating that the verified bid would stand, as awarded. On September 18, 2001 discussions were held with other regional personnel regarding information about apparent lack of BPA start-up preparations. On September 19, 2001 Mr. Abercrombia telephoned another staff Contracting Officer, Mr. Roger Pinnau regarding the new SSA posts and sought extra payment. Mr. Pinnau refused the request because this was an Indefinite Delivery Requirements BPA with fixed hourly prices. Mr. Pinnau followed this up with a letter asking NCLN20 to identify potential problems with their start-up, but NCLN20 did not reply directly to his question. On September 20, 2001, NCLN20 sent FPS a list of emergency contacts for its Michigan staff. It identified Mr. Randy McKay as Contract Manager and Ms. Kai Moore and Mr. Bill Westgate as Alternate Contract Managers. In another telephone conversation to me, Mr. Bissel of Wells Fargo Bank inquired if payments to NCLN20 could be made twice a month rather than the SOW required standard practice of once a month. I stated no exceptions could be made to GSA's policy. Mr. Pinnau sent an e-mail message on September 20, 2001 asking about financial stability of NCLN20 due to repeated inquiries from Wells Fargo Bank, which obviously concerned us. Mr. Pinnau sent a second e-mail later that day inquiring about progress and the current state of preparations as he received an evasive reply from Mr. Abercrombia in response to his e-mail message of September 19, 2001. A direct response to his questions in the September 20, 2001 memo was requested and a third memo from Mr. Pinnau was sent cautioning NCLN20 to read and abide by the terms and conditions of the contract.

On September 21, 2001 FPS Inspector Ronald Sheffield was killed in the line of duty at the Patrick V. McNamara Federal Building lobby in Detroit, MI. The assailant was wounded by return gunfire from an on-duty USI contract guard, preventing further casualties and facilitating his apprehension.

On September 24, 2001 I received a telephone call from Mr. McKay, incumbent Contract Manager of USI and intended Contract Manager of NCLN20. Mr. McKay expressed