concern that required handgun registrations by NCLN20 were untimely. He explained that the needed finances, approximately $550, to obtain the permits had not yet been sent by Mr. Jones and that time was running out to have the permits processed by the State of Michigan authorities. This call from Mr. McKay triggered further concerns from FPS management about the readiness of NCLN20 to begin performance as required on October 1, 2001. I contacted District Director Johnson in Detroit, MI to ascertain his opinion on start-up preparations. District Director Johnson expressed concerned that things were not going well and said Mr. Thibault, nor any other NCLN20 personnel had much contact with him nor had NCLN20 mentioned any problems to him. Milestone due dates for start-up activities were slipping further and further behind NCLN20's own self imposed and acknowledged due dates. In other words, due dates were being re-scheduled and pushed back to the final week of September, 2001. I telephoned Mr. Jones and asked him to clarify the situation regarding required State of Michigan and SOW required handgun permits. Mr. Jones subsequently faxed a letter to me requesting that the requirement for armed guards throughout the State of Michigan be waived until such time that the weapons permits could be obtained. A response letter was sent to NCLN20 on September 25, 2001 that the request for waiver was denied. It should be noted that the FPS was on a heightened state of alert based on the recent terrorist activities of September 11 and also immediately following an FPS line of duty death as mentioned previously, on September 21, 2001. A waiver request for degraded levels of security was not credible, and not in line with the mission of FPS in securing and protecting federally owned and controlled property, federal workers and the general public who frequent these facilities on a day to day basis. It should be stressed that NCLN20 asked for a waiver for the entire State of Michigan which includes industrial cities, border stations and the highest Muslim population in the United States. As a result of local and national incidents that were occurring on a daily basis, FPS got requests from other client agencies throughout the 6 states to add more armed guards to facilities and perimeters. This request from NCLN20 clearly illustrated their lack of understanding of the work requirements in providing armed guards, which is the work requirement that they competitively bid on.

On September 26, 2001 I issued a Cure Notice requesting NCLN20 demonstrate their ability to start up the contract in a timely manner and in accordance with the solicitation requirements on October 1, 2001 when their work period began. This demonstration was due to me by close of business September 27, 2001. No response was received from NCLN20 on the cure notice request. However, on September 27, 2001 a letter was sent by facsimile from NCLN20 to Mrs. Nadine Rouse, Chief of the Support Services Branch requesting a meeting. A copy of this letter was provided to me on Friday, September 28, 2001. In that letter NCLN20 proposed that all posts in Michigan would be unarmed until such time that permits and weapons were obtained over a period of time, which was an unacceptable and unreasonable request. NCLN20 clearly could not demonstrate competency in their contract start-up preparations. NCLN20 seem to take little interest in fulfilling their commitments in a timely manner. They did not respond to my questions or those of other key FPS personnel who were involved with this BPA whether NCLN20 was prepared to commence operations. At that time (only two work days prior to the start of performance) small inventory levels of equipment and uniforms had arrived in

Detroit, MI according to Mr. McKay. Allowing NCLN20 more time would dilute the protection of the Michigan facilities and cost the Government more money to retain the incumbent for a period of time. The pressure upon FPS was significant in the increase and maintenance of facility security here in Region 5 and across the nation.

On September 28, 2001 I terminated for default the NCLN20 BPA and contacted the next lowest bidder, USI, on this solicitation to verify its bid. USI did so immediately and I was able to issue a notice of award and a notice to proceed. I notified the Small Business Administration about the NCLN20 default.

An anticipatory breach of contract existed on the day the cure notice was issued and it should be noted that lack of weapons permits was not the only reason for the T4D. NCLN20 did not possess a Michigan business license, a Michigan security guard firm license, adequate number of weapons, equipment, uniforms and adequate preparation of vehicles. It was also unknown whether NCLN20 possessed a Michigan license as a security guard firm. NCLN20 claimed that it did through its affiliation with Mr. Mark Zerefos, President of B&C Service Company. Mr. Zerefos was listed as an NCLN20 Director, but after the T4D was issued Mr. Zerefos denied such affiliation. NCLN20 also claimed that B&C was a sub-contractor to NCLN20 but that is not borne out in a sworn statement by Mr. Zerefos. FPS checked and confirmed with the State of Michigan that NCLN20 did not have a license. Michigan regulations also do not permit "third party" licenses as NCLN20 should have known – this is common business knowledge.

NCLN20 is responsible for re-procurement costs for the difference between five-year bid price of $32,902,000 and the next higher bidder, USI, with a bid price of $34,619,800, or a difference of $1,657,800.

On October 2, 2001 NCLN20 requested that the GSA Office of Inspector General review the T4D. Mr. Jones alleged that treatment he received from me violated provisions of the SOW and FAR, in that NCLN20 was treated differently than other security guard contractors, there was a lack of progress meetings, and the MIB was mishandled. Mr. Jones also alleged the incumbent contractor was not extended so that NLN20 could start late. All such allegations are denied. FPS offered all its security guard contractors no forbearance for temporarily staffing some newly-created Post-WTC armed guard posts with unarmed guards. FPS never offered more than that, but what it did offer, it offered consistently to all its contractors, including NCLN20. FPS could not and did not offer forbearance to all new and all existing armed guard posts to any contractor. NCLN20 made no progress in obtaining weapons permits from the State of Michigan and proposed to have all of its guards be unarmed. Extending the contract of the incumbent contractor was not a reasonable proposal because hourly rates for this extension would need to be negotiated at a huge added expense to the Government. Such an extension would not have been for a few days, but for months for NCLN20 to obtain licenses and permits to legally operate in Michigan with armed guards. NCLN20 managers refused to respond for several days to repeated requests for information by myself and other FPS personnel. They did respond partially, saying that they intended to start on time, but refused to say if they were ready, willing or able to start. NCLN20 managers stated that they would not

respond further, fearing that GSA might use such statements against them. Another point missed by the IG review was the increase in contracting staff workload in responding to and providing additional armed guards and security systems and equipment at various locations throughout the entire Region – 6 Midwest States with major core cities in the aftermath of the terrorist activities of September 11, 2001.

The speed at which decisions and actions were executed was accomplished in a matter of hours, not days as mandated and required by regulation. The same is true regarding a normal 10 day requirement for a cure notice. We did not have 10 days – in fact we tried to work with NCLN20 and assist them with provision of information relative to State of Michigan contacts, vendors, etc. in order to facilitate a successful start-up. This was not possible; even with our assistance as NCLN20 did not exhibit or display appropriate business sense and organization in the preparation. With this type of behavior being exhibited at the corporate level, how could any responsible federal employee expect that these behaviors would not extend to the field execution level where guard performance in the protection of federal facilities, federal workers and the general public would not be compromised. The fact that only one work day existed between the decision to terminate and for performance to begin for the next new contract period means that the 10 day cure period had to be reduced to fit the available time frame.

On October 28, 2001 the Government Accounting Office (GAO) dismissed an NCLN20 protest regarding the MIB as moot. The GAO ruled that NCLN20 was no longer eligible for contract award because it had been terminated for default.

On May 23, 2002 the GSA Inspector General issued a report that agreed with several of the NCLN20 allegations. FPS and GSA's Regional Counsel objected to the IG report and considered its findings flawed.

On September 10, 2002 NCLN20 filed a lawsuit in the Federal Court of Claims. A copy of the complaint was received by FPS on November 6, 2002. The lawsuit used the flawed GSA IG report as a basis of its lawsuit and sought to show that the Contracting Officer acted in bad faith. In March, 2003, the FPS was transferred from GSA to the Department of Homeland Security. However GSA continues its legal support of the lawsuit.

The lawsuit was filed prior to exhausting all available administrative procedures and led the Government to point out to NCLN20 that it had failed to submit a claim to establish damages. This was done in a request dated August 31, 2005 resulting in a request for Equitable Adjustment based upon breach of contract damages due to the Contracting Officer's actions. Damages were divided into (1) anticipated profits, (2) cost of money damages, actual damages and legal fees. After I rejected the claimed damages, an independent audit was ordered from Defense Contract Audit Agency (DCAA) which was conducted in March, 2007. The DCAA review concentrated upon credits for returned items that had been disclosed, leased vehicles that had been returned for credit, and any other costs not disclosed in their submittal data. The audit revealed that the NCLN20

claimed $49,617 vehicle cost was really $3,000. The actual cost, after deductions for returned items, was found to be $46,856.

The DCAA established a reasonable sum to make NCLN20 whole. There were several reasons why NCLN20 should have been terminated for default, but in order to bring the lawsuit to a close, the Government is justified in changing its T4C to a T4C and to compensate NCLN20 for reasonable costs as determined by the DCAA review. Further, any payments associated with an expired NCLN20 contract for alarm dispatch services at the Battle Creek Mega Center, which expired on September 30, 2001 continues to be on hold regarding close out transactions because this T4D will be released.

DETERMINATION

Based upon the above findings, I hereby determine that Termination for Default be changed to a Termination for Convenience. Accordingly, NCLN20 should be awarded the $46,856.00 in costs the DCAA audit concluded NCLN20 had incurred up to the T4D. I will issue a contracting officer's decision to that effect.

Arthur S. Dobbs
Contracting Officer
13 APR 07

Lawrence L. Ginder
Lead Contract Specialist, Region 5
13 APR 07

John E. Quackenbush
Chief, Central Contracting Group
13 APR 07

for Joel David Malkin
Assistant Regional Counsel -GSA
4/13/07