# EXHIBIT

# 58

05-19-'06 17:06 FROM-Tucker & Hughes,PLLC 313-230-7896 T-628 P022/080 F-576

**Karim**

**From:** roger.pinnau@gsa.gov
**Sent:** Wednesday, January 30, 2002 1:37 PM
**To:** karim@ncln20.com
**Cc:** tracy.cohen@gsa.gov; art.dobbs@gsa.gov
**Subject:** Re: NCLN20 Payment

January 30, 2002 (Wed)

Karim,

This is news to me.

I hadn't heard of any underbilling by NCLN20, and I'm not aware that GSA owes NCLN20 anything on that contract, due to the excess reprocurement costs/charges incurred by NCLN20, due to NCLN20's Termination for Default on another GSA-FPS R5 contract (for Michigan guard services) last year. I had thought that NCLN20 owes GSA a substantial amount.

As you can tell, I'm not as familiar with this matter as Art Dobbs, your contracting officer, so I'll pass this on to Art Dobbs and cc: Tracy Cohen, our supervisor, so they are aware of your inquiry.

Art has been out of state (in Texas) last week and this week, so he may need to research this further before replying to you, when he returns to the office next Tuesday.

You can reach Art on his return, as follows:
Email: art.dobbs@gsa.gov -or- Tel: 312/353-5003 -or- Fax: 312/353-0143

I'll close here, saying that if you haven't already done so, you may wish to research and document your allegations, so you can provide details to Art, in writing, on his return. If Art is already aware of this, give him a few days to get back to the office, so he can respond appropriately.

Thanks, //Roger

//Roger

"Karim Abercromoia" <karim@ncln20.com> on 01/30/2002 03:08:35 PM

To: Roger.pinnau@gsa.gov
cc:

Subject: NCLN20 Payment

Roger,

NCLN20 has not been paid for services rendered through the month of September on contract GS05P98GCD. In addition, we provided the Government with a claim for monies owed as a result of six months of under billing.

We have not been paid and have not heard anything on the status of payment. Can you please provide me with an update.

Karim

# EXHIBIT 82

Federal Protective Service
U.S. Department of Homeland Security
230 South Dearborn, Room 3540
Chicago, IL 60604

U.S. Immigration and Customs Enforcement

April 18, 2007

Mr. Clarence B. Tucker, Sr., PLLC
Attorneys and Counselors at Law
615 Griswold Street, Suite 920
Detroit, Michigan 48226

Subject: GSA contract no. GS05P01GCD0009; conversion of prior termination for default to termination for convenience

Dear Mr. Tucker:

This pertains to terminated Contract #GS05P01GCD0009 for the provision of Armed and Unarmed Security Guard Services at GSA owned and supported facilities in the State of Michigan. This also is in response to your Request for Equitable Adjustment (REA) in amount of $4,904,074. The REA is undated but was electronically submitted via facsimile to this office after close of business on August 31, 2005 and a hard copy was delivered via FedEx on September 12, 2005.

The contract was terminated for default on September 28, 2001 based upon anticipatory breach of contract because of the following reasons:

a) Lack of preparation (adequate weapons, uniforms and supplies) to start performance on October 1, 2001;
b) Lack of weapons permits.
c) Lack of State of Michigan license to operate as a security guard business.
d) Refusal to reply to Contractor Officer questions about preparations.
e) Failure to respond to order for additional guards made necessary by the terrorism of September 11, 2001.

Failure to respond to the Cure Notice issued on September 26, 2001.Subsequent to the termination and prior to submission of the REA, NCLN20 sued the Government to convert the termination for default to a termination for convenience. In response to the REA, the Defense Contract Audit Agency (DCAA) was requested to audit NCLN20's claim. The audit concluded that NCLN20 incurred $46,856.00 in expenses leading up to the termination for default. Without admitting any fault on the part of the Government, but acting in what I believe is the sake of fairness, I have decided to convert the termination for default to a termination for convenience. I therefore authorize the payment to NCLN20 of $46,856.00 in accordance with the DCAA audit.

Mr. Clarence Tucker
Page 2

This is the final decision of the Contracting Officer. You may appeal this decision to the Civilian Board of Contract Appeals (CBCA), 1800 F Street, N.W., Washington, D.C. 20405. If you decide to appeal, you must within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the CBCA and provide a copy to the Contracting Officer from whose decision this appeal is taken. The notice shall indicate that an appeal is intended, reference this decision, and identify the contract by number. You may, solely at your election, proceed under the CBCA small claims procedure for claims of $50,000.00 or less or its accelerated procedure for claims of $100,000.00 or less. Instead of appealing to the CBCA, you may bring an action directly in the United States Court of Federal Claims within 12 months of the date you receive this decision.

Sincerely,

ARTHUR S. DOBBS
Contracting Officer

cc:
Mr. Steven Jones, President

# EXHIBIT 83

CONTRACTING OFFICER'S DETERMINATION AND FINDING

**Authority to Terminate Blanket Purchase Agreement (BPA) for Convenience**

I hereby find that:

The General Services Administration (GSA) issued an Invitation for Bid (IFB) GS05P01GCD0009 on August 20, 2001 for armed and unarmed uniformed security guard services in the State of Michigan for a base period of October 1, 2001 through September 30, 2002, with four one-year option periods.

Bids were received from eight bidders and were opened on Tuesday, August 21, 2001. The lowest bidder was NCLN20 with a five-year total bid price at $32,962,000.00. NCLN20 was sent a facsimile at 2:47 pm CST Wednesday, August 22, 2001 requesting they verify their bid price. Mr. Steven Jones, NCLN20's Chief Executive Officer, telephoned me at approximately 11:00 am CST on Thursday, August 23, 2001 to report that NCLN20's bid price could not be verified. Mr. Jones stated the bid was in error, or a Mistake in Bid (MIB). Mr. Jones further stated NCLN20's bid preparer, an outside firm, incorrectly computed the annual labor cost of Post #50 GAV by transferring the hourly rate for that post at a rate of $15.55 to the column reflecting the post's annual labor cost, rather than multiplying the $15.55 hourly rate by the post's annual labor hours of 8,760. The incorrect average labor cost of $14.88 rather than $15.40, resulted in a mistake of $184,600 on an annual basis and $932,000 computed over the anticipated five year life of this BPA. It should be noted that the alleged MIB did not displace NCLN20 from having the lowest bid. The revised price was still under that of the second lowest bidder, the incumbent contractor, Unlimited Security, Inc. (USI). I informed Mr. Jones that submission of a bid that was not checked for accuracy was not a clerical error but a mistake in business judgment,. I sought and received concurrence with this opinion from the Office of Regional Counsel.

On the morning of Friday, August 24, 2001 I received a call from Mr. Jones stating he will revoke any statements regarding a MIB. He further stated NCLN20 could perform the BPA at the bid price originally submitted and requested award be made at the bid price and to proceed promptly with a work start-up meeting. I asked that he put his statements in writing, which he did, in a facsimile letter dated August 24, 2001. I sent Mr. Jones a facsimile response letter in mid afternoon on August 24, 2001 stating Accord and Satisfaction regarding any MIB, which was countersigned by Mr. Jones and returned within an hour.

With the MIB issue cleared up, I had a telephone conversation with Mr. Jones stating award of the BPA would proceed with a formal Notice of Award. A preliminary Notice of Award letter was then issued to NCLN20 late in the day of August 24, 2001. This form of notification is not contained in the Federal Acquisition Regulation (FAR) or other GSA agency regulation. I wrote it as a matter of expediency to get the award

accomplished. The letter simply states that the Michigan IFB was awarded to NCLN20. It was essentially an abbreviated format of the usual Notice of Award. It did not contain pricing information or Department of Labor regulatory information, rather it clearly stated that award was made to NCLN20 and that work could proceed. It should be noted that NCLN20 was a small business and my intent was to provide them as much time as possible to start up required actions. The preliminary Notice of Award was unconditional and gave NCLN20 the right to take any action required to prepare for timely performance.

Later that day Mr. Jones called me to seek my opinion regarding a contract or project manager. I recommended that he hire Mr. Randy McKay as his Contract Manager in Detroit who had distinguished himself as an effective Contract Manager for the incumbent contractor and could also provide NCLN20 with valuable advice on how to prepare for their upcoming performance. Apparently Mr. Jones hired Mr. McKay immediately—probably over the weekend of August 25 and August 26, 2001. On Monday, August 27, 2001, Mr. Jones and I telephonically conversed several times throughout the day regarding a time and place for a BPA start-up meeting. There was a problem with Mr. Jones and his staff obtaining plane reservations for flights from San Francisco to Detroit. A meeting was scheduled in Detroit, MI on August 30, 2001 but airline problems caused Mr. Jones to miss the meeting with FPS District/field personnel. It was agreed that the BPA start-up meeting would be accomplished via teleconference on August 29, 2001. The meeting agenda contained 38 essential items of discussion, also outlined in the BPA Statement of Work.

As this meeting progressed, NCLN20 personnel provided repeated assurances that the 30 day lead time would not be an impediment to a successful contract start up on October 1, 2001. I prepared a Memorandum for the Record documenting this teleconference meeting. At no point in this teleconference was any condition stipulated that the BPA award was tentative or dependent upon any outside circumstance. This was a post award start-up meeting. Later allegations by NCLN20 that this teleconference was a pre-award meeting are false. Regulation prohibits having a pre-award meeting with one bidder. Controversy with NCLN20 over the award date of the BPA is referenced in a subsequent update on the 38 start-up topics and identifies the August 29, 2001 teleconference as the start-up meeting for the award. FPS personnel explained in detail what preparations were needed to start contract performance and these preparations for contract performance were also clearly stated in the solicitation document. One of the decisions made at the kick-off teleconference was that Mr. John Thibault, NCLN20's Director of Operations was to travel to Detroit, MI to take charge of preparations. Mr. Thibault arrived in Detroit, MI on September 10, 2001 - twelve days after the start-up meeting.

On the afternoon of September 5, 2001 I received a telephone call from Mr. Jones that his attorney may have issued a document to GSA regarding the pre-award MIB. Mr. Jones stated that he did not want his attorney to take any action regarding NCLN20's submitted bid.

After business hours on September 6, 2001, Mr. Jones sent a facsimile memo informing me that he had changed his mind regarding his position on the MIB. He stated that prior to executing the BPA, NCLN20 would like to proceed with the MIB process. I conferred with GSA Regional Acquisition Management and Regional Counsel and determined that Mr. Jones could not change his position because of his prior affirmations to the contrary. Also in this September 6, 2001 facsimile letter, Mr. Jones refers to a telephone conversation I had with a representative of the Wells-Fargo Bank, Mr. Steve Bissel – who was considering a loan to NCLN20. Mr. Bissel inquired about things that did not seem appropriate for a Contracting Officer to discuss about another company and I referred him back to NCLN20. Mr. Bissel reportedly told NCLN20 that I made a statement that the award to NCLN20 was tentative. I did not make any such statement to Mr. Bissel. My intent was to direct Mr. Bissel back to NCLN20 regarding any loan and financial information, not to me. I learned about Mr. Bissel's comment from a later telephone call from Mr. Jones. At that time I informed Mr. Jones that Mr. Bissel's accusation was unfounded.

On September 7, 2001 I sent a letter to NCLN20 citing FAR 14.407-3(g)(2) that their bid had been verified and will be considered as originally submitted. Later, on September 7, 2001, a second letter confirmed the award. Accompanying this letter was a countersigned Standard Form 33, also dated September 7, 2001. This letter was delayed until September 7, 2001 because of the amount of work I was handling at that time. Contract preparations appeared to be in evidence when NCLN20 hired Randy McKay on or about August 25 or 26, 2001; in milestone reports provided by NCLN20 in the start up call on teleconference on August 29, 2001; and also in a letter dated September 6, 2001 to me where Mr. Jones wrote: "As far as your request regarding the October 1, 2001 start date, that is what our bid is based on per the solicitation specifications. We are capable to perform the guard services on the required start date."

After business hours on September 8, 2001, I received a 31-page facsimile document from Mr. Jones describing an alleged MIB. It reiterated his earlier information that the mistake should be treated as a clerical error. On September 10, 2001, Mr. Thibault arrived in Detroit, MI for meetings with FPS district personnel and various others concerned with start up activities. It was unclear why NCLN20 waited 12 days after the August 29, 2001 initial start-up meeting to have Mr. Thibault work with Mr. McKay on preparations and transition of business. During this five day visit I did not have any indication that Mr. Thibault had difficulty in getting information. Months after the NCLN20 T4D, we sought information from the FPS District Director, Mr. Steven Johnson, who commented that Mr. Thibault had very few questions and had little to say. On September 11, 2001 the terrorist acts in New York City and Washington DC occurred resulting in FPS operating around the clock in a high threat environment for several weeks. Despite the increased workload, FPS personnel made themselves continuously available to Mr. Thibault who remained in Detroit, MI until he could secure a means of transportation back to CA. On September 17, 2001. I received a report from Mr. Karin Abercrombia, identified as NCLN20's senior lead supervisor in the NCLN20 bid, who re-scheduled most start-up activities to be completed in the final week of September, 2001. This led me to suspect that little progress was being made thus far.

On September 14, 2001 Mr. Jones made a comment in a telephone conversation "that he had to consult with others regarding the MIB." This comment struck me as unusual since it originated from the individual who was the sole owner of the corporation, if NCLN20 was free of outside interests. On this day I also learned that incumbent contractor USI had declined an offer to sell its' weapons used on the Michigan guard contract to NCLN20. I immediately notified Mr. Jones of this fact which was a reversal on the part of USI who previously declared interest in doing so. It became clear after the T4D that USI may have heard that NCLN20 was having difficulty in preparing for start up. USI was the second lowest bidder and if NCLN20 could not start, there was a chance that USI could replace them as the awardee. On September 15, 2001 I telephoned Mr. Jones to give him advance notice that about 20 additional posts were added by the Social Security Administration (SSA) at its offices throughout Michigan that needed to take effect in October, 2001, NCLN20's first month of performance.

On September 17, 2001 at 6:10 pm CST I received a 78-page document via facsimile that NCLN20 filed a protest with the General Accounting Office (GAO). It appealed the September 7, 2001 letter stating that the verified bid would stand, as awarded. On September 18, 2001 discussions were held with other regional personnel regarding information about apparent lack of BPA start-up preparations. On September 19, 2001 Mr. Abercrombia telephoned another staff Contracting Officer, Mr. Roger Pinnau regarding the new SSA posts and sought extra payment. Mr. Pinnau refused the request because this was an Indefinite Delivery Requirements BPA with fixed hourly prices. Mr. Pinnau followed this up with a letter asking NCLN20 to identify potential problems with their start-up, but NCLN20 did not reply directly to his question. On September 20, 2001, NCLN20 sent FPS a list of emergency contacts for its Michigan staff. It identified Mr. Randy McKay as Contract Manager and Ms. Kai Moore and Mr. Bill Westgate as Alternate Contract Managers. In another telephone conversation to me, Mr. Bissel of Wells Fargo Bank inquired if payments to NCLN20 could be made twice a month rather than the SOW required standard practice of once a month. I stated no exceptions could be made to GSA's policy. Mr. Pinnau sent an e-mail message on September 20, 2001 asking about financial stability of NCLN20 due to repeated inquiries from Wells Fargo Bank, which obviously concerned us. Mr. Pinnau sent a second e-mail later that day inquiring about progress and the current state of preparations as he received an evasive reply from Mr. Abercrombia in response to his e-mail message of September 19, 2001. A direct response to his questions in the September 20, 2001 memo was requested and a third memo from Mr. Pinnau was sent cautioning NCLN20 to read and abide by the terms and conditions of the contract.

On September 21, 2001 FPS Inspector Ronald Sheffield was killed in the line of duty at the Patrick V. McNamara Federal Building lobby in Detroit, MI. The assailant was wounded by return gunfire from an on-duty USI contract guard, preventing further casualties and facilitating his apprehension.

On September 24, 2001 I received a telephone call from Mr. McKay, incumbent Contract Manager of USI and intended Contract Manager of NCLN20. Mr. McKay expressed

concern that required handgun registrations by NCLN20 were untimely. He explained that the needed finances, approximately $550, to obtain the permits had not yet been sent by Mr. Jones and that time was running out to have the permits processed by the State of Michigan authorities. This call from Mr. McKay triggered further concerns from FPS management about the readiness of NCLN20 to begin performance as required on October 1, 2001. I contacted District Director Johnson in Detroit, MI to ascertain his opinion on start-up preparations. District Director Johnson expressed concerned that things were not going well and said Mr. Thibault, nor any other NCLN20 personnel had much contact with him nor had NCLN20 mentioned any problems to him. Milestone due dates for start-up activities were slipping further and further behind NCLN20's own self imposed and acknowledged due dates. In other words, due dates were being re-scheduled and pushed back to the final week of September, 2001. I telephoned Mr. Jones and asked him to clarify the situation regarding required State of Michigan and SOW required handgun permits. Mr. Jones subsequently faxed a letter to me requesting that the requirement for armed guards throughout the State of Michigan be waived until such time that the weapons permits could be obtained. A response letter was sent to NCLN20 on September 25, 2001 that the request for waiver was denied. It should be noted that the FPS was on a heightened state of alert based on the recent terrorist activities of September 11 and also immediately following an FPS line of duty death as mentioned previously, on September 21, 2001. A waiver request for degraded levels of security was not credible, and not in line with the mission of FPS in securing and protecting federally owned and controlled property, federal workers and the general public who frequent these facilities on a day to day basis. It should be stressed that NCLN20 asked for a waiver for the entire State of Michigan which includes industrial cities, border stations and the highest Muslim population in the United States. As a result of local and national incidents that were occurring on a daily basis, FPS got requests from other client agencies throughout the 6 states to add more armed guards to facilities and perimeters. This request from NCLN20 clearly illustrated their lack of understanding of the work requirements in providing armed guards, which is the work requirement that they competitively bid on.

On September 26, 2001 I issued a Cure Notice requesting NCLN20 demonstrate their ability to start up the contract in a timely manner and in accordance with the solicitation requirements on October 1, 2001 when their work period began. This demonstration was due to me by close of business September 27, 2001. No response was received from NCLN20 on the cure notice request. However, on September 27, 2001 a letter was sent by facsimile from NCLN20 to Mrs. Nadine Rouse, Chief of the Support Services Branch requesting a meeting. A copy of this letter was provided to me on Friday, September 28, 2001. In that letter NCLN20 proposed that all posts in Michigan would be unarmed until such time that permits and weapons were obtained over a period of time, which was an unacceptable and unreasonable request. NCLN20 clearly could not demonstrate competency in their contract start-up preparations. NCLN20 seem to take little interest in fulfilling their commitments in a timely manner. They did not respond to my questions or those of other key FPS personnel who were involved with this BPA whether NCLN20 was prepared to commence operations. At that time (only two work days prior to the start of performance) small inventory levels of equipment and uniforms had arrived in

Detroit, MI according to Mr. McKay. Allowing NCLN20 more time would dilute the protection of the Michigan facilities and cost the Government more money to retain the incumbent for a period of time. The pressure upon FPS was significant in the increase and maintenance of facility security here in Region 5 and across the nation.

On September 28, 2001 I terminated for default the NCLN20 BPA and contacted the next lowest bidder, USI, on this solicitation to verify its bid. USI did so immediately and I was able to issue a notice of award and a notice to proceed. I notified the Small Business Administration about the NCLN20 default.

An anticipatory breach of contract existed on the day the cure notice was issued and it should be noted that lack of weapons permits was not the only reason for the T4D. NCLN20 did not possess a Michigan business license, a Michigan security guard firm license, adequate number of weapons, equipment, uniforms and adequate preparation of vehicles. It was also unknown whether NCLN20 possessed a Michigan license as a security guard firm. NCLN20 claimed that it did through its affiliation with Mr. Mark Zerefos, President of B&C Service Company. Mr. Zerefos was listed as an NCLN20 Director, but after the T4D was issued Mr. Zerefos denied such affiliation. NCLN20 also claimed that B&C was a sub-contractor to NCLN20 but that is not borne out in a sworn statement by Mr. Zerefos. FPS checked and confirmed with the State of Michigan that NCLN20 did not have a license. Michigan regulations also do not permit "third party" licenses as NCLN20 should have known – this is common business knowledge.

NCLN20 is responsible for re-procurement costs for the difference between five-year bid price of $32,902,000 and the next higher bidder, USI, with a bid price of $34,619,800, or a difference of $1,657,800.

On October 2, 2001 NCLN20 requested that the GSA Office of Inspector General review the T4D. Mr. Jones alleged that treatment he received from me violated provisions of the SOW and FAR, in that NCLN20 was treated differently than other security guard contractors, there was a lack of progress meetings, and the MIB was mishandled. Mr. Jones also alleged the incumbent contractor was not extended so that NLN20 could start late. All such allegations are denied. FPS offered all its security guard contractors no forbearance for temporarily staffing some newly-created Post-WTC armed guard posts with unarmed guards. FPS never offered more than that, but what it did offer, it offered consistently to all its contractors, including NCLN20. FPS could not and did not offer forbearance to all new and all existing armed guard posts to any contractor. NCLN20 made no progress in obtaining weapons permits from the State of Michigan and proposed to have all of its guards be unarmed. Extending the contract of the incumbent contractor was not a reasonable proposal because hourly rates for this extension would need to be negotiated at a huge added expense to the Government. Such an extension would not have been for a few days, but for months for NCLN20 to obtain licenses and permits to legally operate in Michigan with armed guards. NCLN20 managers refused to respond for several days to repeated requests for information by myself and other FPS personnel. They did respond partially, saying that they intended to start on time, but refused to say if they were ready, willing or able to start. NCLN20 managers stated that they would not

respond further, fearing that GSA might use such statements against them. Another point missed by the IG review was the increase in contracting staff workload in responding to and providing additional armed guards and security systems and equipment at various locations throughout the entire Region – 6 Midwest States with major core cities in the aftermath of the terrorist activities of September 11, 2001.

The speed at which decisions and actions were executed was accomplished in a matter of hours, not days as mandated and required by regulation. The same is true regarding a normal 10 day requirement for a cure notice. We did not have 10 days – in fact we tried to work with NCLN20 and assist them with provision of information relative to State of Michigan contacts, vendors, etc. in order to facilitate a successful start-up. This was not possible; even with our assistance as NCLN20 did not exhibit or display appropriate business sense and organization in the preparation. With this type of behavior being exhibited at the corporate level, how could any responsible federal employee expect that these behaviors would not extend to the field execution level where guard performance in the protection of federal facilities, federal workers and the general public would not be compromised. The fact that only one work day existed between the decision to terminate and for performance to begin for the next new contract period means that the 10 day cure period had to be reduced to fit the available time frame.

On October 28, 2001 the Government Accounting Office (GAO) dismissed an NCLN20 protest regarding the MIB as moot. The GAO ruled that NCLN20 was no longer eligible for contract award because it had been terminated for default.

On May 23, 2002 the GSA Inspector General issued a report that agreed with several of the NCLN20 allegations. FPS and GSA's Regional Counsel objected to the IG report and considered its findings flawed.

On September 10, 2002 NCLN20 filed a lawsuit in the Federal Court of Claims. A copy of the complaint was received by FPS on November 6, 2002. The lawsuit used the flawed GSA IG report as a basis of its lawsuit and sought to show that the Contracting Officer acted in bad faith. In March, 2003, the FPS was transferred from GSA to the Department of Homeland Security. However GSA continues its legal support of the lawsuit.

The lawsuit was filed prior to exhausting all available administrative procedures and led the Government to point out to NCLN20 that it had failed to submit a claim to establish damages. This was done in a request dated August 31, 2005 resulting in a request for Equitable Adjustment based upon breach of contract damages due to the Contracting Officer's actions. Damages were divided into (1) anticipated profits, (2) cost of money damages, actual damages and legal fees. After I rejected the claimed damages, an independent audit was ordered from Defense Contract Audit Agency (DCAA) which was conducted in March, 2007. The DCAA review concentrated upon credits for returned items that had been disclosed, leased vehicles that had been returned for credit, and any other costs not disclosed in their submittal data. The audit revealed that the NCLN20

claimed $49,617 vehicle cost was really $3,000. The actual cost, after deductions for returned items, was found to be $46,856.

The DCAA established a reasonable sum to make NCLN20 whole. There were several reasons why NCLN20 should have been terminated for default, but in order to bring the lawsuit to a close, the Government is justified in changing its T4C to a T4C and to compensate NCLN20 for reasonable costs as determined by the DCAA review. Further, any payments associated with an expired NCLN20 contract for alarm dispatch services at the Battle Creek Mega Center, which expired on September 30, 2001 continues to be on hold regarding close out transactions because this T4D will be released.

DETERMINATION

Based upon the above findings, I hereby determine that Termination for Default be changed to a Termination for Convenience. Accordingly, NCLN20 should be awarded the $46,856.00 in costs the DCAA audit concluded NCLN20 had incurred up to the T4D. I will issue a contracting officer's decision to that effect.

Arthur S. Dobbs — 13 APR 07
Contracting Officer

Lawrence L. Ginder — 13 APR 07
Lead Contract Specialist, Region 5

John E. Quackenbush — 13 APR 07
Chief, Central Contracting Group

J. Joel David Malkin — 4/13/07
Assistant Regional Counsel -CSA

# EXHIBIT 84

MALYSZEK & MALYSZEK
SPECIALISTS IN FEDERAL GOVERNMENT CONTRACTS
*"Practice exclusively involving Federal Government Contract matters and proceedings before Federal Courts and Agencies"*

Walter J. Malyszek
(Founding Member 2002)

*2029 Century Park East, Suite 1400*
*Los Angeles, CA 90067*
*Ph ((310) 772-2266 • Fax (310) 772-2265*

Cynthia S. Malyszek
(Member D.C. Bar)

SENT via FEDERAL EXPRESS & FAX

December 1, 2005

Attn: Art Dobbs
Contracting Officer
U.S. Department of Homeland Security
Federal Protection Service – Region 5
Suite 3540 (5PSAC)
230 South Dearborn Street
Chicago, IL 60604

RE: Response to letters of October 7, 2005 & November 21, 2005

Mr. Dobbs,

This is a formal response to your October 7th, 2005 and November 21, 2005 letters requesting additional information in support of our REA.

Your October 7th letter acknowledged receipt of our REA, and stated that "In an effort to assist NCLN20 in quantifying its damages, we are attaching a form for your completion and return to us (please include supporting documentation-receipts, certifications, etc.)." Then you further explain that the reason you are sending the form is that the items on the form are based on the requirements of the solicitation, and resulting award.

Our REA is not based on the requirements of the solicitation and resulting award, our REA is based on breach of contract damages due to the CO's actions and in-action during the administration of the contract. The CO's letters of October 7th and November 21st clearly misunderstand the REA that was submitted. The REA is based on: (1) proving the Government had acted in bad faith thus breaching the contract through the CO's bad faith, abuse of discretion, and arbitrary and capricious decision making; and (2) requesting

damages due to the Governments actions. This response breaks down our damages of $4,904,073 into five different areas: (1) anticipated profits, (2) cost of money damages, (3) actual damages of the Battlecreek contract, and (4) actual costs and settlement and (5) legal fees.

In accordance with the Instructions in your October 7th letter, and as is stated in our REA, NCLN20 is claiming damages not otherwise specified in your attached form. Our response is for damages not specified in your submitted form such as anticipated profits, cost of money damages, actual damages of the Battlecreek contract, actual costs and settlement and legal fees, as stated above.

In accordance with your request, our response identifies, quantifies and explains with the attached supporting information both entitlement and quantum. (See attachments)

In regard to your statement that "incomplete or omitted responses may delay the consideration of your REA, so please ensure that your answers are complete and include all necessary explanations and supporting documentation." Understand that the case in the Court of Federal Claims is seeking a wrongful default termination which would convert the termination for default into a termination for convenience. The REA is seeking damages from the Government's for it's breach of contract and is seeking the costs associated with the Termination for Convenience.

NCLN120 is seeking a final decision: 1) that the CO's conduct in administrating the contract constituted bad faith, 2) Breach of Contract damages and 3) Termination for convenience damages.

In your letter of November 21, 2005 you state that you have received no response to your October 7, 2005 letter. Because of the complexity of the support for the data both on entitlement and quantum, NCLN20 has taken the past seven weeks to gather the support for both the entitlement and quantum parts of the REA. As you are well aware the damages for breach of contract that we are seeking are not limited by the cost accounting standards or allowable costs under the FAR Part 31. Because of this standard NCLN20's REA is different then what is normal under the changes clause. NCLN20 has taken time to ensure

that the information is correct and placed in such a format that is understandable to the CO given that this is a breach of contract REA, rather then a change under the changes clause.

As the CO is well aware NCLN20 has filed an appeal of the Termination for Default, and has requested that the court make a finding based on the CO's actions and inactions that the court make a finding of bad faith, abuse of discretion and his decision to terminate was arbitrary and capricious, within the meaning set out in Tecom, Inc. v. United States 66 Fed. CL. 736; 2005 U.S. Claims Lexis 195.

**Because of the Breach of Contract by the Government, Cost Principles Do Not Apply.**

There are still some reasons to distinguish between a price adjustment under a contract clause and a suit for damages for a breach of contract. In a suit for damages, the Cost Principles for determining allowable cost would not appear to be applicable

Damages Measure

The basic rule for awarding common law damages for a breach of contract is stated as follows in Restatement of Law, Contracts § 329, comment a at 504:

> "In awarding compensatory damages, the effort is made to put the injured party in as good a position as that in which he would have been put by full performance of the contract...."

NCLN20 is to recover the value of services rendered both in providing the equipment (i.e., the costs of ownership, including a reasonable return on money invested in the equipment, fixed costs, etc.) and in operating that equipment (maintenance, fuel, wages, etc.), and that, to the extent the value of service does not exceed the entire, total, provable costs [it] incurred in performance of the Agreement, as in NCLN20's case includes anticipated profits.

The damages that NCLN20 is specifically addressing in the REA are breach of contract

damages as stated above, and in addition to termination for convenience costs as the CO is currently seeking in your request letter of October 7th, 2005. Again, NCLN20 is seeking your final decision on whether or not the contracting officer have breached the contract based his failure to: (these failures where confirmed by the inspector general)

1. ***Not grant NCLN20 a start-up period consistent with the terms of the contract.***
2. ***Did not give NCLN20 10 days to respond to its cure notice as required by the FAR.***
3. ***Have increased the Government to increased costs by not exercising a valid Option to Extend Services clause***
4. ***Did not give the SBA advance notice of the contract termination as required.***
5. ***Did not administer NCLN20's mistake in bid in a manner consistent with the FAR***
6. ***Was inconsistent in the treatment of NCLN20 as compared to other guard services contractors.***
7. ***The CO's conduct was personally biased and prejudiced against NCLN20.***
8. ***The CO's and the Government Breached their implied duties of Good Faith to cooperate and not to hinder performance.***

NCLN20'S BREACH OF CONTRACT DAMAGES

When one of the parties to a contract breaches its part of the agreement, the other party usually becomes entitled to damages. The fundamental principles of damages is to restore the injured party as nearly as possible to the pecuniary position that it would have been in had it not been for the wrongful action of the other contracting party. United States v. Hafahley, 257 F2.d 920 (10th Cir. 1958): Massachusetts Bay Transp Authority v. United States, 129 F.3d 1226(Fed. Cir. 1997). "Damages are always the default remedy for breach of contract." United States v. Winstar Corp., 518 U.S. 839, 885, (1996).

The contract by its terms excluded the payment to the contractor of any sums in the nature of consequential damages. The Board has held, in order to sustain the damages, that the damages incurred must be actual damages. NCLN20's damages that we are anticipatory profits and other actual damages to NCLN20 as a result of the government's breach of contract.

An award may only be made for the actual damages for the breach of contract and only for the natural and probable consequences of the breach. The damages must have been foreseeable at the time of the making of the contract, not at the time of the breach. Lucas V. United States, 25 Cl. Ct 296 (1992).

**THE CONTRACTING OFFICER BREACHED THE CONTRACT BY NOT ACTING IN GOOD FAITH**

As stated in McQuagge v. United States, 197 F. Supp. 460, 461 (W.D. La. 1961), "this case presents a disgusting example of bureaucratic incompetence, irresponsibility, negligence and outright disdain for the Government's Interests."

The Contracting Officers conduct throughout attempts to procure Guard Services, the administration of the NCLN20's contract, the decision to terminate NCLN20 for default, and the award and administration of the contract is laced with an "odor piscatorial," Appeal of ABS Baumanschinenvertrieb quoting Alinco Life Insurance Co. v. United States, 178 Ct. Cl. 813, 823. (1967). The odor is exuded by the Government's bad faith, capricious, whimsical, arbitrariness and unreasonableness.

The Government's conduct amounts to a breach of its duty to act in good faith entitling NCLN20 to its anticipated profits and other common law damages.

Despite the oft parroted "irrefragable proof" language, a contractor need not meet any heightened standard of proof to show lack of good faith on the part of government actors. In some situations the presumption of good faith is entitled to no application at all.

Here, in an extensive opinion, the Court of Federal Claims examined the precedential history of the presumption of good faith in federal government contracts. The court examined both the applicability of the presumption and the evidence necessary to overcome it. Citing Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234 (Fed. Cir. 2002), the court concluded that:

> "When a government official is accused of fraud or quasi-criminal wrongdoing in the exercise of his official duties, there is a strong presumption of good faith conduct that must be rebutted by clear and convincing evidence. But in light of the other precedents discussed above, this Court is unwilling to extend this strong presumption beyond the bound set by the Federal Circuit in Am-Pro, to settings where the rationale does not apply. When a government official acts under a duty to employ discretion, granted formally by law, regulation, or contract, and a lack of good faith is alleged that does not sink to the level of fraud
> or quasi-criminal wrongdoing, clear and convincing evidence is not needed to rebut the presumption. Instead, this may be inferred from a lack of substantial evidence, gross error, or the like. And when the government actions that are alleged are not formal, discretionary decisions, but instead the actions that might be taken by any party to a contract, the presumption of good faith has no application."

Tecom, Inc., v. United States, 66 Fed. Cl. 736 (2005).

Citing voluminous precedent the court showed that bad faith may be implied from a variety of conduct, including, but not limited to: (1) arbitrary actions; (2) gross error; (3) unreasonableness; (4) the exercise of caprice and wanton power; (5) lack of substantial evidence to support a decision; (6) great or gross negligence; and (7) even a "clearly erroneous" interpretation of a contract by an inexperienced engineer." Id. The court further concluded that a discrete decision by a single official is not required. Rather, when "a number of acts are alleged to constitute a lack of good faith, the acts must be judged in the aggregate, and not on the basis of any particular individual's bad faith." Id.

All of the damages sustained by NCLN20 Inc. where actual damages, such as Profit, the cost of money, offset of the Battlecreek contract, contract costs and close out costs and consulting and attorney fees. All the damages that NCLN20 is seeking are actual damages and "Cost Principles" for determining allowable cost are not applicable. See Meva Corp. v. United States, 206 Ct. Cl. 203, 511 F.2d 548 (1975).

Absolute certainty as to the amount of damages is not essential, this being a matter for determination according to the circumstances of each case. There is no objection to damages that they are difficult to ascertain, depending upon contingent and uncertain events, for in all actions for damages for breach of contract the foundation or underlying principle full compensation for the wrong done. Needles v. United States, 101 Ct. Cl. 535, 618.

Although the proof may not be so positive as to enable the court to make an absolute determination of the precise excess costs resulting from delays chargeable to one party, an approximate and reasonable allowance on the basis of all the facts and circumstances may be made. Fuller v. United States, 63 F.Supp. 765, 105 Ct. Cl. 248. The rule which precludes recovery because of uncertain or speculative damages, has no application here. That rule applies only to situations where the fact of damage is itself uncertain. Here the fact of damage suffered by NCLN20 is certain. It is enough under these circumstances if there is a basis for a reasoned inference as to the extent of the damage chargeable to one of the parties. Anderson v. Mt Clemens Pottery Co., 328 U.S. 680, 688, 66 S. Ct. 1187, 90 L.Ed. 1515, Eastman Kodak Co. v. Southern Photo Material CO., 273 U.S. 359, 377-379, 47 S.Ct. 400, 71Led. 684.

NCLN20 INC. has made the best rational and reasonable determination of actual damages.

**ANTICIPATORY PROFIT - $3,200,000**

NCLN20 Inc.'s original contract bid allowed for a fair profit for this contract. We used that stated amount plus the amount allowed for by the constructive changes that increase the number of security personal and stands that where to be covered under the contract, that where ordered by the Government. This profit was increased due the amount of work that

needed to be performed and due to the risk of doing the work without being paid. Our rates for profit are determined in accordance with the principles set out in FAR15.9000.

The rate of profit included in an equitable adjustment should fairly reflect the nature of the work and the risks involved. If the change requires work that is more difficult or involves a higher degree of risk then the original work under the contract, the contractor is entitled to a higher rate of profit then that included in the original contract price. American Pipe & Steel Corp. ASBCA 7899, 1964 BCA ¶ 4058.

The Government requested NCLN20 to increase over what was contracted for, the amount of security guards and sites after September 11th, 2001. This change order was required by the CO, it was much more difficult and risky, due to the current state of the country at this time. This is the reason way our profit was increased, on the change order after September 11, 2001.

Further, NCLN20 Inc., may recover profit on indirect costs for extra work that it performed. Kemmons-Wilson, In., ASBCA 16167, 72-2 BCA ¶ 9689.

When the Government breaches the contract before the contractor has commenced to perform, the contractor is entitled to the value of the contract. This means that it can recover the difference between the contract price and what it would have cost to perform. In other words, the contractor can get loss of anticipated profits. United States v. Purcell Envelope CO., 249 U.S. 313 (1919); Neely V. United States, 152 Ct. Cl. 137, 285 F.2d 438 (1961).

When, as in our case, a termination for convenience or default is the product bad faith on the part of the Government, the contractor is not limited to damages under the termination for convenience clause of the contract but can secure traditional breach of contract damages. See National Factors, Inc., v. United States, 204 Ct. Cl. 98, 103,492 F.2d 1383 (1974). Such damages include damages that where foreseeable by the parties at the time of the agreement and that were the proximate result of the breach of contract. Olin Jones

Sand Co. v. United States, 225 Ct. Cl. 741, 742 (1980). See also L'Enfant Plaza Properties, Inc., v. United States 3 Cl. Ct. 582, 589 (1983).

The Court of Federal Claim has stated the rule that a Government breach of contract will entitle the contractor to recover for the loss of the profit it would have realized had the contract not been breached. Companhia Atlantica v. United States, 180 F. Supp. 342 (Ct. Cl. 1960); Needles v. United States, 101 Ct. Cl. 535(1944); Bradley v. United States, 66 Ct. Cl. 551 (1928); Burns v. United States 66 Ct. Cl 142 (1928); Weller Construction Co v. United States 61 Ct. Cl. 261 (1925)

A contractor is entitled to full breach of contract damages if the Government terminates its contract in bad faith or the decision to terminate is an abuse of discretion. Torncello v. United States, 681 F 2d 756 (Ct. Cl.1982); Apex International Management Services, Inc. ASBCA 38087, et al. 94-2 BCA 26842, 1994 ASBCA LEXIS 86 (1994).

The 3.2 million dollars that NCLN20 is seeking is actual loss of anticipated profit.

**COST OF MONEY DAMAGES - $390,392**

These funds where borrowed from an individual to finance NCLN20 after the termination for default was issued, and when the Government pulled money out of NCLN20's account on a separate contract number out of Battlecreek, Michigan.

The cost of money is an element of the cost of facilities capital. Facilities Capital Cost of Money specifically establishes the allowability of the cost of facilities capital for a specific contract. Although the cost of facilities capital need not be recorded in the contractor's books and records, memorandum records kept in sufficient detail to be verified have been maintained by NCLN20.

The costs are considered to be incurred for the purposes of reimbursements and progress payments. The courts have stated that the cost of money is allowable for pricing contract modifications and terminations when the initial contract award was made without submission of cost or pricing data, as is the case with NCLN20.

In court cases the cost of money for future expansion was included in cost of money calculations. The cost of money on unamortized special tooling and special test equipment is allowable as a direct contract cost in accordance with the FAR.

If the Cost Principles are not applicable to the adjustment, interest on borrowings is properly included in the adjustment. Again, because of the breach of contract, the Cost Principles due not apply to this REA.

**ACTUAL DAMAGES COSTS OF BATTLECREEK CONTRACT– $ 306,419**

The REA that is before us these costs are foreseeable because the Government "acted" and withdrew funds out of NCLN20's bank account after they where deposited. This physical act of the governments directly connected the act of the bad faith termination for default to the termination and withdrawal of NCLN20's property without the proper due process.

The Government has never demanded excess reprocurement costs from NCLN20, yet the pulled out the funds directly out of NCLN20's account. This violated their due process rights and violated the FAR. This act has made the damages and loss of profits on this contract actual damages that are recoverable by NCLN20 in an effort for them to be made whole.

**ACTUAL COSTS OF WORK PERFORMED ON CONTRACT GSO5P01GCD0009 - $550,147**

The costs include such items as direct labor, direct materials, and overhead, general and administrative costs.

**LEGAL FEES EAJA - $ 457,117**

Small contractors, such as NCLN20 can recover claim presentation costs under the Equal *Access to* Justice Act (EAJA). 5 U.S.C. § 504(a)(1) states:

An agency that conducts an adversary adjudication shall award, to a prevailing party other than the United States, fees and other expenses incurred by that party in connection with that proceeding, unless the adjudicative officer finds that the position of the agency was substantially justified or that special circumstances make an award unjust. Whether or not the position of the agency was substantially justified shall be determined on the basis of the administrative record, as a whole, which is made in the adversary adjudication for which fees and other expenses are sought.

28 U.S.C. § 2412(d)(1) contains substantially the same provision dealing with the recovery of fees and expenses in litigation in federal courts, such as the Court of Federal Claims. Claims for fees and expenses must be filed within 30 days after final disposition of a case in court or by an appeals board.

The General Accounting office has found that a Government Contract lawyer rate of $475 per hour is reasonable.

Conclusion

As requested in your October 7th, letter NCLN20 is providing you with support for our REA that is based on damages for breach of contract. As stated in your original request, the guide lines you provided where helpful; but did not give support for the REA based on Breach of Contract Damages.

In addition we have attached support for our actual costs which includes invoices from vendors during contract performance.

We request a final decision from the Contracting Officer. If any further support is needed please forward your request as soon as possible.

Sincerely,

Malyszek & Malyszek
for NCLN20 Inc.

DETAILED SUMMARY - COST BRAKE DOWN OF BREACH OF CONTRACT DAMAGES
IN SUPPORT OF NOVEMBER 30TH 2005 LETTER TO ART DOBBS

| | Amount | Explanation | | | | |
|---|---|---|---|---|---|---|
| Profit | 3,200,000 | 10% of profit on contract GS05P01GCD0009. | | | | |
| | | totals | G&A | Profit | totals | |
| | | 892997.7 | 35719.91 | 35719.91 | 71439.81 | |
| | | 44549.59 | 1781.984 | 1781.984 | 3563.967 | |
| | | 4788006 | 191520.3 | 191520.3 | 383040.5 | |
| | | 382562.5 | 15302.5 | 15302.5 | 30605 | |
| | | 182685.9 | 7307.434 | 7307.434 | 14614.87 | |
| | | 58855.75 | 2354.23 | 2354.23 | 4708.46 | |
| | | Total | | | | 507972.6 |
| | | | | | | 2539863 |
| | | Increased profit for change order work. | | | | 300,137 |
| | | Built in hourly rates | | | | 360,000 |
| Cost of Money | 390,392 | | | | | |
| Battlecreek contract | 306,419 | T/C costs | | | | |
| | | | Profits | | | 11520 |
| | | | Bid Preparation Costs | | | 3600 |
| | | | REA | | | 1500 |
| | | | Payroll Expenses | | | 7200 |
| | | | Admin Costs REA | | | 1673 |
| | | | Settlement Costs | | | 808 |
| | | | Bounding Fees | | | 7200 |
| | | | SUB | | | 33501 |
| | | Unpaid Invoices | | | | |
| | | | # CM022801 | | | 38,786 |
| | | | # CM02280203 | | | 38,786 |
| | | | # CM02280202 | | | 20203 |
| | | | Underpayments on all Inv. | | | 75,142 |
| | | | Insurance Policy | | | 100,000 |
| | | | SUB | | | 272,917 |
| Cost of Work Perforr | 550,147 | Direct Labor | 25,848 | | | |
| | | Indirect labor | 257500 | | | |
| | | Direct Costs | 102466.4 | | | |
| Legal/Consultant Fe | .457117 | Fees are increasing, final number will be submitted once case is completed. | | | | |

TOTAL BREACH OF CONTRACT DAMAGES 4,904,075

DA 0149

# EXHIBIT
# 86

Case 1:02-cv-01282-SGB Document 67-5 Filed 04/24/2007 Page 1 of 2

EAST BAY BRANCH OFFICE
**DEFENSE CONTRACT AUDIT AGENCY**
39510 PASEO PADRE PARKWAY, SUITE 210
FREMONT, CALIFORNIA 94538-4741
E-mail: dcaa-fao4141@dcaa.mil

IN REPLY REFER TO
04141/820.7/04141-2007Z49300001

March 29, 2007

U.S. Department of Homeland Security
Immigration and Customs Enforcement – Federal Protective Service
230 South Dearborn Street, Room 3540
Chicago, IL 60604

ATTENTION: Mr. Roger Pinnau, Contracting Officer
Roger.pinnau@dhs.gov

SUBJECT: Litigation Support for Request for Equitable Adjustment (REA) on Contract No. GS05P01GCD0009
NCLN20, Inc. (NCLN20), Concord, CA

As requested by your office through U.S. Department Homeland Security – Office of Inspector General in an Interagency Agreement Order (IAO), dated March 7, 2007, we performed financial services related to NCLN20's submitted data to assist your office in completing a qualification matrix (Inventory and Accountability Report) as provided in your January 2, 2007 e-mail.

Our financial services consisted of the following tasks:

- To complete the Qualification Matrix (See Enclosure 1) per your January 2, 2007 request.
- A review of the contractor submitted data for items purchased related to the subject contract. In order to confirm the submitted data, we:
    - examined on a sample basis source documents such as invoices and cancelled checks;
    - conducted inquiries to establish whether or not all credits for returned items had been disclosed;
    - inquired as to why the leases of vehicles had not been terminated and the vehicles returned to mitigate costs; and
    - inquired as to whether or not NCLN20 had incurred any other costs no disclosed in their submitted data.

Based on the information collected, discussions with NCLN20's representatives and our observations we identified the items purchased related to the subject contract including their model make, purchased date and the approximate delivered date and recorded and completed the Qualification Matrix as requested. We also identified additional items were returned and the corresponding credits amounted to $16,408.

04141/820.7/04141-2007Z49300001 March 29, 2007

Further, we established through the contractor's representative that the leases of vehicles had been terminated and the vehicles returned resulting in a net cost for the vehicles of $3,000 instead of the $49,617 in represented in NCLN20's submission and that no other costs were incurred that were not presented in NCLN20's submission. As a result of the additional disclosures made by NCLN20's representatives, the net cost associated with the items presented in NCLN20's submission, net of credits for returned items, is $46,856. (See Enclosure 2)

We discussed our observations with Mr. Clarence Tucker, NCLN20's attorney, on March 29, 2007.

If you have any questions related to this memorandum or need further assistance please contact Ms Doris White, Supervisory Auditor at (510) 713-0586.

Sincerely,

*/s/ Doris M. White*
*/for/* Ronald Hop
Branch Manager
DCAA East Bay Office

Enclosures:

1. Qualification Matrix (Inventory and Accountability Report)

   REA Inventory & Accountability Report

2. Purchased items by Invoice and by Category

   Purchased items by Invoice and by catego

04141-2007Z49300001

Enclosure 1

DA 0153

**NCLN20 Professional Services, Inc. - Michigan: Request for Equitable Adjustment ("REA") Inventory & Accountability Report**
*Instructions: Please complete this report, using additional narrative and pages where needed for completeness, and including support* documentation such as receipts. Most, but not all requirements for Contractor - provided property are in RFQ GS05P01GCD009, Section C-11 (also see Section K-17, et al). Your response should be complete in and of itself, and submitted as part of your REA.

| Uniforms, Equipment, Accessories & Supplies | Required Count for 152 Incumbent employees | Inventory Quantity, Make, Model & Date Purchased | Quantity & Date Distributed in Michigan | Quantity & Date & Means of Disposal after T4D |
|---|---|---|---|---|
| | | | | |
| Shirts - Long Sleeve (meets state requirements) | 3 x 152 = 456 | Total Quantity Purchased: 386, PO Date: 9/21, 9/22/01 | 66 units delivered on 9/27/01, 311 on 9/28/01 and 9 on 9/29/01 | NA |
| Shirts - Short Sleeve (meets state requirements) | 3 x 152 = 456 | Total Quantity Purchased: 12, P.O. Date : 9/21, 9/22/01 | 12 units delivered on 9/27/01 | NA |
| Trousers - All Season (meets state requirements) | 3 x 152 = 456 | Total Quantity Purchased: 500, P.O. Date: 9/24/01 | 500 units delivered on 9/27/01 | NA |
| Neckties - Clip-on | 2 x 152 = 304 | Total Quantity Purchased: 320, P.O. Date: 9/22, 9/24/01 | 320 units delivered on 9/27/01 | NA |
| Hat - with plastic cover | 1 x 152 = 152 | Total Quantity Purchased: 61, P.O. Date: 9/21, 9/22/01 | 61 units delivered on 9/28/01 | NA |
| Jacket - Winter-weight (meets state requirements) | 1 x 152 = 152 | Total Quantity Purchased: 28, P.O. Date: 9/21, 9/22/01 | 28 units delivered between 9/27 thru 9/29/01 | NA |
| Gloves - Winter Pair | 1 x 152 = 152 | Total Quantity Purchased: None | | |
| Pistol Belt (Duty Belt) | 1 x 152 = 152 | Total Quantity Purchased: 107 P.O. Date: 9/21, 9/22/01 | 107 units delivered between 9/27 & 9/28/01 | NA |
| Holster - Leather (Level 2) | 1 x 152 = 152 | Total Quantity Purchased: 113 P.O. Date: 9/21, 9/22/01 | 113 units shipped on 9/27/01 | NA |
| Keeper/Speed Loader | 1 x 152 = 152 | Belt Keeper: 756 units purchased, Speed Loader: 280 units purchased P.O. Date: 9/21, 9/22 & 9/28/01 | All units shipped between 9/27/01 thru 9/29/01 | NA |
| Ammo/Keeper Pouch/Case | 1 x 152 = 152 | Total Quantity Purchased: 117 P.O. Date: 9/21, 9/22/01 | All units shipped on 9/27/01 | NA |
| Metal Handcuff Pair w/key | 1 x 152 = 152 | Total Quantity Purchased: 73 P.O. Date: 9/21, 9/22/01 | Units shipped either on 9/27 or 9/28/01 | NA |
| Handcuff Case | 1 x 152 = 152 | Total Quantity Purchased: 189 P.O. Date: 9/21, 9/22 & 9/28/01 | All units shipped between 9/27/01 thru 9/29/01 | NA |
| Handcuff Key Strap w/flap | 1 x 152 = 152 | Total Quantity Purchased: None | | |
| Shoulder Patch - Contractor | 8 x 152 = 1,216 | Total Quantity Purchased: 1,400 No Information on when purchased | No information on when delivered | NA |
| Whistle - Metal Police-type | 1 x 152 = 152 | Total Quantity Purchased: None | | |
| Nameplate - shirt/jacket type | 1 x 152 = 152 | Total Quantity Purchased: None | | |
| Gloves - Disposable Pair | 1 x 152 = 152 | Total Quantity Purchased: None | | |
| Mask - Compact CPR Rescue | 1 x 152 = 152 | Total Quantity Purchased: 150 P.O. Date: 9/21/01 | All units shipped on 9/27/01 | NA |
| Badge - Metal Security Type (meets state requirements) | 1 x 152 = 152 | Total Quantity Purchased: 3 P.O. Date: 9/21/01 | All units shipped on 9/27/01 | NA |

04141-2007Z49300001 Enclosure 1

| | | | | |
|---|---|---|---|---|
| Revolver - Double-action, 4" barrel, .357/.38 Caliber, police-type (Model 66, etc.) | 1 x 152 = 152 | Total Quantity Purchased: 110 Invoice Date:9/19/01 | Units are delivered on 9/27, 9/28 & 10/01/01, All units are returned in October, 01. | All units are returned in October, 01, resulting a net cancellation charge of $3,333 |
| Baton w/holder - Police-style | 1 x 152 = 152 | Nightstick (Baton): 13 units Nightstick holder, Donut: 144 units P.O. Date: 9/21, 9/22/01 | All units are shipped on 9/27/01 | NA |
| Flashlight w/holder | 1 x 152 = 152 | Total Quantity Purchased: 10 P.O. Date: 9/21/01 | All units shipped on 9/27/01 | NA |
| Raincoat (inclement weather) | 1 x 152 = 152 | Total Quantity Purchased: None | | |

| **SEDAN, Patrol-type, with light bar, first-aid kit, fire-extinguisher & patrol vehicle decals/markings** | **REQUIRED COUNT** | **Inventory Quantity, Make & Model & Date Leased or Purchased, w/Receipts** | **Quantity & Date Provided in Michigan, with Location Assignments** | **Quantity & Date & Means of Disposal after T4D, with disposition receipts** |
|---|---|---|---|---|
| 2-wheel Drive | 1 x 2 = 2 | Total Quantity Purchased: None | | |
| 4-wheel Drive | 1 x 1 = 1 | Total Quantity Leased: 3, 4x4 Jeep Cherokee, leased thru Enterprise Rent a Car, Vehicle Buyers Order Date: 9/25/01 | Delivered on Michigan 9/25/01 | NA |

| **Ammunition** | **REQUIRED COUNT** | **Inventory Quantity, Make & Model & Date Purchased, with Receipts** | **Quantity & Date Distributed in Michigan, with distribution receipts** | **Quantity & Date & Means of Disposal after T4D, with disposition receipts** |
|---|---|---|---|---|
| .38 special 110 grain JHP + P | 18 x 152 = 2,736 (plus training ammo & qualification ammo) | Quantity: None | | |

| **Contract Manager's Office Equipment, Supplies & Services (furniture, fax, telephone, -lines, etc.)** | **REQUIRED COUNT** | **Inventory Quantity, Make & Model & Date Purchased, with Receipts** | **Quantity & Date Distributed in Michigan, with distribution receipts** | **Quantity & Date & Means of Disposal after T4D, with disposition receipts** |
|---|---|---|---|---|
| See RFQ Section H-28 | See RFQ Section H-28 | | | |
| Dell Computer and misc. | | Total Quantity leased: 1 | | |
| Camera and Supplies | | Total Quantity Purchased: 1, Transactions charged Date: 9/7/01 | Shipped to Steven Jones, Lafayette Office. No information indicated any delivery to Michigan | NA |

DA 0154

04141-2007Z49300001

Enclosure 1

| Exam Certifications | REQUIRED COUNT | Quantity & Date Purchased or Certified, with Receipts/Certificates | Quantity & Date Earned or Certified in Michigan, with Receipts/Certificates | Quantity & Date & Means of Disposal after T4D, with disposition receipts |
|---|---|---|---|---|
| Drug Screening - SAMHSA | 1 x 152 = 152 | Quantity: None | | |
| Medical - Physical | 1 x @76 = @76 (Est.) | Quantity: None | | |
| Psychological Reliability | 1 x @76 = @76 (Est.) | Quantity: None | | |
| CGIM - Written Exam | 1 x @76 = @76 (Est.) | Quantity: None | | |
| Firearm Live-fire Range Quantification, using same firearm make & model provided by Contractor | 1 x 152 = 152 | Quantity: None | | |

| Licenses & Permits | REQUIRED COUNT | Inventory Quantity, Date Purchased, with Receipts | INVENTORY COUNT | INVENTORY COUNT |
|---|---|---|---|---|
| Michigan Corporate Reg. | 1 x 1 = 1 | Quantity: None | | |
| Michigan Business License | 1 x 1 = 1 | Quantity: None | | |
| Michigan Guard Co. License | 1 x 1 = 1 | Quantity: None | | |
| Michigan Firearm Permits | 1 x 152 = 152 | Total Quantity Obtained: 110 . Invoice from NCLN20's consultant R. Mckay indicated a transaction Date: 9/27/01 | Assumed permits obtained by R. Mckay in Rochester Hills, MI | NA |
| Detroit City Firearm Permits | 1 x @40 = @40 (Est.) | Quantity: None | | |

| Insurance Certificate | REQUIRED COUNT | Inventory Quantity, Date Purchased, with Receipts | INVENTORY COUNT | INVENTORY COUNT |
|---|---|---|---|---|
| Michigan Business Liability | 1 x 1 = 1 | Quantity: None | | |
| Michigan Vehicle | 1 x 3 = 3 | Quantity: None | | |

Notes: The information provided above are based on copy of invoices provided by NCLN20 under the "Start Up Performance Summary and Documentation" Binder submitted along with the Breach of Contract Claim on Oct 26, 2006. Please refer to the detail breakdown by invoices for additional items and costs identified from the invoices.

DA 0155

Case 1:02-cv-01282-SGB Document 67-7 Filed 04/24/2007 Page 1 of 4

04141-2007Z49300001

Enclosure 2

**Purchased Items by Invoice**

| Invoice Number | Vendor | Description | Quantity | Amount |
|---|---|---|---|---|
| P01178960101 | Alpine Trading Co, Inc. | Men - Detroit Pants | 254 | 3,517 |
| PO Date: 09/24/01 | | Tie Clip | 200 | 590 |
| Invoice Date: 09/24/01, UPS 3 day. | | Shipping & Handling | | 477 |
| | | | | 4,584 |
| P01178990101 | Alpine Trading Co., Inc. | Men - Ann Arbor Pants | 75 | 1,043 |
| PO Date: 09/24/01 | | Shipping & Handling | | 122 |
| Invoice Date: 09/24/01, UPS 3 day. | | | | 1,164 |
| P01178930101 | Alpine trading Co., Inc. | Men Battle Creek Pants | 171 | 2,327 |
| PO Date: 09/24/01 | | Shipping & Handling | | 281 |
| Invoice/Shipped Date: 09/24/01 | | | | 2,607 |
| P01178540103 | Alpine trading Co., Inc. | L/S Shirts w Patch | 54 | 1,014 |
| PO Date 9/22/01 | | S/S Shirts w Patch | 12 | 203 |
| Invoice/Shipped Date: 9/27/01 | | Police Jacket | 1 | 45 |
| | | Tie Clip | 2 | 5 |
| | | Belt Keeper | 106 | 212 |
| Credited Back | 16408:05 | Sam Browne Belt | 53 | 1,220 |
| | | Nightstick Donut | 60 | 57 |
| | | Handcuff Case | 1 | 12 |
| | | Handcuff Nickel | 48 | 456 |
| | | Speed Loader Case | 17 | 276 |
| | | Nightstick Holder | 4 | 12 |
| | | Hat - Round Top w Badge | 42 | 1,432 |
| | | Holster - Leather | 1 | 60 |
| | | Shipping and Handling | | 2,263 |
| | | Total | | 7,266 |
| P01178540102 | Alpine Trading Co., Inc. | Tie Clip | 118 | 266 |
| PO Date: 09/22/01 | | Belt Keeper | 134 | 268 |
| Invoice/Shipped Date: 09/27/01 | | Handcuff Case | 59 | 705 |
| | | Speed Loader Case, Double | 43 | 699 |
| | | Holster - Forward Draw | 59 | 3,537 |
| | | Total | | 5,474 |
| P01178140101 | Alpine Trading Co., Inc. | L/S Shirts w Patch | 72 | 1,121 |
| PO Date: 09/21/01 | | Police Jacket | 13 | 477 |
| Invoice Date: 09/27/01, UPS Next Day | | Handcuff Nickel | 25 | 238 |
| | | Handcuff Case | 25 | 299 |
| | | Nightstick, Plastic | 13 | 129 |
| | | Nightstick, Holder | 25 | 74 |
| | | Nightstick, Donut | 25 | 24 |
| | | Garrison Belt | 16 | 120 |
| | | Hat - Round Top w Badge | 19 | 608 |
| | | Shipping and Handling | | 573 |
| | | | | 3,663 |
| P01178190101 | Alpine Trading Co., Inc. | L/S Shirts w Patch | 12 | 170 |
| PO Date: 09/21/01 | | Sam Browne Belt | 38 | 893 |
| Invoice/Shipped Date: 09/27/01 | | Nightstick, Donut | 30 | 29 |
| | | Handcuff Case | 80 | 956 |
| | | Speed Loader Case, Double | 57 | 926 |
| | | Police Windbreaker w Badge | 1 | 45 |
| | | Belt Keeper | 480 | 960 |
| | | Guard Breast Badge | 3 | 15 |
| | | Dyna CPR Mask | 150 | 1,838 |
| | | Maglite, 5 Cell 'D" | 10 | 280 |

04141-2007Z49300001

Enclosure 2

| | | | | |
|---|---|---|---|---|
| | | Flashlight Holder - Leather | 10 | 80 |
| | | Holster - Leather | 53 | 3,177 |
| | | Shipping and Handling | | 1,954 |
| | | | | 11,320 |
| **P01178190102** | Alpine Trading Co., Inc. | L/S Shirts w Patch | 239 | 3,475 |
| PO Date: 09/21/01 | | Police Jacket | 11 | 409 |
| Invoice/Shipped Date: 09/28/01 | | | | 3,884 |
| **P01181450101** | Alpine Trading Co., Inc. | Belt Keeper | 36 | 72 |
| PO Date: 09/28/01 | | Handcuff Case | 24 | 287 |
| Invoice Date: 09/28/01, UPS Next Day | | Shipping & Handling | | 1,748 |
| | | | | 2,106 |
| **P01178140102** | Alpine Trading Co., Inc. | L/S Shirts w patch | 9 | 181 |
| PO Date 09/21/01 | | Police Windbreaker w Badge | 2 | 89 |
| Invoice Date: 09/28/01, UPS Next Day | | | | 271 |
| Total | | | | **42,341** |

| | | | |
|---|---|---|---|
| **2434** Double Action | Revolver - S&W, Mod.10, 4" HVY BBL | 69 | 10,701 |
| Invoice Date: 09/19/01 | Sales tax on Revolver | | 1,284 |
| | | | 11,985 |
| **2434 Refund Inv.** | Refund - Revolver | | (10,701) |
| Invoice Date: 09/30/01 | Refund Sales tax | | (1,284) |
| | Miscellaneous Charge for Refund | | 539 |
| | | | (11,446) |
| Overcharge credit | Credit on Refund Charge | | (240) |
| Invoice Date: 09/30/01 | | | |
| | Total | | 300 |

04141-2007Z49300001 Enclosure 2

| | | | | |
|---|---|---|---|---|
| 62883 | Trader Sports | Revolver - Model 82, 4" Heavy Barrel | 41 | 9,820 |
| Order Date: 09/19/01 | | Sales tax on Revolver | | 786 |
| Delivered to Detroit on 9/27, 9/28 and 10/1/01 | | | | 10,605 |
| 62884 | Trader Sports | Speed Loader | 280 | 1,414 |
| Order Date: 09/19/01 | | Sales tax on Speed Loader | | 113 |
| Delivered to Detroit on 9/27, 9/28 and 10/1/01 | | | | 1,527 |
| Refund Check Issued | | Refund | | (12,132) |
| Issue Date: 11/1/01 | | 25% charge on Refund | | 3,033 |
| | | | | (9,099) |
| | | Total | | 3,033 |

| | | | | |
|---|---|---|---|---|
| CU 0283 | Enterprise Car Sales/Leasing | Well's Fargo Finance - Vehicle Price | 1 | 16,539 |
| CU 1168 | Enterprise Car Sales/Leasing | Well's Fargo Finance - Vehicle Price | 1 | 16,539 |
| CU 1167 | Enterprise Car Sales/Leasing | Well's Fargo Finance - Vehicle Price | 1 | 16,539 |
| Order Date: 9/25/01 | | | | 49,617 |

| | | | |
|---|---|---|---|
| 1762432E2310000285 | UPS | Delivery on Return of Double Action items | 81 |
| 1762432E2310000294 | | Delivery on Return of Double Action items | 81 |
| 1762432E2310000301 | | Delivery on Return of Double Action items | 81 |
| 1762432E2310000310 | | Delivery on Return of Double Action items | 81 |
| 1762432E2310000329 | | Delivery on Return of Double Action items | 41 |
| 1762432E2310000338 | | Delivery on Return of Double Action items | 25 |
| 1762432E0310023806 | | Delivery on Return of Double Action items | 20 |
| 17450X900102366699 | | Delivery on Return of Emblems | 31 |
| | | Total | 442 |

| | | | |
|---|---|---|---|
| Loan No. 500 | Dell Financial Services | Outstanding Loan | 3,457 |
| | | Business Loan - Late Charges | 25 |
| | | Total | 3,482 |

| | | | | |
|---|---|---|---|---|
| 24321 | Natow Toma Uniforms | Patches shipped to Image First | 600 | 1,200 |
| | | Shipping | | 93 |
| | | | | 1,293 |
| 29194 | Natow Toma Uniforms | Patches shipped to Image First | 400 | 800 |
| | | Shipping | | 48 |
| | | | | 848 |
| N/A | Natow Toma Uniforms | Patches shipped to Image First | 400 | 800 |
| | | Shipping | | 35 |
| | | | | 835 |
| | | Total | | 2,977 |

| | | | | |
|---|---|---|---|---|
| 165824 | Camera Mart, Inc. | Camera and Supplies | 1 | 898 |
| | | tax | | 54 |
| | | | | 952 |

| | | | | |
|---|---|---|---|---|
| N/A | Randy Mckay | Weapon Permit cost | 110 | 550 |
| | | Guns Registry | 110 | 1,100 |
| | | Pay for Mckay services | | 2,755 |
| | | Total | | 4,405 |
| | Kay Moore | Services?? | | 2,333 |
| | | Total | | 6,739 |
| Less | Alpine Trading Co., Inc. | Credit for Reurned Items | | (16,408) |
| Less | Enterprise Car Sales/Leasing | Credit for Reurned Items | | (46,617) |
| | | Total | | 46,856 |

Case 1:02-cv-01282-SGB Document 67-7 Filed 04/24/2007 Page 4 of 4

04141-2007Z49300001

Enclosure 2

Purchased Items by Category

| Matrix Category | Quantity | Costs |
|---|---|---|
| Shirts - Long Sleeve | 386 | 5,961 |
| Shirts Short Sleeve | 12 | 203 |
| Trousers - All Season | 500 | 7,766 |
| Neckties - Clip On | 320 | 860 |
| Hat - w/ plastic cover | 61 | 2,040 |
| Jacket - Winter -Weight | 28 | 1,065 |
| Gloves - Winter Pair | - | - |
| Pistol Belt (Duty Belt) | 107 | 2,233 |
| Holster - Leather | 113 | 6,774 |
| Belt Keeper | 756 | 1,512 |
| Speed Loader | 280 | 1,527 |
| Ammo/Keeper Pouch/Case | 117 | 1,901 |
| Metal Handcuff Pair w/key | 73 | 694 |
| Handcuff Case | 189 | 2,259 |
| Hnadcuff Key Strap w/flap | - | - |
| Shoulder Patch - Contractor | 1400 | 2,977 |
| Whistle - Metal Police-type | - | - |
| Nameplate - shirt/jacket type | - | - |
| Gloves - Disposable Pair | - | - |
| Mask - Compace CPR Rescue | 150 | 1,838 |
| Badge - Metal Security Type | 3 | 15 |
| Revolver - Double Action 4" BBL | 110 | 1,806 |
| Baton, Police style | 13 | 129 |
| Nightstick holder, Donut | 144 | 195 |
| Flashlight w/holder | 10 | 359 |
| Raincoat | | |
| Alpine trading Co Items Returned | | (16,408) |
| 2-wheel Drive | - | - |
| 4-wheel Drive | 3 | 3,000 |
| .38 special 110 JHP+P | | |
| Office Supplies | | |
| Dell Computer and misc. | 1 | 3,482 |
| Camera and Supplies | 1 | 952 |
| Drug Screeing - SAMHSA | | |
| Medical - Physical | | |
| Pschological Reliability | | |
| CGIM - Written Exam | | |
| Firearm Live-fire Range Qualification, using same firearm make & model provided by Contractor | | |
| Michigan Corporate Reg. | | |
| Michigan Business License | | |
| Michigan Guard Co. License | | |
| Michigan Firearm Permits | 110 | 1,650 |
| Detroit City Firearm Permits | | |
| Michigan Business Liability | | |
| Michigan Vehicle | 3 | - |
| Services for R. Mckay & K.Moore | | 5,089 |
| Delivery for return items | | 442 |
| Various Shipping not individually identifiable | | 6,538 |
| Total | | 46,856 |

# EXHIBIT 87

08-07-'07 13:49 FROM-Tucker & Hughes,PLLC 313-230-7896

# AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

1. CONTRACT ID CODE | PAGE 1 OF PAGES 1

2. AMENDMENT/MODIFICATION NO.: Modification 2
3. EFFECTIVE DATE: 10-13-99
4. REQUISITION/PURCHASE NO.:
5. PROJECT NO. (If applicable): BCMI Megacenter

6. ISSUED BY / CODE:
General Services Administration
F   ral Protective Service (5PSAM)
23u S. South Dearborn Street (Suite 3540)
Chicago, IL 60604-1696

7. ADMINISTERED BY (If other than Item 6) / CODE:
Same as Block 6, Art S. dobbs (312-353-5003)

8. NAME AND ADDRESS OF CONTRACTOR (No., street, county, State and ZIP Code)

NCLN20 Professional Services Company
ATTN: Steve Jones, President
5820 Stoneridge Mall Road (#207)
Pleasanton, CA 94588

CODE | FACILITY CODE

(✓) 9A. AMENDMENT OF SOLICITATION NO.
9B. DATED (SEE ITEM 11)
✓ 10A. MODIFICATION OF CONTRACT/ORDER NO.: GS05P99GCD0005
✓ 10B. DATED (SEE ITEM 13): 8-16-99

## 11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended. ☐ is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods:

(a) By completing Items 8 and 15, and returning ________ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA (If required)

## 13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS, IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

( ) A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A.

B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b).

✓ C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF:
BY MUTUAL AGREEMENT OF THE PARTIES

D. OTHER (Specify type of modification and authority)

E. IMPORTANT: Contractor ☐ is not, ☒ is required to sign this document and return 3 copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

Effective October 1, 1998 the requirement for a performance bond is removed. The contractor is granted an increase in health and welfare benefits as became effective in June, 1999. The contractor is granted a $0.10 (or ten cents) an hour increase in all its hourly rates, in consideraton of the aforementioned.

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

15A. NAME AND TITLE OF SIGNER (Type or print): Stephen Jones CEO
16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print): Art S. Dobbs, Contracting Officer

15B. CONTRACTOR/OFFEROR: [signature] (Signature of person authorized to sign)
15C. DATE: 10/25/99
16B. UNITED STATES OF AMERICA BY ________ (Signature of Contracting Officer)
16C. DATE SIGNED

PREVIOUS EDITION UNUSABLE
This form was electronically produced by Elite Federal Forms, Inc.

STANDARD FORM 30 (Rev. 10-83)
Prescribed by GSA
FAR (48 CFR) 53.243

RECEIVED 09-19-'07 20:31 FROM- TO- Tucker & Hughes,PLLC P012/016

# EXHIBIT 88

General Services Administration
Federal Protective Service (5PSAM)
230 South Dearborn Street (Suite 3540)
Chicago, IL 60604-1696

Tel: 312/ 353-5003
Fax: 312/353-0143
E-Mail: art.dobbs@gsa.gov

September 1, 2000

Cal. Madsen

Mr. Stephen Jones, CEO
NCLN20, Inc.
3404 Hall Lane
Lafayette, CA 94549

SUBJECT: 30-Day Notice of Intent to Exercise GS05P99GCD0001

Dear Mr. Jones:

The subject contract for operation the Battle Creek Megacenter expires on September 30, 2000. In accordance with section I FAR 52.217-9 OPTION TO EXTEND THE TERM OF THE CONTRACT, the Government intends to exercise the first option period of the contract to cover performance during the period of October 1, 2000 through September 30, 2001.

The contract price for this period may be adjusted in accordance with the clause entitled FAR 52.222-43 FAIR LABOR STANDARDS ACT AND SERVICE AND SERVICE CONTRACT ACT—PRICE ADJUSTMENT (MULTIYEAR AND OPTION CONTRACTS) in section I of the contract. Any such adjustment must be in accordance with this clause, as a result of a revised contract wage determination from the U.S. Department of Labor (DOL).

Any modification exercising this option will incorporate all current (as of the date of the modification) DOL wage determinations that are applicable to the contract, except where a valid collective bargaining agreement supersedes such DOL wage determinations. The applicable wage determinations were forwarded to you with our 60-day notice to exercise the option.

Your insurance will need to be in force for the forthcoming option period, according to section I clause FAR 52.226-5 INSURANCE --WORK ON A GOVERNMENT INSTALLATION. Please provide me written evidence of insurance.

Sincerely,

ART S. DOBBS
Contracting Officer
GSA Great Lakes Region
Federal Protective Service

Printed on Recycled Paper
PAGER 800-759-7243 PIN 570-6082

# EXHIBIT 89

**NCLN20**
Since 1990
Post Office Box 69
Fax (925) 299-2931
Lafayette, CA 94549
Telephone (925) 299-29[illegible]

September 20, 2001

General Services Administration
Federal Protective Services (5P5AM)
Mr. Art Dobbs, Contracting Officer
230 South Dearborn Street (Suite 3540)
Chicago, IL 60604-1696

Subject: Request for Equitable Adjustment for wage and benefit increases for 6-months Extension for contract GS05P99GCD0005 for Dispatch Operator Services at the Battle Creek Megacenter from 10/01/2001 through 03/31/2002

Dear Mr. Dobbs:

We are in receipt of your correspondence dated 09/19/2001 in which your office rejected our original cost proposal for the 6-months extension referenced above.

Your letter refences that we are allowed to make an adjustment to our prices (rates) based only on the results of revisions to the prevailing labor rates provided by the Secretary of Labor. To that effect, your letter included a copy of the U.S. Department of Labor Wage Determination No. 94-2277, Revision 14, dated May 31, 2001. Based on the increases in the wages ($0.53 per hour) and benefits ($0.63 per hour) listed in the new wage determination, we have prepared an equitable adjustment request in this regard in conformance with FAR Clause 52.222-43. We respectfully request that the hourly pricing for providing Basic Services under this contract be increased by $1.32 per hour for the Dispatch Operators and $1.[illegible] for the Dispatch Operator Supervisors. Additionally, we respectfully request that the hourly pricing for providing Short Term / Emergency Services under this contract be increased by $1.65 per hour for the Dispatch Operators and $1.65 for the Dispatch Operator Supervisors. Attached to this letter, you will find a two-page spreadsheet along with a three-page narrative explaining our basis for this equitable adjustment request.

Please, review the enclosed. If you have any questions in this regard, please do not hesitate to contact me at your earliest convenience. As always we are looking forward to hearing from you. As indicated, we are looking forward to another six months of providing services to GSA under contract number Contract Number GS05P99GCD0005 for Dispatch Operator Services at the Battle Creek Megacenter.

Sincerely,

[signature]

Karim Abercrombia
Chief of Operations

Enclosure

*Schedule 1-A*
***Request for Equitable Adjustment - Basic Services***
***due to New Wage Determinations with higher wages and higher H&W benefits***
***for General Services Administration, Federal Protective Service (5PSAM)***
***to provide Dispatch Operator Services at Battle Creek Megacenter***
***under Contract No. GS05P99GCC0005 for the six (6) months extension from 10/01/2001 - 03/31/2002***

***Hourly RSA Increase Analysis for GSA for Battle Creek Megacenter; WD 1994-2277, Rev. 14, dated 05/31/2001***

| 1 Description | 2 Wage Rate | 3 H&W Rate | 4 Increase per Hr | 5 FICA 7.65% | 6 FUTA 0.80% | 7 SUI 2.80% | 8 W/C 1.00% | 9 Sub-Total Increase | 10 Holiday 11.00 | 11 Vacation 10.00 | 12 Hourly Increase |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Dispatch Operator / Alarm Monitor** | | | | | | | | | | | |
| *Wages* | | | | | | | | | | | |
| Base Year | $ 15.02 | | | | | | | | | | |
| Option I | $ 15.55 | | | | | | | | | | |
| Difference | $ 0.53 | $ - | $ 0.53 | $ 0.0405 | $ 0.0042 | $ 0.0148 | $ 0.0053 | $ 0.5948 | $ 0.0252 | $ 0.0229 | $ 0.6429 |
| *Health & Welfare* | | | | | | | | | | | |
| Base Year | | $ 1.39 | | | | | | | | | |
| Option I | | $ 2.02 | | | | | | | | | |
| Difference | $ - | $ 0.63 | $ 0.63 | $ - | $ - | $ - | $ - | $ 0.6300 | $ 0.0267 | $ 0.0242 | $ 0.6809 |
| *Totals* | | | $ 1.16 | $ 0.0405 | $ 0.0042 | $ 0.0148 | $ 0.0053 | $ 1.2248 | $ 0.0519 | $ 0.0471 | $ 1.3238 |
| **Dispatch Operator Supervisor** | | | | | | | | | | | |
| *Wages* | | | | | | | | | | | |
| Base Year | $ 15.37 | | | | | | | | | | |
| Option I | $ 15.90 | | | | | | | | | | |
| Difference | $ 0.53 | $ - | $ 0.53 | $ 0.0405 | $ 0.0042 | $ 0.0148 | $ 0.0053 | $ 0.5949 | $ 0.0252 | $ 0.0229 | $ 0.6429 |
| *Health & Welfare* | | | | | | | | | | | |
| Base Year | | $ 1.39 | | | | | | | | | |
| Option I | | [illegible] | | | | | | | | | |
| Difference | $ - | $ 0.63 | $ 0.63 | $ - | $ - | $ - | $ - | [illegible] | $ 0.0267 | $ 0.0242 | [illegible] |
| *Totals* | | | $ 1.16 | [illegible] | [illegible] | $ 0.0148 | $ 0.0053 | $ 1.2248 | $ 0.0519 | $ 0.0471 | [illegible] |

09-19-'06 17:04 FROM-Tucker & Hughes,PLLC 313-230-7890 T-628 P013/080 F-576

Schedule 1-B

*Request for Equitable Adjustment - Short Term Emergency Services*
*due to New Wage Determinations with higher wages and higher H&W benefits*
*for General Services Administration, Federal Protective Service (5PSAM)*
*to provide Dispatch Operator Services at Battle Creek Megacenter*
*under Contract No. GS05P99GCC0005 for the six (6) months extension from 10/01/2001 - 03/31/2002*

*Hourly REA Increase Analysis for GSA for Battle Creek Megacenter; WD 1994-2277, Rev. 14, dated 05/31/2001*

| 1<br>Descrip-tion | 2<br>Overtime Wage Rate | 3<br>H&W Rate | 4<br>Increase per Hr | 5<br>FICA 7.65% | 6<br>FUTA 0.80% | 7<br>SUI 2.80% | 8<br>W/C 1.00% | 9<br>Sub-Total Increase | 10<br>Holiday 11.00 | 11<br>Vacation 10.00 | 12<br>Hourly Increase |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Dispatch Operator / Alarm Monitor** | | | | | | | | | | | |
| *Wages (Based on Overtime due Short-Term Emergency Services character* | | | | | | | | | | | |
| Base Year | $ 22.53 | $ 22.53000 | | | | | | | | | |
| Option I | $ 23.33 | $ 22.53000 | | | | | | | | | |
| Difference | $ 0.80 | $ - | $ 0.80 | $ 0.0612 | $ 0.0064 | $ 0.0224 | $ 0.0080 | $ 0.8980 | $ 0.0380 | $ 0.0345 | $ 0.9705 |
| *Health & Welfare* | | | | | | | | | | | |
| Base Year | | $ 1.39 | | | | | | | | | |
| Option I | | $ 2.02 | | | | | | | | | |
| Difference | $ - | $ 0.63 | $ 0.63 | $ - | $ - | $ - | $ - | $ 0.6300 | $ 0.0267 | $ 0.0242 | $ 0.6809 |
| *Totals* | | | $ 1.43 | $ 0.0612 | $ 0.0064 | $ 0.0224 | $ 0.0080 | $ 1.5280 | $ 0.0647 | $ 0.0587 | $ 1.6514 |
| **Dispatch Operator Supervisor** | | | | | | | | | | | |
| *Wages (Based on Overtime due Short-Term Emergency Services character* | | | | | | | | | | | |
| Base Year | $ 23.05 | | | | | | | | | | |
| Option I | $ 23.85 | | | | | | | | | | |
| Difference | $ 0.80 | $ - | $ 0.80 | $ 0.0612 | $ 0.0064 | $ 0.0224 | $ 0.0080 | $ 0.8980 | $ 0.0380 | $ 0.0345 | $ 0.9705 |
| *Health & Welfare* | | | | | | | | | | | |
| Base Year | | $ 1.39 | | | | | | | | | |
| Option I | | $ 2.02 | | | | | | | | | |
| Difference | $ - | $ 0.63 | $ 0.63 | $ - | $ - | $ - | $ - | $ 0.6300 | $ 0.0267 | $ 0.0242 | [illegible] |
| *Totals* | | | $ 1.43 | $ 0.0612 | $ 0.0064 | $ 0.0224 | $ 0.0080 | $ 1.5280 | $ 0.0647 | $ 0.0587 | $ 1.6514 |

RECEIVED 09-19-'07 20:31 FROM- TO- Tucker & Hughes,PLLC P006/016

General Services Administration
Great Lakes Region
230 South Dearborn Street
Chicago, IL 60604-1696

July 22, 1999

NCLN20, Inc.
Attn. Mr. Steve Jones, Pres.
5820 Stoneridge Mall Road, Suite 205
Pleasanton, CA 94588

Subject: Meeting with GSA on July 15, 1999
Contract GS05P99GCD0001

Dear Mr. Jones:

This letter summarizes our first post award meeting on July 15, 1999 regarding the staffing of the Battle Creek Megacenter. Present with us were Robert Starke of AKAL, Karin Abercrombia of NCLN20, Rick Gunderman and David Doubleday, both of GSA.

We reviewed the milestone schedule you prepared and found that the first six items were already completed. The remaining 14 points were on time for starting performance on October 1, 1999.

GSA wants you to submit a price proposal regarding revised rates due to the removal of the performance bond. Your revised price should reflect a reduction based upon full staffing of 25 personnel. After evaluating the price proposal, GSA will issue a modification to the contract.

That modification will also eliminate the restriction of hair styles and beards which pertain to contract security guards. We are pleased to hear that the attendants will normallly ware a dress shirt and tie or other suitable attire for an office.

A modification to the contract will be done to allow Megacenter personnel to use the equipment of the Health Unit in the Battle Creek facility.

With respect to the letter from Mr. Leo Reijnders of Advance Management Services, dated July 7, 1999, it is necessary to increase the supervision hours when full staffing is achieved, however, there is not an immediate need to modify the contract to add these hours. We can let that go for a period of several months.

Federal Recycling Program Printed on Recycled Paper

4

Rick Gunderman explained that 10 to 12 operators will be needed at start up on October 1, 1999. The full complement of personnel may not be reached in the first twelve months of performance, depending upon when control center functions are transferred from Regions 4 and 6.

Gunderman provided details on the following: An DC3 key system has been installed. Fiber-optic cabling is used. A combination picture identification and key card will be issued contract personnel. There will be a turnstile control. Post 30 can release the Megacenter door. NCLN20 will have access to NCIC 2000. He also explained that a standard operating procedure has not been completed. This undertaking is delayed, but progress is being made on it.

The Contract Manager will initially be Karin Abercrombia, however, a permanent Contract Manager will be required to be on-site on a 40 hour a week basis. The Contract Manager must be available at all times, if a problem arises.

NCLN20 intends to check on an insurance plan for its personnel.

We agreed to meet two more times prior to the start date. The next meeting will be in the Battle Creek Megacenter at 10:00 a.m. on Wednesday, August 18, 1999. A third meeting will be held in mid-September, but further details were not discussed.

Sincerely,

Art S. Dobbs
Contracting Officer
Federal Protective Service
GSA Great Lakes Region

cc:

D. Doubleday
R. Gunderman
R. Pinnau
M. Lopinto
A. Cabello
M. Flynn-Eggert

RECEIVED 09-19-'07 20:31 FROM- TO- Tucker & Hughes,PLLC P008/016

# AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

| 1. CONTRACT ID CODE | PAGE 1 OF PAGES 1 |
|---|---|

| 2. AMENDMENT/MODIFICATION NO. | 3. EFFECTIVE DATE | 4. REQUISITION/PURCHASE REQ. NO. | 5. PROJECT NO. (If applicable) |
|---|---|---|---|
| Modification 1 | Sep. 7, 1999 | | BCMI MegaCenter |

| 6. ISSUED BY CODE | 7. ADMINISTERED BY (If other than Item 6) CODE |
|---|---|
| General Services Administration<br>Federal Protective Service (5PSAM)<br>230 S. South Dearborn Street (Suite 3540)<br>Chicago, IL 60604-1696 | Same as item 6, through these Contracting Officers:<br>Roger R. Pinnau, ACO (Tel: 312/886-3515)<br>Art S. Dobbs, CO (Tel: 312/353-5003) |

| 8. NAME AND ADDRESS OF CONTRACTOR (No., street, county, State and ZIP Code) | (X) | 9A. AMENDMENT OF SOLICITATION NO. |
|---|---|---|
| NCLN20 Professional Services Company<br>Attn: Steve Jones, President (Tel: 925/734-1585)<br>Post Office Box 11607<br>5820 Stoneridge Mall Road (#205)<br>Pleasanton, CA 94588 | | 9B. DATED (SEE ITEM 11) |
| | | 10A. MODIFICATION OF CONTRACT/ORDER NO.<br>GS05P99GCD0001 (See Item #14) |
| | XX | 10B. DATED (SEE ITEM 11)<br>June 16, 1999 |
| CODE FACILITY CODE | | |

## 11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended, ☐ is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods: (a) By completing items 8 and 15, and returning ______ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment your desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA (If required)

## 13. THIS ITEM ONLY APPLIES TO MODIFICATION OF CONTRACTS/ORDERS. IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

| CHECK ONE | |
|---|---|
| | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. |
| XX | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b). |
| | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: |
| | D. OTHER (Specify type of modification and authority) |

E. IMPORTANT: Contractor [X] is not, ☐ is required to sign this document and return ______ copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

GS05P99GCD0001: Performance of Alarm Monitoring and Operation of Public Safety-related Telecommunications & Security Systems at GSA's Federal Protective Service "MegaCenter," in Battle Creek, Michigan. This unilateral administrative modification of the contract changes the contract number from GS05P99GCD0001 to GS05P99GCD0005. This change is required due to some unique characteristics of GSA's automated procurement system (SACONS). The contractor shall ensure that the new contract number (GS05P99GCD0005) is used on all correspondence, invoices, insurance and other written and verbal references to this contract. Wheresoever the original Contract number of GS05P99GCD0001 is found, the new Contract number GS05P99GCD0005 shall be deemed to supersede and replace it. This modification does not change any other feature of the contract. All terms and conditions of contract GS05P99GCD0001 are now those of GS05P99GCD0005.

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A. NAME AND TITLE OF SIGNER (Type or print) | | 16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print) | |
|---|---|---|---|
| | | Roger R. Pinnau, Contracting Officer | |
| 15B. CONTRACTOR/OFFEROR | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA | 16C. DATE SIGNED |
| (Signature of person authorized to sign) | | Roger R. Pinnau<br>(Signature of Contracting Officer) | Sept. 7, 1999 |

NSN 7540-01-152-8070
Previous edition unusable

STANDARD FORM 30 (REV. 10-83)
Prescribed by GSA FAR (48 CFR) 53.243

RECEIVED 09-19-'07 20:31 FROM- TO- Tucker & Hughes,PLLC P009/016

RECEIVED 09-19-'07 20:31 FROM- TO- Tucker & Hughes,PLLC P013/016
FROM-Tucker & Hughes,PLLC 313-230-7896 T-622 P013/080 F-575

Schedule 1-8
Request for Equitable Adjustment - Short Term Emergency Services
due to New Wage Determinations with higher wages and higher H&W benefits
for General Services Administration, Federal Protective Service (5PSAM)
to provide Dispatch Operator Services at Battle Creek Megacenter
under Contract No. GS05P99GCC0005 for the six (6) months extension from 10/01/2001 - 03/31/2002

Hourly REA Increase Analysis for GSA for Battle Creek Megacenter; WD 1994-2277, Rev. 14, dated 05/31/2001

| 1 Description | 2 Overtime Wage Rate | 3 H&W Rate | 4 Increase per Hr | 5 FICA 7.65% | 6 FUTA 0.80% | 7 SUI 2.80% | 8 W/C 1.00% | 9 Sub-Total Increase | 10 Holiday 11.00 | 11 Vacation 10.00 | 12 Hourly Increase |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Dispatch Operator / Alarm Monitor** | | | | | | | | | | | |
| Wages (Based on Overtime due Short-Term Emergency Services character | | | | | | | | | | | |
| Base Year | $ 22.53 | $ 22.53000 | | | | | | | | | |
| Option I | $ 23.33 | $ 22.53000 | | | | | | | | | |
| Difference | $ 0.80 | $ - | $ 0.80 | $ 0.0612 | $ 0.0064 | $ 0.0224 | $ 0.0080 | $ 0.8980 | $ 0.0380 | $ 0.0345 | $ 0.9705 |
| Health & Welfare | | | | | | | | | | | |
| Base Year | | $ 1.39 | | | | | | | | | |
| Option I | | $ 2.02 | | | | | | | | | |
| Difference | $ - | $ 0.63 | $ 0.63 | $ - | $ - | $ - | $ - | $ 0.6300 | $ 0.0267 | $ 0.0242 | $ 0.6809 |
| Totals | | | $ 1.43 | $ 0.0612 | $ 0.0064 | $ 0.0224 | $ 0.0080 | $ 1.5280 | $ 0.0647 | $ 0.0587 | $ 1.6514 |

| 1 Description | 2 Overtime Wage Rate | 3 H&W Rate | 4 Increase per Hr | 5 FICA 7.65% | 6 FUTA 0.80% | 7 SUI 2.80% | 8 W/C 1.00% | 9 Sub-Total Increase | 10 Holiday 11.00 | 11 Vacation 10.00 | 12 Hourly Increase |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Dispatch Operator Supervisor** | | | | | | | | | | | |
| Wages (Based on Overtime due Short-Term Emergency Services character | | | | | | | | | | | |
| Base Year | $ 23.05 | | | | | | | | | | |
| Option I | $ 23.85 | | | | | | | | | | |
| Difference | $ 0.80 | $ - | $ 0.80 | $ 0.0612 | $ 0.0064 | $ 0.0224 | $ 0.0080 | $ 0.8980 | $ 0.0380 | $ 0.0345 | $ 0.9705 |
| Health & Welfare | | | | | | | | | | | |
| Base Year | | $ 1.39 | | | | | | | | | |
| Option I | | $ 2.02 | | | | | | | | | |
| Difference | $ - | $ 0.63 | $ 0.63 | $ - | $ - | $ - | $ - | $ [illegible] | $ [illegible] | $ 0.0242 | [illegible] |
| Totals | | | $ 1.43 | $ 0.0612 | $ 0.0064 | $ 0.0224 | $ 0.0080 | $ 1.5280 | $ 0.0647 | $ 0.0587 | $ 1.6514 |

*Narrative to Request for Equitable Adjustment*
*Due to new wage determination which incorporates higher wages & benefits*
*As included in DOL Wage Determination No. 94-2277, Revision 14, dated 05/31/2001*
*For General Service Administration, Federal Protective Services*
*Under Contract No. GS05P99GCD0005*
*For Six-Months Extension from 10/01/2001 through 03/31/2002*

The following two spreadsheets provides an overview of the methodology used to arrive at this Request for Equitable Adjustment as a result of increases in wages and benefits incorporated through new Wage Determination into the above referenced contract per separate correspondence from GSA dated 09/19/2001. The first spreadsheet (Schedule 1-A) provides an overview of the REA for the "Basic Services" portion of the contract. The second spreadsheet (Schedule 1-B) provides an overview of the REA for the "Short Term Emergency Services" portion of the contract and is based on the need for overtime pay for the personnel providing the "Short Term Emergency Services)."

The format and make-up of the two spreadsheets is fairly similar. Each spreadsheet is divided into two major sections which each represent the two major labor categories and CLINs under this contract namely, Dispatch Operators / Alarm Monitors and Dispatch Operator Supervisors. Each spreadsheet consists of 12 columns which represent the following information:

Column 1: Provides a description of the labor category / year analyzed.

Column 2: Provides an overview of the wage rates included in the wage determinations at the beginning of this contract and the wage rates applicable during the six-months extension period of this contract based on the new wage determination. An overtime rate of 150% times the base rate is used in Schedule 1-B to denote that it is anticipated that the provision of Short Term Emergency Services will result in overtime pay.

Column 3: Provides an overview of the H&W rates included in the wage determinations at the beginning of this contract and the H&W rates applicable during six-months extension period of this contract based on the new wage determination.

Column 4: Provides the total increase per hour in wages and H&W benefits from the base year wage determinations to those applicable in six-months extension period.

Column 5: Represents the FICA taxes increase, calculated at 7.65% of the increase shown in Column 4. This value is calculated by taking the value of column 4, multiplying this value by 7.65% and rounding the resulting value to 2 decimals. FICA taxes have only been applied to the increase in wages and not to the increase in H&W benefits since these benefits are paid into a separate benefit plan.

Column 6: Represents the FUTA taxes increase, calculated at 0.8% of the increase shown in Column 4. This value is calculated by taking the value of column 4, multiplying this value by 0.8% and rounding the resulting value to 2 decimals. FUTA taxes

have only been applied to the increase in wages and not to the increase in H&W benefits since these benefits are paid into a separate benefit plan.

Column 7: Represents the SUI (SUTA) taxes increase, calculated at 2.8% of the increase shown in Column 4. This value is calculated by taking the value of column 4, multiplying this value by 2.8% and rounding the resulting value to 2 decimals. SUI taxes have only been applied to the increase in wages and not to the increase in H&W benefits since these benefits are paid into a separate benefit plan.

Column 8: Represents the Worker's Compensation Insurance increase, calculated at 1.00% of the increase shown in Column 4. This value is calculated by taking the value of column 4, multiplying this value by 1.00% and rounding the resulting value to 2 decimals. Worker's Compensation Insurance has only been applied to the increase in wages and not to the increase in H&W benefits since these benefits are paid into a separate benefit plan

Column 9: Represents a sub-total value of the wage and benefit increase plus all increases in applicable taxes and insurances. This value is arrived at by adding columns 4 through 8.

Column 10: Represents the increase in Holiday pay as a result of the increase in wages and benefits. This value is calculated at 11 holidays times 8 hours per day divided by 2,080 annual work hours for a Full-Time-Equivalent employee multiplied by the sub-total increase presented in column 9.

Column 11: Represents the increase in Vacation pay as a result of the increase in wages and benefits. This value is calculated at 10 vacation days times 8 hours per day divided by 2,080 annual work hours for a Full-Time-Equivalent employee multiplied by the sub-total increase presented in column 9.

Column 12: Represents a total cost of the wage and benefit increases plus all increases in applicable taxes and insurances and vacation and holiday cost. This value is arrived at by adding columns 9 through 11.

Based on this analysis NCLN20, Inc. respectfully requests an equitable adjustment in this regard as follows:

| *Labor Classification / CLIN* | *Requested increases in this Request for Equitable Adjustment due to wage & benefit increases* |
|---|---|
| Basic Services, Dispatch Operator | $1.32 per hour |
| Basic Services, Dispatch Operator Supervisor | $1.32 per hour |
| Short Term Emergency Services, Dispatch Operator | $1.65 per hour |
| Short Term Emergency Services, Dispatch Operator Supervisor | $1.65 per hour |

RECEIVED 09-19-'07 20:31 FROM- TO- Tucker & Hughes, PLLC P016/016
05-19-'06 17:05 FROM-Tucker & Hughes, PLLC 313-230-7896 T-628 P021/080 F-575



After implementation of these requested pricing increases, the newly proposed hourly prices for this project are expected to be as follows:

| *Labor Classification / CLIN* | *Hourly Rates per the original contract* | *REA increases due to higher wages & benefits* | *Proposed Hourly Rates after REA Increase* |
|---|---|---|---|
| Basic Services, Dispatch Operator/ Alarm Monitor | $24.76 | $1.32 | $26.08 |
| Basic Services, Dispatch Operator Supervisor | $26.74 | $1.32 | $28.06 |
| Short Term Emergency Services, Dispatch Operator/ Alarm Monitor | $24.76 | $1.65 | $26.41 |
| Short Term Emergency Services, Dispatch Operator Supervisor | $26.74 | $1.65 | $28.39 |