# In the United States Court of Federal Claims

No. 02-1282C
Filed: June 4, 2008
**TO BE PUBLISHED**

| | | |
|---|---|---|
| ************************************ | | Anti-Assignment Act, 31 U.S.C. § 3727; |
| | * | Certification, 41 U.S.C. § 605(c)(1); |
| NCLN20, INC., | * | Claim, 48 C.F.R. § 2.101; |
| | * | Contract Disputes Act of 1978, |
| Plaintiff, | * | 41 U.S.C. §§ 601 *et seq.*; |
| | * | Issue In Controversy, |
| v. | * | 48 C.F.R. § 33.201; |
| | * | Mistake In Bid, |
| THE UNITED STATES, | * | 48 C.F.R. §§ 14.407-3(a), (g)(2); |
| | * | Motion To Dismiss, RCFC 12(b)(1); |
| Defendant. | * | Request For Equitable Adjustment; |
| | * | Small Business Act of 1958, |
| | * | 15 U.S.C. §§ 631 *et seq.*; |
| | * | Termination For Convenience, |
| | * | 48 C.F.R. § 52.249-4; |
| ************************************ | | Termination For Default, 48 C.F.R. §§ 49.401(a)-(b). |

**Clarence B. Tucker, Sr.**, Clarence B. Tucker, Sr., PLLC, Detroit, Michigan, for Plaintiff.

**Douglas K. Mickle**, United States Department of Justice, Washington, D.C., for Defendant.

**MEMORANDUM OPINION AND ORDER**

**BRADEN,** ***Judge***.

On October 26, 2007, the defendant ("Government") filed a Motion For Partial Dismissal, asserting that the Third and Fourth Claims of NCLN20, Inc. ("NCLN20" or "Plaintiff")'s September 27, 2007 Amended Complaint should be dismissed, because they were not submitted to the contracting officer ("CO"), as required by the Contract Disputes Act of 1978, 41 U.S.C. §§ 605(a)-(c). For the reasons discussed herein, the Government's Motion For Partial Dismissal is denied.

In order to facilitate review of this Memorandum Opinion and Order, the following outline is provided:

**I. RELEVANT FACTS.**

**A. The Battle Creek Contract.**

**1. Plaintiff's May 21, 1999 Bid.**

**2. Amendments And Extensions.**

**3. Requests For Payment Of Unpaid Invoices.**

**B. The Michigan Guard Contract.**

**1. Plaintiff's August 17, 2001 Bid.**

**2. Plaintiff's August 23, 2001 Request To Correct A Mistake In Bid.**

**3. The Government's August 24, 2001 Preliminary Notice And September 7, 2001 Notice Of Award.**

**4. Plaintiff's Efforts To Commence Performance.**

**5. The Government's September 28, 2001 Termination For Default.**

**6. The General Accounting Office's October 26, 2001 Dismissal Of Plaintiff's Protest.**

**7. The General Services Administration Office Of Inspector General's May 23, 2002 Report.**

**II. PROCEDURAL HISTORY.**

**III. DISCUSSION.**

**A. Jurisdiction.**

**B. Standing.**

**C. Standard For Decision On A Motion To Dismiss, Pursuant To RCFC 12(b)(1).**

**D. The Government's Motion For Partial Dismissal.**

**1. The Government's Argument.**

**2. The Plaintiff's Response.**

**3. The Court's Resolution.**

**IV. CONCLUSION.**

**COURT APPENDIX.**

* * *

## I. RELEVANT FACTS.[1]

### A. The Battle Creek Contract.

#### 1. Plaintiff's May 21, 1999 Bid.

NCLN20 is a California-based corporation that provides security services for federal government agencies throughout the country. *See* Amend. Compl. ¶ 1. NCLN20 qualifies as a "minority business enterprise," under the Small Business Administration's ("SBA") Section 8(a) Program.[2] *Id.*

---

[1] The relevant facts recited herein were derived from: the September 27, 2007 Amended Complaint ("Amend. Compl."); Plaintiff's October 26, 2006 Certified Restated, Supplemented, and Amended Claims For Monetary Damages For Anticipatory Breaches Of Contract Appendix Of Exhibits ("Pl. Ex. 1-81"); the Government's July 12, 2004 Motion for Summary Judgment ("Gov't Mot. S.J.") and Appendix thereto ("Gov't App."); Plaintiff's October 19, 2004 Opposition ("Pl. Opp.") and Appendix thereto ("Pl. App."); and the Government's November 18, 2004 Reply ("Gov't Reply").

[2] Section 8(a) of the Small Business Act of 1958, 15 U.S.C. § 637(a)(1)(A), provides that: "[i]t shall be the duty of the Administration and it is hereby empowered, whenever it determines such action is necessary or appropriate . . . to make an award to a small business concern owned and controlled by socially and economically disadvantaged individuals which has previously completed its period of Program Participation[.]" 15 U.S.C. § 637(a)(1)(A).

The Section 8(a) Program, or Small/Disadvantaged Business Development Program, was established by Congress "to assist eligible small disadvantaged business concerns compete in the American economy through business development." 13 C.F.R. § 124.1. A business may participate in the Program if it is "a small business which is unconditionally owned and controlled by one or more socially and economically disadvantaged individuals who are of good character and citizens of the United States and [demonstrate] potential for success." *Id.* at § 124.101.

On May 21, 1999, NCLN20 submitted a bid on Solicitation No. GS05P99GCD0001, issued by Federal Protective Service ("FPS") of the General Services Administration ("GSA") to provide security staff for GSA's "Mega Center" in Battle Creek, Michigan ("Battle Creek Contract"). *See* Amend. Compl. ¶ 82. This contract had a base period of one year, commencing October 1, 1999, with a second year option for a total value of approximately $2.1 million. *See* Pl. Ex. 6. On June 16, 1999, the Contracting Officer ("CO")[3] accepted NCLN20's bid by letter. *Id.*

**2. Amendments And Extensions.**

On September 7, 1999, GSA modified the Battle Creek Contract, but only changed the contract number from GS05P99GCD0001 to GS05P99GCD0005. *See* Amend. Compl. ¶ 82; *see also* Pl. Ex. 7. On October 25, 1999, the Battle Creek Contract again was amended to increase health and welfare benefits, retroactive to June 1999. *See* Pl. Ex. 87.

On September 1, 2000, the Government exercised the first option period, for the performance term October 1, 2000 to September 30, 2001. *See* Pl. Ex. 88.

On August 23, 2001, the CO requested NCLN20 to submit a Cost Proposal for an additional six month extension of the Battle Creek Contract. On August 29, 2001, the requested Cost Proposal was provided to GSA. *See* Pl. Ex. N. On September 19, 2001, NCLN20 was invited to submit a revised Cost Proposal for the Six Month Extension, on or before September 21, 2001, to conform wage rates and benefits with recent U.S. Department of Labor Wage Determinations. *See* Pl. Ex. 54 (Sept. 19, 2001 letter from the CO to NCLN20 President).

On September 20, 2001, NCLN20 submitted a Request for Equitable Adjustment ("REA"), to conform wages and benefits with the recent U.S. Department of Labor Wage Determinations, and requested a six month extension. *See* Pl. Ex. 89. The record does not evidence any response to the September 20, 2001 REA.

**3. Requests For Payment Of Unpaid Invoices.**

On October 16, 2001, NCLN20 sent a letter to the CO requesting payment of unpaid Battle Creek Contract Invoices Nos. 3462, 3463, and 3464, in the amount of $75,142.20. *See* Pl. Ex. 56 ("We have reviewed our invoices and have determined that for the month of September 2001, there is no outstanding deficiency or deduction that we have been made aware. We have compensated all employees per Department of Labor Standards. Please send a written response to this letter if your office has decided not to pay these invoices. Otherwise, I look forward to seeing the funds returned

---

[3] Prior to March 1, 2003, the CO, Mr. Arthur Dobbs, was employed by GSA. *See* Dobbs Decl. II ¶ 1. Thereafter, Mr. Dobbs joined the Federal Protective Service ("FPS"), Bureau of Immigration and Custom Enforcement, United States Department of Homeland Security. *Id.*; *see also* Pl. Ex. 83 at 7 (CO's April 13, 2007 Determination And Finding) ("In March, 2003, the FPS was transferred from GSA to the Department of Homeland Security. However GSA continues its legal support of the lawsuit.").

to my bank account as per the contract."); *see also* Pl. Ex. 57 (Oct. 16, 2001 letter from NCLN20's Chief of Operations to the CO) (reporting that GSA was under-billed $75,142.20, because of corrupted spreadsheets that subsequently were corrected). Attached also was a copy of an October 15, 2001 bank statement showing that GSA paid for these invoices on October 11, 2001, but then withdrew that amount from NCLN20's account the next day, without explanation. *See* Pl. Ex. 56.

On January 30, 2002, the CO advised NCLN20 that GSA was unaware of any under-billing and asserted that GSA did not owe "anything on [the Battle Creek Contract], due to the . . . excess reprocurement costs/charges incurred by NCLN20 . . . [and] NCLN20's Termination for Default[4] on another GSA FPS R5 Contract (for Michigan Guard services) last year." Amend. Compl. ¶ 88. NCLN20 responded that it "had not been paid for services rendered and . . . had submitted an REA claim for monies owed for unpaid invoices and [sic] a result of six months of *underbilling*." *Id.* (emphasis in original).

### B. The Michigan Guard Contract.

#### 1. Plaintiff's August 17, 2001 Bid.

On July 31, 2001, GSA issued an Invitation to Bid on Solicitation No. GS05PO1GCD0009, an indefinite delivery, fixed price, requirements service contract for armed and unarmed uniformed security guard services assigned to federal buildings in the State of Michigan ("Michigan Guard Contract"). *See* Gov't App. at 1-2. This Solicitation was set aside for award through the Small/Disadvantaged Business Development Program of the Small Business Administration. *Id.* The base term of the proposed contract was October 1, 2001, or 30 calendar days from the date of award, whichever was later, with four consecutive one-year option periods. *Id.* Bids were due on August 17, 2001 by 4:30 p.m. *Id.*

---

[4] Federal Acquisition Regulation ("FAR") 49.401(a)-(b) states that a "termination for default" is:

> generally the exercise of the Government's contractual right to completely or partially terminate a contract because of the contractor's actual or anticipated failure to perform its contractual obligations.
>
> If the contractor can establish, or it is otherwise determined that the contractor was not in default or that the failure to perform is excusable; i.e., arose out of causes beyond the control and without the fault or negligence of the contractor, the default clauses prescribed in 49.503 and located at 52.249 provide that a termination for default will be considered to have been a termination for the convenience of the Government, and the rights and obligations of the parties governed accordingly.

48 C.F.R. §§ 49.401(a)-(b).

On August 15, 2001, NCLN20 submitted a bid on the July 31, 2001 Solicitation. *See* Gov't App. at 479, 484-85; *see also* Pl. App. at 146 (Jones Decl.) ¶ 3. On August 20, 2001, GSA opened the responsive bids. *See* Pl. App. at 147 (Jones Decl.) ¶ 5. NCLN20 submitted the lowest bid, proposing a five-year total price of $32,962,000. *See* Gov't App. at 399 (Dobbs Decl. ¶ 3). On August 21, 2001, the CO advised NCLN20's President and CEO that the company was the lowest bidder. *See* Gov't App. at 400 (Dobbs Decl. ¶ 4); *see also* Pl. App. at 147 (Jones Decl. ¶ 6). On August 22, 2001, a Notification of Apparent Low Bidder was faxed to NCLN20, together with a request to verify the prices submitted. *See* Pl. App. at 144-45.

**2. Plaintiff's August 23, 2001 Request To Correct A Mistake In Bid.**

On August 23, 2001, NCLN20's President and CEO informed GSA of a Mistake in Bid ("MIB"),[5] pursuant to FAR 14.407-3(a), in the amount of $923,000.00 over the five-year contract term. *See* Gov't App. at 400 (Dobbs Decl. ¶ 4). GSA responded that since NCLN20's bid could not be verified, it would be considered non-responsive and the Michigan Guard Contract would be awarded to the next lowest bidder. *Id.* NCLN20's accountant immediately faxed a letter to GSA explaining the error and requested a correction:

> NCLN20, Inc. would like to correct a clerical spreadsheet error in their bid on [the Solicitation.] The clerical error was a spreadsheet error in the calculation of the average hourly rate used to calculate total labor dollars. The Average Hourly Rate was calculated incorrectly as $14.88. A spreadsheet formula was incorrect and thus calculated a lower average hourly rate. The corrected average hourly rate is [$]15.40. On an annual basis, this is a $184,600 error and over the 5 year contract, this is a $923,000 error.
>
> NCLN20, Inc. would like to increase it's [sic] bid in the sum of $923,000 to correct this error[.]

Pl. App. at 18.

---

[5] FAR 14.407-3(a) provides:

> If a bidder requests permission to correct a mistake and clear and convincing evidence establishes both the existence of the mistake and the bid actually intended, the agency head may make a determination permitting the bidder to correct the mistake; provided, that if this correction would result in displacing one or more lower bids, such a determination shall not be made unless the existence of the mistake and the bid actually intended are ascertainable substantially from the invitation and the bid itself.

48 C.F.R. § 14.407-3(a).

On August 24, 2001, NCLN20's President and CEO again contacted GSA to discuss the correction, but was informed that GSA's Legal Department considered that an inaccurate bid was not a "clerical error," but a mistake in business judgment. *See* Gov't App. at 400 (Dobbs Decl. ¶ 4). Thereafter, GSA forwarded NCLN20 a prepared letter withdrawing the MIB claim requesting: "that [NCLN20] sign this letter of accord and satisfaction stating that you are voluntarily, intentionally and irrevocably withdrawing your mistake in bid claim. Upon countersigning, you may proceed with performance provided such performance is in full compliance with the terms of the contract." Pl. App. at 19. NCLN20's President and CEO signed and returned that letter. *See* Pl. App. at 148 (Jones Decl. ¶ 14).

In addition, NCLN20's President and CEO sent a letter to GSA to confirm that:

> I am officially and irrevocably withdrawing my request to make changes to my bid and hereby *accept the award of the above referenced contract*. I understand that this may result in unforeseen conditions. I am aware of the perils involved in managing a contract of this size. I am confident in the strength of my management team and can say with the utmost candor that this is in the best interest of NCLN20. I feel that with the significant savings to the government, it is also in the best interest of the General Services Administration.

Gov't App. at 417 (emphasis added).

### 3. The Government's August 24, 2001 Preliminary Notice And September 7, 2001 Notice Of Award.

On August 24, 2001, GSA faxed a Preliminary Notice of Award for Contract No. GS05PO1GCD0009 ("the Michigan Guard Contract") to NCLN20 stating:

> Please consider this a preliminary notice of award regarding the [Solicitation]. During the week of August 27, 2001, a post-award meeting will be scheduled in order to discuss performance start up on October 1, 2001.
>
> You can expect a formal notice of award letter within the next two business days.

Pl. App. at 20.

On that date, NCLN20's President and CEO also contacted counsel for advice on securing an "Assignment of Claims" loan to fund the first payroll. *See* Pl. App. at 149 (Jones Decl. ¶ 16). During their discussion, counsel informed NCLN20's President and CEO that he "had been to court against [the same CO] and GSA/FPS with a few other guard companies, in which this type of scenario had occurred [and] that to his knowledge and in his experience, there was no . . . rule for disallowing mistakes in bid." *See* Pl. App. at 149 (Jones Decl. ¶ 18). NCLN20's President and CEO informed the CO that NCLN20's counsel was of the opinion that the MIB claim was legitimate and that the Michigan Guard Contract should be "recalculated," before being awarded. *See* Pl. App. at

149 (Jones Decl. ¶ 19). The CO responded that GSA's Legal Department would be consulted. *See id.* ¶ 20.

During an August 30, 2001 "Kickoff Meeting" the CO advised NCLN20 that the incumbent contractor, Unlimited Security, Inc., was interested in selling NCLN20 weapons, as well as possibly equipment and uniforms. *See* Pl. App. at 150 (Jones Decl. ¶ 25). In addition, the CO and other GSA personnel strongly recommended that NCLN20 should hire "Randy McKay, as a good choice for . . . contract manager . . . and they knew his work." *Id.* ¶ 24.

On August 30, 2001, NCLN20 again was informed by counsel that:

> there was no legal reason that the Mistake in Bid could not be recalculated unless the contracting officer chose not to . . . this could only be done [, however,] in special circumstances where the contracting officer had additional information that allowed the contracting officer to verify the information independently.

Pl. App. at 151 (Jones Decl. ¶ 28).

On September 6, 2001, GSA was advised that NCLN20 intended to perform under the Michigan Guard Contract, but intended to pursue the MIB claim:

> As far as your request *regarding the October 1, 2001 start date, that is what our bid is based on per the solicitation specifications*. We are capable to perform the guard services on the required start date. Regarding our mistake in bid, I have been in contact with our attorney Larry Sklute. He has advised me that our mistake in bid is a mathematical error in our bid worksheets, and as such, it is not, as you have said in a conversation on August 24th, a mistake in judgment. During that same conversation you stated that that is why [the Government] would not be included to allow NCLN20 to correct it. I have reviewed the cases supplied by Mr. Sklute. I believe that he is correct. Although NCLN20 can perform the guard services and operate without correcting the mistake, now that I have information showing that NCLN20 is entitled to correction of our mistake in bid, we would like to do so. I signed the letter of withdrawal of our mistake in bid that you had drafted based on your explanation of August 24. Prior to executing the contract, I would like to proceed with the mistake in bid process.

Gov't App. at 420 (emphasis added).

On September 7, 2001, GSA's Legal Department decided that NCLN20's mistake was one of "business judgment." *See* Gov't App. at 403 (Dobbs Decl. ¶ 10). Specifically: "With respect to your faxed message dated September 6, 2001 regarding a mistake in bid, FAR 14.407-3(g)(2)[6] would

---

[6] FAR 14.407-3(g)(2) provides: "If the bid is verified, the contracting officer shall consider the bid as originally submitted. . . . If the bidder alleges a mistake, the contracting officer shall advise

apply: If the bid is verified, the contracting officer shall consider the bid as originally submitted[.]" Gov't App. at 421. On September 7, 2001, NCLN20 filed a formal request with GSA to adjust the MIB, submitting corrected worksheets. *Id*. at 425-62.

Nevertheless, on September 7, 2001, GSA awarded the Michigan Guard Contract to NCLN20 for October 1, 2001 through September 30, 2002 for five years at a fixed price of $32,962,000.00, with a one-year base period and four one-year renewal options. *See* Gov't App. at 422. NCLN20, however, did not receive the award letter until September 10, 2001. *See* Pl. App. at 152 (Jones Decl. ¶ 36).

**4. Plaintiff's Efforts To Commence Performance.**

On September 10, 2001, a NCLN20 employee traveled to Detroit to purchase handguns and obtain the permits and licenses required under Michigan law and meet with FPS district personnel. *See* Pl. App. at 152 (Jones Decl. ¶ 37). The terrorist attacks of September 11, 2001, however, intervened and prevented the scheduled meeting; all federal buildings in Michigan were shut down. *See* Pl. App. at 152 (Jones Decl. ¶¶ 38-41). Nevertheless, on September 11, 2001, NCLN20 sent GSA a status report regarding efforts to commence performance. *See* Gov't App. at 595-99; *see also* Pl. App. at 28-32.

On September 14, 2001, GSA informed NCLN20's President and CEO that the incumbent contractor decided after all not to sell NCLN20 weapons, equipment, or uniforms. *See* Gov't App. at 405 (Dobbs Decl. ¶ 14). As a result, NCLN20 had to order equipment from other sources and attempt to obtain 69 of the 110 weapons by September 15, 2001. *Id*.

On September 17, 2001, NCLN20 filed a protest with the General Accounting Office, now the Government Accountability Office ("GAO"), to appeal GSA's September 7, 2001 decision to disallow NCLN20's MIB claim. *See* Gov't App. at 463-519. The next day, the CO also advised NCLN20 that GSA decided to add 27 additional posts at all Michigan Social Security Administration Buildings to the Michigan Guard Contract and those new positions would have to be filled by the contract start-up on October 1, 2001. *See* Gov't App. at 405 (Dobbs Decl. ¶ 15); *see also* Pl. App. at 153 (Jones Decl. ¶ 42); Pl. App. at 154 (Jones Decl. ¶¶ 49-51).

---

the bidder to make a written request to withdraw or modify the bid. The request must be supported by statements (sworn statements, if possible) and shall include all pertinent evidence such as the bidder's file copy of the bid, the original worksheets and other data used in preparing the bid, subcontractors' quotations, if any, published price lists, and any other evidence that establishes the existence of the error, the manner in which it occurred, and the bid actually intended." 48 C.F.R. § 14.407-3(g)(2).

On September 18, 2001, NCLN20's Chief of Operations submitted a revised start-up plan notifying GSA that, despite NCLN20's best efforts, some weapons, equipment, and uniforms would not arrive until several days before the start-up date. *See* Gov't App. at 601-05.

On September 19, 2001, NCLN20 also requested an increase in hourly rates for the 27 new posts:

> We have gone forward with all intentions of starting on Oct. 1, 2001 and I don't foresee any reason why we couldn't. Yesterday, Art and I began discussing some of the pending changes on the contract before he had to hang up and take another call. My understanding is that there will be a contract modification to increase the hours and post on the contract. One question is will [the] Government waive some of the initial requirments [sic] to ramp up the staffing? Also, if we're unable to do so fast enough, because of the essential urgency, will the Government pay for the resulting overtime cost?

Gov't App. at 609; *see also* Gov't App. at 47 (Dobbs Decl. ¶ 18).

On September 20, 2001, the Wells Fargo Bank[7] contacted the CO to inquire whether payment to NCLN20 could be made twice per month, instead of monthly. *See* Gov't App. at 407 (Dobbs Decl. ¶ 19). Wells Fargo Bank was informed that no exception would be made to GSA's standard practice of making payment within 30 days. *Id.* On September 20, 2001, the Administrative CO[8] sent an e-mail to NCLN20 inquiring about the company's ability to commence performance on the start-up date:

> [On September 20, 2001,] NCLN20 submitted a partial response to one question (financial responsibility), and failed to respond at all to my other two questions submitted yesterday and repeated again, today (about whether NCLN20 is ready, willing and able to start contract performance as required, on October 1, 2001).
>
> In their partial response about their financial backing, they denied [the CO's] report of their Wells Fargo contact's statement.

---

[7] At this time, Wells Fargo Bank was considering whether to finance part of NCLN20's Michigan Guard Contract. *See* Gov't App. at 403 (Dobbs Decl. ¶ 9).

[8] The Administrative CO in this case is Mr. Roger Pinnau, Federal Protective Service ("FPS"). *See* Gov't App. 592; *see also* Pl. Ex. R at G-1 (Michigan Guard Contract Solicitation) (The "Administrative Contracting Officer (ACO) may act as the CO during the CO's absence/unavailability. . . . The [ACO] is designated by the Contracting Officer. During the presence or availability of the CO, the duties of the ACO may include" analysis of proposals and guidance for contractors.).

> It is my belief that NCLN20's refusal to respond in writing as required (by close of business today) reflects an unreadiness or unwillingness to perform as required by the contract. I have grave doubts about NCLN20's readiness or willingness to perform [the Michigan Guard Contract] as required by the terms and conditions of the contract, on October 1, 2001.
>
> I recommend that the contracting officer . . . review this matter and take appropriate action.

Gov't App. at 607.

On that date, a second fax and e-mail was sent to confirm that NCLN20 was required to commence performance on October 1, 2001:

> 6) After stating to you again that NCLN20 must comply with contract requirements, I again ask, will NCLN20 be ready to comply in full with all contract requirements, and start of contract performance as required on October 1, 2001? No equivocations ---- I want a simple yes, or no, today, stating either:
> a) yes, NCLN20 can and will comply with the [contract] in full, including full performance starting October 1, 2001, or
> b) no, NCLN20 can't or won't comply with [the] contract. You may explain why you can't or won't comply or be able to comply, if that is the case, in your written response, today.
>
> 7) NCLN20 must respond to this question, in writing, today. In this time of terrorist attacks, we have little time to make alternative arrangements. If NCLN20 can not or will not perform as required by the contract, we must take alternate actions, immediately, for public safety reasons. We do not have time for delays.
>
> 8) If the answer is yes, NCLN20 can and will perform as required by the Contract, we must be assured in detail as to NCLN20's preparations and accomplishments, with an updated contract startup plan from NCLN20, reflecting that NCLN20 is indeed ready and willing to do so. Show us in that plan that NCLN20 has made substantial progress, and can realistically be expected to perform on time, in accordance with the contract, without delays or other contract violations.

Gov't App. at 608-09.

The Administrative CO also explained that GSA's decision to add 27 new guards did not require a modification of the Michigan Guard Contract. *Id.*

On September 21, 2001, a FPS employee was shot and died in the lobby of the Frank V. McNamara Federal Building in Detroit, Michigan. *See* Gov't App. at 408 (Dobbs Decl. ¶ 21). NCLN20's President and CEO telephoned the CO about this situation, but declined to discuss the

status of NCLN20's performance progress in detail, fearing that the CO would misuse that information. *See* Pl. App. at 156 (Jones Decl. ¶ 70).

On September 24, 2001, the CO again inquired if NCLN20 was able to hire and certify all of the guards required and obtain necessary weapon permits and licenses. *See* Pl. App. at 44-45. A follow-up letter was faxed to NCLN20 providing the location of the new posts and contact information. *Id*.

In response, NCLN20's President and CEO immediately responded:

> Today you [the CO] contacted NCLN20 and inquired about the status of the handgun registrations and indicated that today NCLN20 must give you copies of the registration for each of the handguns.
>
> The Government notified NCLN20. . . . of the contract award in a notice of award letter, dated September 7, 2001. The Government mailed the letter by federal express and NCLN20 received it on September 10, 2001. Immediately afterwards NCLN20 contacted the incumbent, other guard contractors and several gun dealers for the purchase and supply of the handguns. After locating a viable supplier on 14 September 2001 NCLN20 inspected the handguns for purchase. Although NCLN20 has purchased the weapons, normal operations of the state licensing authorities is [sic] Monday, Tuesday and Friday and the state licensing office informed NCLN20, Inc. that they only register ten handguns per day. NCLN20's contract requires more than one hundred handguns.
>
> NCLN20 complied with contract provision G-15, which requires preparation for start of contract performance to occur "after contract award, but prior to start of contract performance." GSA recognizes that contract start-up will require "significant . . . resources, effort and coordination with GSA and other parties (local Government authorities, commercial suppliers and service providers. . . ." However, GSA has allowed only fourteen (14) working days to start-up.
>
> The local Government licensing authorities require significant time/effort -- more than fourteen (14) working days -- to register the handguns. NCLN20 requests that the Government waive the registration requirement, allowing NCLN20 to man the posts with unarmed guards and man a post with an armed guard as soon as a gun registration permit is issued for that guard. NCLN20's suggested approach is designed to provide GSA's customers with guard service to the maximum extent possible. That is GSA's goal in this time of crisis.

Pl. App. at 44-45.

On September 24, 2001, NCLN20 learned that the Michigan weapons registration agency accepted only cash and that the $550 check tendered the previous day would not be accepted. *See* Pl. App. at 155 (Jones Decl. ¶ 59). In response, a check was issued to the contracting manager,

Randy McKay, to register the guns in his name. *See* Pl. App. at 155 (Jones Decl. ¶¶ 59-60). NCLN20 also advised the CO of this situation. *See* Gov't App. at 408-09 (Dobbs Decl. ¶ 23). The FPS Director responded that Michigan would only allow the company to obtain a weapons license, because third party licenses were not permitted. *Id*.

On September 25, 2001, NCLN20 purchased three Jeep vehicles. *See* Pl. App. at 70-76. On that same date, NCLN20 obtained 41 weapons, but GSA denied the company's request to waive the handgun registration requirement. GSA also declined to issue any task orders or modifications regarding the hiring of the new additional guards:

> [NCLN20 was] notified by letter and facsimile via a preliminary notice of award dated August 24, 2001 that your company was being awarded Contract #GS05PO1GCD0009. On Tuesday, August 27, 2001, a teleconference start up meeting was held at which time 38 items contained in the Contract Implementation and Performance Start-up Plan were discussed. Progress and completion dates per item were provided by you and your staff.
>
> On Friday, September 7, 2001 you were issued the formal notice of award and notice to proceed. Several teleconferences were held during the weeks of September 10 and 17, 2001 respectively, to discuss various issues pertaining to your start up plan. You also provided me an updated Contract Implementation and Performance Start-up Plan via facsimile on Thursday, September 20, 2001 with your own assigned dates of completion.
>
> Based on these discussions and your demonstrated understanding of the contract guard requirements, no waiver will be granted for the registration of any handguns to be used on this contract. Further you will be expected to staff all posts as listed in Section J-1 of the contract, and all other posts added since then because of increased terrorist activities, with the appropriately specified guard and appropriate equipment, as required by the contract.

Gov't App. at 522-23.

On September 26, 2001, the CO faxed another letter to the NCLN20's President and CEO stating:

> Contract performance is scheduled to begin October 1, 2001. It is essential to the contract (Section C-8.1, paragraphs b and g) that guards be armed and properly licensed. Despite our requests this past week, you have not ascertained that your company will comply with this requirement.
>
> As of this date, your company has not demonstrated that you will be capable of staffing and arming all required post locations as specified in Section J-1 of the contract. Therefore, you are being notified that the Government considers your inability to secure weapons permits a condition that is endangering performance of

> this contract. Unless this condition is cured within 24 hours, or by close of business on Thursday, September 27, 2001, at 4:30pm CST, by providing us copies of all state required weapons permits, the Government may terminate for default under the terms and conditions of Clause 52.249-8, Default (Fixed Price Supply and Service), 1984.

Gov't App. at 610-11. The CO also placed a follow-up call to remind NCLN20's President and CEO that the company was required to obtain all weapons permits. *See* Gov't App. at 409 (Dobbs Decl. ¶ 26).

On September 27, 2001, NCLN20's President and CEO requested a meeting with the Chief of FPS Support Services Branch, because:

> During a conversation on 25 September 2001 the contracting officer . . . Mr. Art Dobbs, has instructed NCLN20 to obtain gun permits by 26 September 2001. On that same day, NCLN20 [informed] the Government that NCLN20 promptly sought to obtain the guns and purchased the guns immediately after the contracting officer notified NCLN20 on 10 September 2001 that the Government had awarded NCLN20 the contract.
>
> In that same letter, NCLN20 informed [Mr. Dobbs] that NCLN20 complied with contract provision G-15 . . . . However, [the Government] has allowed only fourteen (14) working days to start-up. The Government has failed to provide a start up period of at least thirty (30) days as requested by solicitation section K-17. *Also, the unfortunate event of September 11, 2001 hampered NCLN20's efforts to start-up. As such, NCLN20 reasonably requested that the Government waive the registration requirement, allowing NCLN20 to man the posts with unarmed guards and man a post with an armed guard as soon as a gun registration permit is issued by the state for that guard*. As stated in that letter, this approach is designed to provide your customer with guard service to the maximum extent possible in this time of crisis. That is [The Government's] stated goal. According to an email that we attached to our letter, Mrs. Nadine F. Rouse states:
>
> > During this time of crisis it is imperative that [the Government] provide guard services to our customers to the maximum extent possible. Thus, during this period, regions may have to use guards lacking some or most of the existing Guard II requirements.
>
> Mr. Dobbs drafted a letter, dated 25 September 2001, stating that the letter is written "in response to your letter dated Monday, September 24, 2001." Therein, Mr. Dobbs states that a "preliminary notice of award dated August 24, 2001" had been issued informing NCLN20 that the contract is "being" awarded to NCLN20. In other words, according to that letter, as of 24 August 2001, [the Government] did not award the contract to NCLN20. [The Government] reiterated this fact at least three times. During the early part of September 2001, the bank informed NCLN20 that Mr. Dobbs

> informed the bank that [the Government] had not yet awarded the contract to NCLN20.
>
> Mr. Dobbs confirmed this fact again, when he mailed NCLN20 the notice of award letter that NCLN20 received for the first time on 10 September 2001. Also, in his letter of 25 September Mr. Dobbs states that [the Government] did not notify NCLN20 of the contract award until he "issued" his letter, dated 7 September 2001.
>
> As demonstrated above, *the delay is beyond NCLN20's control*. However, in a letter of 26 September 2001 Mr. Dobbs alleges that he is authorized to exercise FAR Clause 52.249-8. In this regard, he states that NCLN20 must cure the purported defects "by close of business on Thursday, September 27, 2001 at 4:30 pm CST" or face a possible termination for default.
>
> Please contact me to make arrangements to schedule the requested meeting. I look forward to hearing from you.

Gov't App. at 524-26 (emphasis added).

**5. The Government's September 28, 2001 Termination For Default.**

On September 28, 2001, GSA issued a Determination and Finding, terminating the Michigan Guard Contract for default.[9] *See* Gov't App. at 527-28. Instead, this contract was awarded to Unlimited Security, Inc., the incumbent and second lowest responsive bidder. *Id.* at 410-11 (Dobbs Decl. ¶ 28); *see also* Pl. App. at 156 (Jones Decl. ¶ 68).

**6. The General Accounting Office's October 26, 2001 Dismissal Of Plaintiff's Protest.**

On September 17, 2001, NCLN20 filed a protest with the GAO, contesting GSA's refusal to allow a correction of the MIB. On October 26, 2001, NCLN20's protest was dismissed:

> [GSA] view[s] the protest as academic because NCLN20, by virtue of having had its contract terminated for default, is ineligible for award for reasons unrelated to its bases for protest. The jurisdiction of our Office is established by the bid protest provisions of . . . 31 U.S.C. §§ 3551-3556. . . . The General Accounting Office will not consider a protest where the issue presented has no practical consequences with regard to an existing federal government procurement and thus is of purely academic interest.

Gov't App. at 529-30.

[9] *See supra*, note 4.

**7. The General Services Administration Office Of Inspector General's May 23, 2002 Report.**

On October 2, 2001, NCLN20 requested that the GSA Office of Inspector General review the September 28, 2001 termination for default. *See* Gov't App. at 537. On May 23, 2002, the Regional Inspector General for Auditing, Great Lakes Region, issued Report No. A020042/P/5/R02010 ("IG Report"). *Id.*

The IG Report concluded:

> Our review showed that FPS: (i) did not grant NCLN20 a start-up period consistent with the terms of the contract; (ii) did not give NCLN20 10 days to respond to its cure notice as required by the FAR; (iii) may have exposed the Government to increased costs by not exercising a valid Option to Extend Services clause; (iv) did not give the Small Business Administration advance notice of the contract termination as required; (v) may not have administered NCLN20's claim for mistake in bid in a manner consistent with the FAR; and (vi) appeared to be inconsistent in treatment of NCLN20 as compared to other guard services contractors.

*Id.*

The IG Report also stated that, although it was unacceptable to contemplate starting the Michigan Guard Contract without armed guards, it "appeared that FPS' response to the September 11, 2001 emergency was inconsistent with its treatment of incumbent and past guard contractors as compared to NCLN20." *Id*. at 550. As a matter of fairness in light of increased demand for armed service after the terrorist attacks on September 11, 2001, while NCLN20 completed the task of obtaining the firearm licenses and permits, FPS could have pursued one of several options: (i) exercising an option to extend the incumbent contractor's period of service; (ii) subcontracting guards from the incumbent contractor or another responsible guard service company or hiring off-duty Michigan police personnel; (iii) filling reimbursable posts with unarmed guards if the customer agency gives permission; (iv) temporarily re-instituting a former policy allowing unarmed guards to man screening devices as long as the guards were in the line of sight of an armed guard; (v) granting NCLN20 a 30 day start-up period required by the contract; and/or (vi) granting NCLN20 10 days to respond to the CO's cure notice. *Id*.

## II. PROCEDURAL HISTORY.

On September 30, 2002, NCLN20 filed a Complaint in the United States Court of Federal Claims. The case was assigned to the Honorable Christine O.C. Miller. On January 31, 2003, the Government filed an Answer. On March 24, 2003, the parties filed a Joint Preliminary Status Report, to inform the court that settlement discussions had commenced, but a period of 180 days would be required if settlement efforts failed. On July 10, 2003, the court convened a status conference, wherein the parties stated they had abandoned settlement and commenced discovery.

On August 15, 2003, this case was transferred to the undersigned judge. On October 16, 2003, the court convened a status conference. On October 17, 2003, the court entered a Status Conference Order, authorizing interrogatories to be issued by November 4, 2003, to be answered no later than December 4, 2003. The Order further provided that if no settlement appeared likely, the parties provide the court with a list of potential deponents and additional discovery required to prepare for trial, that would be scheduled for late September or October 2004.

On November 26, 2003, the Government filed a Motion To Compel Discovery. On December 9, 2003, January 7, 2004, and February 25, 2004, the court convened status conferences to ascertain the progress of discovery. On February 26, 2004, the court entered an Order dismissing the Government's November 26, 2003 Motion To Compel, based on the Government's representation that it was satisfied with NCLN20's responses to discovery requests. The court also granted NCLN20's February 26, 2004 Motion For Leave To File Out Of Time The Plaintiff's First Set Of Interrogatories And Production Of Documents.

On March 15, 2004, the parties filed a Status Report requesting that the court stay the case to allow the parties again to pursue a potential settlement. On March 23, 2004, the court issued an Order staying the case until June 9, 2004, for this purpose.

On June 9, 2004, the Government filed a Status Report, advising the court that settlement efforts were not productive and proposing dispositive motions be filed by July 12, 2004. On June 21, 2004, NCLN20 filed a concurring Status Report. On June 21, 2004, the court entered a Scheduling Order, setting a deadline for any Government dispositive motions.

On July 12, 2004, the Government filed a Motion For Summary Judgment And Appendix In Support Thereof, together with Proposed Findings of Uncontroverted Fact. On October 19, 2004, NCLN20 filed an Opposition, Appendix in support thereof, and Response to the Government's Proposed Findings of Uncontroverted Fact. On November 18, 2004, the Government filed a Reply. On February 10, 2005, NCLN20 filed a Sur-Reply. In writing the opinion, the court discovered that NCLN20 had not submitted certified claims to the CO before filing the Complaint, a jurisdictional prerequisite.

On August 31, 2005, by consent of the parties, NCLN20 submitted a certified REA to the CO regarding claims arising from the Michigan Guard Contract. On September 23, 2005, the court convened a telephone status conference to determine how to proceed on the summary judgment motion in light of NCLN20's certified REA. On October 3, 2005, the court stayed the case until the CO could issue a final decision on the certified REA.

On December 5, 2005, the Government filed an initial Status Report advising the court that, although NCLN20 submitted certain information to the CO in the REA, additional information was requested.

On March 6, 2006, the Government filed a second Status Report, advising the court that NCLN20's new counsel, Mr. Clarence B. Tucker, Sr., recently acquired his client's case files and was in the process of determining whether to supplement or amend the REA. The Government also

reported that, pursuant to the request of the Administrative CO, the Defense Contract Audit Agency ("DCAA")[10] commenced an independent audit of NCLN20's REA.

On June 5, 2006, the Government filed a third Status Report, advising the court that DCAA's audit would be completed by July 31, 2006. Thereafter, the Government estimated that the CO would be able to issue a final decision on NCLN20's REA within 60 days.

On September 5, 2006, the Government filed a fourth Status Report, advising the court that DCAA did not receive certain requested documents from NCLN20, despite repeated requests. NCLN20 responded that the problem was caused by prior counsel, but relevant documents would be forthcoming by mid-October 2006.

On December 1, 2006, the Government filed a fifth Status Report, advising the court that GSA received a "supplemental REA" on or around November 1, 2006, that also was forwarded to DCAA, but DCAA's audit would not be completed before February 28, 2007.

On March 5, 2007, the court contacted counsel to inquire about the status of the CO's evaluation and the DCAA audit. On March 7, 2007, the Government responded that the DCAA audit should be completed within two or three weeks and a final decision by the CO would be issued by early April 2007, barring unforeseen circumstances. On March 15, 2007, NCLN20 filed a Response To The Law Clerk's Email Dated 3/5/07 Requiring An Update On The Status Of The DCAA Audit And Response And Objections To Defendant USA's Email Dated 3/17/07 Re: "Status of DCAA Audit," together with nine attachments ("Law Clerk Resp. Ex. A-H"). Therein, NCLN20 alleged that DCAA refused to audit: the REA or Amended REA claims for anticipatory lost profits, attorney fees, or interest; NCLN20's entitlement to quantum damages, alleged in the October 26, 2006 Amended Claims; and NCLN20's Amended Claims.

On March 29, 2007, the DCAA audit concluded that NCLN20 incurred $46,856.00 in expenses until the September 28, 2001 termination for default of the Michigan Guard Contract. *See* Pl. Ex. 86 (March 29, 2007 DCAA Audit of NCLN20's REA).

---

[10] The DCAA:

> consists of approximately 4,000 people located at more than 300 field audit offices throughout the United States, Europe, and in the Pacific. The Agency provides standardized contract audit services for the Department of Defense, as well as accounting and financial advisory services regarding contracts and subcontracts to all DoD Components responsible for procurement and contract administration. These services are provided in connection with negotiation, administration, and settlement of contracts and subcontracts. DCAA also provides contract audit services to some other Government Agencies.

Defense Contract Audit Agency: About DCAA, History, at http://www.dcaa.mil

On March 30, 2007, the Government filed a sixth Status Report advising the court that the CO would issue a final decision "within a few weeks," barring unforeseen circumstances.

On April 24, 2007, the Government submitted a seventh Status Report, attaching a copy of DCAA's March 29, 2007 audit,[11] together with the CO's April 13, 2007 Determinations and Findings. The April 13, 2007 Determinations and Findings concluded that:

> The DCAA established a reasonable sum to make NCLN20 whole. There were several reasons why NCLN20 should have been terminated for default, but in order to bring the lawsuit to a close, the Government is justified in changing its [termination for default] to a [termination for convenience[12]] and to compensate NCLN20 for reasonable costs as determined by the DCAA review. Further, any payments associated with an expired NCLN20 contract for alarm dispatch services at the Battle Creek Mega Center, which expired on September 30, 2001 continues to be on hold regarding close out transactions because this [termination for default] will be released.

Pl. Ex. 83. After converting the Michigan Guard Contract from a termination for default to a termination of convenience, the CO authorized payment of $46,856.00 to NCLN20. *Id*. The CO also informed NCLN20 that the April 13, 2007 Determinations And Findings were final. *See* Pl. Ex. 82.

---

[11] The March 29, 2007 Audit reviewed costs incurred in 2001 by NCLN20 to commence the Michigan Guard Contract. *See* Pl. Ex. 86 at 1. Specifically, the Audit: examined source documents including invoices and cancelled checks; inquired whether credits for returned items properly were disclosed; inquired whether leases of vehicles were terminated or returned to mitigate costs; and inquired as to whether NCLN20 incurred additional costs not disclosed in data submitted to the Government. *Id*. The Audit reported that: NCLN20 returned certain contract items for credits in the amount of $16,408; leases of contract vehicles were terminated and the leased vehicles returned, reducing the net cost for the leases to $3,000; and that NCLN20 incurred a net cost of $46,856 in commencing the Michigan Guard Contract. *Id*. at 1-2.

[12] Regarding a "termination for convenience," FAR 52.249-4 provides that:

> The Contracting Officer, by written notice, may terminate [a] contract, in whole or in part, when it is in the Government's interest. If [a] contract is terminated, the Government shall be liable only for payment under the payment provisions of [the] contract for services rendered before the effective date of termination.

48 C.F.R. § 52.249-4 (Termination For Convenience (Services) (Short Form) (clause for insertion in Government service contracts)); *see generally* Paul J. Seidman & David J. Seidman, *Maximizing Termination For Convenience Settlements/Edition II--Part I*, 08-3 Briefing Papers 1 (Feb. 2008).

On May 9, 2007, the court convened a status conference during which the Government argued that NCLN20's September 30, 2002 Complaint was moot, because the CO converted the Michigan Guard Contract from a termination for default to a termination for convenience. The Government conceded, however, that NCLN20's lost profits claims were not audited, because the CO determined he did not act in bad faith. The court encouraged the parties to explore settlement over the next 60 days, but lifted the September 30, 2002 stay and scheduled a status conference for July 10, 2007.

On July 10, 2007, NCLN20 reported that the parties held a settlement conference to no avail, so the company was prepared to proceed with this litigation. Because the reasons for termination changed, the parties agreed to a voluntary dismissal of the September 30, 2002 Complaint to allow NCLN20 to file a new complaint by mid-August 2007.[13]

On September 27, 2007, NCLN20 filed a First Amended Complaint[14] ("Amend. Compl.") in the United States Court of Federal Claims, together with five binders of Exhibits.[15] The First

---

[13] On July 17, 2007, NCLN20 filed a Notice Of Attorney Liens. On July 19, 2007, the court issued an Order striking this notice, because it did not comply with the Rules of the United States Court of Federal Claims and contravened the Anti-Assignment Act, 31 U.S.C. § 3727.

[14] In the July 10, 2007 Status Conference, NCLN20 had agreed to a voluntary dismissal of this case, and to file a new complaint in a directly-related case. *See* 7/10/07 TR. Instead, NCLN20 filed the September 27, 2007 Amended Complaint in this case. The record does not evidence any objection on the part of the Government.

[15] NCLN20 attests that "Binders 1, 2, 3, and 5 were served upon Arthur S. Dobbs, Contract[ing] Officer for U.S. Department of Homeland Security, on 10/27/06 with Plaintiff NCLN20's [October 26, 2006] Certified, Restated, Supplemental, and Amended Claims[.]" *See* Amend. Compl. Appendix: Annexed Exhibits. Exhibit Binder 1 includes: An Overview of Contract Damages and supporting Schedules ("Pl. Ex. A-C"); IRS Publication 15 (Circular E) Employer's Tax Guide ("Pl. Ex. D"); an August 23, 2001 letter to Mr. Art Dobbs, Contracting Officer ("Pl. Ex. E"); List Of Employees and Payroll Registers ("Pl. Ex. F, Pl. Ex. H"); U.S. Department of Energy Excel Spreadsheet of Midwest Retail Gas Prices: June 4, 2001 to August 14, 2006 ("Pl. Ex. G."); Price For Leased Vehicles Under the Michigan Guard Contract ("Pl. Ex. I"); NCLN20 Attorney Invoices ("Pl. Ex. J"); and NCLN20 Invoices for Battle Creek Contract ("Pl. Ex. K").

Exhibit Binder 2 includes: correspondence and invoices concerning the Battle Creek Contract in 2001 ("Pl. Ex. L"); 2001 Michigan Vehicle Buyers Vendor Forms Between Wells Fargo Equipment Finance Corp., and Enterprise Car Sales) ("Pl. Ex. M"); NCLN20's August 29, 2001 Cost Proposal for Six Month Extension Of Battle Creek Contract ("Pl. Ex. N"); 2001 Invoices from "ATC Uniform" To NCLN20 ("Ex. O"); August 20, 2001 Price Abstract comparing price proposals submitted under Michigan Guard Contract Solicitation ("Pl. Ex. P"); and NCLN20's Michigan Guard Contract Proposal and Michigan Guard Contract Solicitation ("Pl. Ex. R").

Claim For Relief ("First Claim") seeks monetary damages for the Government's "bad faith, arbitrary, capricious, malicious, material, and total anticipatory breaches and wrongful termination of [the Michigan Guard Contract] and other relief." *See* Amend. Compl. ¶¶ 59-73. The Second Claim For Relief ("Second Claim") seeks monetary damages for the Government's "malicious, material and full anticipatory breaches of [the Michigan Guard Contract's] implied duties of good faith and fair dealing, to cooperate and not to hinder or interfere with contract performance[,] and wrongful termination of [the Michigan Guard Contract]." *Id.* ¶¶ 74-79. The Third Claim For Relief ("Third Claim") seeks monetary damages for the Government's "bad faith, arbitrary, capricious, malicious, material and total anticipatory breaches and wrongful termination of [the Battle Creek Contract]." *Id.* ¶¶ 80-97. The Fourth Claim For Relief ("Fourth Claim") seeks monetary damages for the Government's "malicious, material and anticipatory breaches of [the Battle Creek Contract's] implied duties of good faith and fair dealing, to cooperate and not to hinder or interfere with [Battle Creek Contract's] performance[,] and wrongful termination of [the Battle Creek Contract]." *Id.* ¶¶ 98-103.

On October 26, 2007, the Government filed an Answer to the September 27, 2007 Amended Complaint ("Gov't Answer"). On that same date, the Government also filed a Motion For Partial Dismissal ("Gov't Mot. Dis."), together with the October, 26, 2007 Declaration of the CO, Mr. Arthur D. Dobbs ("Dobbs Decl. II"). On January 11, 2008, NCLN20 filed a Response ("Pl. Resp. II"), together with four exhibits ("Pl. Resp. II Ex. A-D"). On February 18, 2008, the Government filed a Reply ("Gov't Reply II"), together with an Appendix of Exhibits ("DA 1-174"). On March 17, 2008, NCLN20 filed a Sur-Reply, together with one exhibit ("Pl. SR Ex. A").

## III. DISCUSSION.

### A. Jurisdiction.

The United States Court of Federal Claims has "jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United

---

Exhibit Binder 3 includes: NCLN20's October 26, 2006 Certified Restated, Supplemented, and Amended Claims For Monetary Damages For Anticipatory Breaches Of Contract ("Oct. 2006 Claims"), along with Appendix of Exhibits ("Pl. Ex. 1-81").

Exhibit Binder 4 includes: April 18, 2007 letter To NCLN20's Counsel Announcing CO's Decision ("Pl. Ex. 82"); the CO's April 13, 2007 Determination And Finding ("Pl. Ex. 83"); December 1, 2005 letter From NCLN20's prior counsel to the CO ("Pl. Ex. 84"); Sept. 5, 2001 GSA Request For Services Form for Michigan Guard Solicitation ("Pl. Ex. 85"); the March 29, 2007 DCAA Audit of NCLN20's REA for the Michigan Guard Contract ("Pl. Ex. 86"); Modification 2 of the Battle Creek Contract ("Pl. Ex 87"); Sept. 1, 2000 letter from the CO to NCLN20 President providing notice of intent to exercise first option under the Battle Creek Contract ("Pl. Ex. 88"); and Sept. 20, 2001 NCLN20 REA for sixth month extension of the Battle Creek Contract ("Pl. Ex. 89").

Exhibit Binder 5 includes: 2001 invoices showing costs of preparing performance of the Michigan Guard Contract ("Tabs A-J").

States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). The Tucker Act, however, is "only a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages." *United States* v. *Mitchell*, 445 U.S. 535, 538 (1980) (quoting *United States* v. *Testan*, 424 U.S. 392, 398 (1976)). Therefore, to satisfy the jurisdictional requirements of the Tucker Act, a plaintiff must identify and plead a constitutional provision, federal statute, independent contractual relationship, and/or executive agency regulation that provides a substantive right to money damages. *See Todd* v. *United States*, 386 F.3d 1091, 1094 (Fed. Cir. 2004) ("[J]urisdiction under the Tucker Act requires the litigant to identify a substantive right for money damages against the United States separate from the Tucker Act."); *see also Roth* v. *United States*, 378 F.3d 1371, 1384 (Fed. Cir. 2004) ("Because the Tucker Act itself does not provide a substantive cause of action . . . a plaintiff must find elsewhere a money-mandating source upon which to base a suit.").

The Contract Disputes Act of 1978 ("CDA") authorizes the United States Court of Federal Claims to adjudicate claims for monetary damages arising from "any express or implied contract . . . entered into by an executive agency for . . . the procurement of services[.]" 41 U.S.C. § 602(a)(2). The court has subject matter jurisdiction over the September 27, 2007 Amended Complaint, because it alleges substantive claims under the CDA, *i.e.*, claims for monetary damages under two Government contracts, the Battle Creek Contract and Michigan Guard Contract, for the procurement of Government services. *See* Amend. Compl. ¶¶ 59-103; *see also* 41 U.S.C. § 602(a)(2); *Id.* § 609(a)(1) ("[A] contractor may bring an action directly on the claim in the United States Court of Federal Claims, notwithstanding any contract provision, regulation, or rule of law to the contrary.").

Each claim alleged in the Amended Complaint, however, must satisfy the mandatory requirements of the CDA before the United States Court of Federal Claims can exercise subject matter jurisdiction. *See* 41 U.S.C. § 605(a); *see also B.D. Click Co.* v. *United States*, 1 Cl. Ct. 239, 241 (1982) ("The plaintiff has failed to produce or cite any evidence establishing either that it submitted a written claim to the contracting officer or that the contracting officer rendered a final decision. . . . Consequently, the court lacks subject matter jurisdiction to consider plaintiff's claims[.]"). As discussed herein, however, the court has determined that NCLN20 has satisfied the CDA's jurisdictional prerequisites.

### B. Standing.

Standing must be determined "as of the commencement of suit." *Rothe Dev. Corp.* v. *Dep't of Def.*, 413 F.3d 1327, 1334 (Fed. Cir. 2005). The party invoking federal jurisdiction bears the burden of establishing standing. *See Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 561 (1992). In order to establish standing, "a plaintiff must demonstrate [that] it has suffered an injury in fact that is . . . concrete and particularized and . . . actual or imminent, not conjectural or hypothetical; . . . the injury is fairly traceable to the challenged action of the defendant; and . . . it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc.* v. *Laidlaw Envtl. Serv., Inc.*, 528 U.S. 167, 180-81 (2000) (citing *Lujan*, 504 U.S. at 560-61).

On June 16, 1999, NCLN20 was awarded the Battle Creek Contract. On September 7, 2001, NCLN20 was awarded the Michigan Guard Contract. On September 28, 2001, GSA terminated the Michigan Guard Contract for default. On April 13, 2007, the Government converted GSA's September 28, 2001 termination for default to a termination for convenience, but rejected or continued to ignore NCLN20's claims under the Battle Creek Contract. Accordingly, NCLN20 has a concrete injury under both contracts fairly traceable to the Government's actions and has standing in the United States Court of Federal Claims. *See Rothe Dev. Corp.*, 413 F.3d at 1334 (holding that a plaintiff must demonstrate an actual injury directly caused by Government action).

**C. Standard For Decision On A Motion To Dismiss, Pursuant To RCFC 12(b)(1).**

A challenge to the "court's general power to adjudicate in specific areas of substantive law . . . is properly raised by a [Rule] 12(b)(1) motion[.]" *Palmer* v. *United States*, 168 F.3d 1310, 1313 (Fed. Cir. 1999); *see also* RCFC 12(b)(1) ("Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, or third-party claim, shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion: (1) lack of jurisdiction over the subject matter[.]"). When considering whether to dismiss an action for lack of subject matter jurisdiction, the court is "obligated to assume all factual allegations to be true and to draw all reasonable inferences in plaintiff's favor." *Henke* v. *United States*, 60 F.3d 795, 797 (Fed. Cir. 1995). NCLN20 bears the burden of establishing jurisdiction by a preponderance of the evidence. *See Reynolds* v. *Army & Air Force Exch. Serv*., 846 F.2d 746, 748 (Fed. Cir. 1988) ("[O]nce the [trial] court's subject matter jurisdiction [is] put in question, it [is] incumbent upon plaintiff to come forward with evidence establishing the court's jurisdiction."). If the court determines that it does not have jurisdiction over the claims alleged, a motion to dismiss must be granted. *See* RCFC 12(b)(1).

**D. The Government's Motion For Partial Dismissal.**

**1. The Government's Argument.**

The Government first asserts that the court does not have subject matter jurisdiction over the Third and Fourth Claims of the September 27, 2007 Amended Complaint, because NCLN20 failed to submit Battle Creek Contract claims to the CO before filing the Amended Complaint. *See* Gov't Mot. Dis. at 1. In fact, NCLN20 "did nothing more than make a routine request for payment of outstanding [Battle Creek Contract] invoices, which does not qualify as a 'claim' under the CDA." *Id*. at 5; *see also* 48 C.F.R. § 2.101 ("A voucher, invoice, or other routine request for payment that is not in dispute when submitted is not a claim."); Dobbs Decl. II ¶ 5 ("I have reviewed the contract files pertaining to [Battle Creek Contract] and state that I have not received a certified claim as set forth in the Contracts Disputes Act with respect to invoices pertaining to [the Battle Creek Contract], either unpaid or underpaid."). In fact, the Government argues that these invoices were never "disputed" between NCLN20 and the CO. *See* Gov't Mot. Dis. at 5 (citing Amend. Compl. ¶ 88) ("On 1/30/02, [the CO] sent [NCLN20's Chief of Operations] an email stating that he wasn't aware of NCLN20's underbilling, and claimed that [the Government] didn't owe NCLN20 anything on the Contract, due to the [claimed] excess reprocurement costs/charges incurred by NCLN20, due to

NCLN20's Termination for Default" on the Michigan Guard Contract.) (internal citation and quotation omitted).

In addition, the Government asserts that NCLN20 did not make a request for, nor did it obtain, a final decision from the CO regarding the Battle Creek Contract "claims," as required by the CDA. *See* Gov't Mot. Dis. at 5; *see also* Dobbs Decl. II ¶ 5 ("Furthermore, I have not been asked to render a final decision on any claim pertaining to these [Battle Creek Contract] invoices.").

The Government also asserts that, although the Battle Creek Contract claims exceed $100,000, NCLN20 failed to certify them. *See* Gov't Mot. Dis. at 5; *see also* 41 U.S.C. § 605(c)(1) ("For claims of more than $100,000, the contractor shall certify that the claim is made in good faith, that the supporting data are accurate and complete to the best of his knowledge and belief, that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable, and that the certifier is duly authorized to certify the claim on behalf of the contractor.").

In the alternative, even if the Battle Creek Contract "claims" are cognizable under the CDA, they must be dismissed, because the CO rendered a final decision on January 30, 2002, but NCLN20's Amended Complaint was not filed within 12 months thereafter. *See* 41 U.S.C. § 609(a)(3) ("Any [contractor action] shall be filed within twelve months from the date of the receipt by the contractor of the decision of the contracting officer concerning the claim, and shall proceed de novo in accordance with the rules of the appropriate court."); *see also K & S Constr*. v. *United States*, 35 Fed. Cl. 270, 277 (1996); *White Buffalo Constr., Inc*. v. *United States*, 28 Fed. Cl. 145, 147 (1992) (filing claim just one day following expiration of 12-month-rule rendered claim untimely, and could not "be extended out of sympathy for particular litigants, even if this effects a seemingly harsh result[.]").

**2. The Plaintiff's Response.**

NCLN20 responds that the court has subject matter jurisdiction over the Third and Fourth Claims of the Amended Complaint, because NCLN20 properly submitted these claims to the CO by: the October 16, 2001 "REAs"; the August 31, 2005 certified REA; the December 1, 2005 "REA supplementation;" and the October 26, 2006 Certified Restated, Supplemented, and Amended Claims For Monetary Damages ("Oct. 26, 2006 Claims"). *See* Pl. Resp. II at 3-4; *see also* Pl. Ex. 56 (Oct. 16, 2001 letter from NCLN20's President to the CO); Pl. Ex. 57 (Oct. 16, 2001 letter from NCLN20's Chief of Operations to the CO); Pl. Ex. 3 (NCLN20's Aug. 31, 2005 REA for the Michigan Guard Contract); Pl. Ex. 84 (Dec. 1, 2005 letter from NCLN20's Counsel to the CO); and Pl. Ex. Binder 3 (Oct. 26, 2006 Claims, together with Appendix of Exhibits). In fact, the CO acknowledged receipt of the August 31, 2005 certified REA in the April 13, 2007 Determination And Findings. *See* Pl. Resp. II at 18 (citing Pl. Ex. 83 at 7 (April 13, 2007 CO's Determination And Findings)); *see also* Pl. Ex. 82 (April 18, 2007 letter from the CO to NCLN20's counsel) (April 13, 2007 Determination And Findings constitute "the final decision of the Contracting Officer.").

NCLN20 explains that these multiple "claims" were "non-routine" and "in dispute," as evidenced by the record between 2001 and 2007. *See* Pl. Resp. II at 15-16. Although the Tucker Act

and the CDA do not define the term "claim," the United States Court of Appeals for the Federal Circuit has held that "nothing in [48 C.F.R. § 2.101] suggests that *other* written demands seeking payment of a sum certain as a matter of right, *i.e*., those demands that are not 'routine request[s] for payment,' also must be already in dispute to constitute a 'claim.'" *Reflectone* v. *Dalton*, 60 F.3d 1572, 1576 (Fed. Cir. 1995) (emphasis added); *see also* Pl. Resp. II at 11-12. Therefore, the "in dispute" requirement advocated by the Government is unsupported by the contract, the CDA and governing precedent. *See* Pl. Resp. II at 12-14.

The CO's April 13, 2007 Determinations And Findings concluded that:

> any payments associated with an expired NCLN20 contract for alarm dispatch services at the Battle Creek Mega Center, which expired September 30, 2001 continues to be on hold regarding close out transactions because this [termination for default] will be released.

Pl. Ex. 83.

Therefore, the CO "failed to issue a final decision on [the Battle Creek Contract] claims in a timely manner." Pl. Resp. II at 3 (citing 41 U.S.C. § 605(c)(5) ("Any failure by the contracting officer to issue a decision on a contract claim within the period required will be deemed to be a decision by the contracting officer denying the claim and will authorize the commencement of the appeal or suit on the claim as otherwise provided in this chapter.")); *see also Schickler* v. *United States*, 54 Fed. Cl. 264, 270 (2002) ("A deemed denial is not sufficient to start the clock on the CDA's statute of limitations; the 12-month period 'does not begin to run until the contracting officer renders an actual written decision on the contractor's claim.'") (quoting *Pathman Constr. Co.* v. *United States*, 817 F.2d 1573, 1574 (Fed. Cir. 1987)).

**3. The Court's Resolution.**

Congress requires that a government contractor submit any claim arising under a contract in writing to the relevant CO for a decision as a jurisdictional prerequisite to filing a complaint in the United States Court of Federal Claims. *See* 41 U.S.C. § 605(a) ("All claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision."); *see also Greenhill Reforestation* v. *United States*, 39 Fed. Cl. 683, 685 (1997) ("The requirement in the CDA that claims 'shall be in writing and submitted to the contracting officer for decision,' has been construed as a jurisdictional prerequisite to proceeding in this court.") (citation omitted).

For claims over $100,000, Congress also requires that "the contractor . . . certify that the claim is made in good faith, that the supporting data are accurate and complete to the best of his knowledge and belief, that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable, and that the certifier is duly authorized to certify the claim on behalf of the contractor." 41 U.S.C. § 605(c)(1); *see also Donald M. Drake Co*. v. *United States*, 12 Cl. Ct. 518, 519 (1987) ("In order for [the United States Court of Federal Claims] to entertain a direct access action under the CDA, plaintiff must have: 1) submitted a written

and properly certified claim to the contracting officer, and 2) obtained a final decision by the contracting officer on the claim.") (citation omitted); *United Sales* v. *United States*, 34 Fed. Cl. 88, 94 (1995) ("[T]he CDA requires, as a jurisdictional prerequisite, that a contractor's claim . . . be submitted . . . with the proper certification."). The certification may not be waived, as it was "enacted to hold contractors liable for fraudulent, unwarranted and inflated claims and to encourage settlements." *United Sales*, 34 Fed. Cl. at 95 (citing *Skelly & Loy* v. *United States*, 231 Ct. Cl. 370, 376 n.11 (1982)). In addition, certification cannot be made in a "piecemeal fashion." *Black Star Sec., Inc.* v. *United States*, 5 Cl. Ct. 110, 115 (1984).

In this case, NCLN20 argues that the mandatory CDA requirements were met with respect to the Battle Creek Contract claims on four different occasions:[16]

- The October 16, 2001 "REAs." *See* Pl. Resp. II at 3-4 (citing Pl. Ex. 56 (Oct. 16, 2001 letter From NCLN20 President to the CO) and Pl. Ex. 57 (Oct. 16, 2001 letter from NCLN20's Chief of Operations to the CO)).

- The August 31, 2005 certified REA. *See* Pl. Ex. 3 (NCLN20's Aug. 31, 2005 REA regarding the Michigan Guard Contract).

- The December 1, 2005 "REA supplementation." *See* Pl. Ex. 84 (Dec. 1, 2005 letter from NCLN20's Counsel to CO).

- The October 26, 2006 Certified Restated, Supplemented, and Amended Claims For Monetary Damages. *See* Pl. Ex. Binder 3 (NCLN20's Oct. 26, 2006 Claims, together with Appendix).

First, the October 16, 2001 "REAs" were letters requesting payment either for outstanding invoices or to correct underpayment from "corrupted spreadsheets." *See* Pl. Ex. 56 (Oct. 16, 2001 letter from President of NCLN20 to the CO) ("I am writing to beg your assistance in paying the proceeds of our final invoices[.]"); *see also* Ex. 57 (Oct. 16, 2001 letter from NCLN20's Chief of Operations to the CO) ("The contract manager . . . discovered a computation problem with the [employee hour] spreadsheet. . . . For your review, I have included a monthly breakdown that shows the invoice total versus the correct total and the discrepancy in payment."). Whether the $75,142.20 sought in these letters was in "dispute" or "non-routine" is not relevant, however, because NCLN20 failed explicitly or implicitly to request a "final decision" therein, as required by the CDA. *See* 41 U.S.C. § 605(a) ("All claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer *for a decision*.") (emphasis added); *see also James M. Ellett Constr. Co.* v. *United States*, 93 F.3d 1537, 1540 (Fed. Cir. 1996) (a letter implicitly requested a final decision of the CO where the letter's stated purpose was "to file formal notice of claim pursuant to the Contract Disputes Act of 1978[.]"); *Scan-Tech Sec., L.P.* v. *United States*, 46 Fed. Cl. 326, 331 (2000) ("[T]he claim must, either explicitly or implicitly, request a contracting officer's final decision."). Accordingly, the October 16, 2001 letters do not satisfy the

[16] The court has listed each of the filings regarding the Battle Creek Contract asserted to satisfy the claim requirements of the CDA in an attached Court Appendix.

requirements of the CDA with respect to Claims 3 and 4 of the September 27, 2007 Amended Complaint.

Second, the August 31, 2005 certified REA,"Request for Equitable Adjustment of Contract Number: GS05P01GCD0009," concerns the Michigan Guard Contract. *See* Pl. Ex. 3 at 2. The Third and Fourth Claims of the Amended Complaint, however, seek monetary damages under the Battle Creek Contract. *See* Amend. Compl. ¶¶ 80-103; *see also* Pl. Ex. 3 at 1-11. Therefore, the August 31, 2005 certified REA does not satisfy the requirements of the CDA with respect to Claims 3 or 4 of the September 27, 2007 Amended Complaint. *See James M. Ellet Constr. Co.*, 93 F.3d at 1540; *see also Scan-Tech Sec., L.P.*, 46 Fed. Cl. at 331.

Third, the December 1, 2005 "REA supplementation," a letter from NCLN20's former counsel to the CO, asserts the same claims and damages as set forth in the Third and Fourth Claims of the September 27, 2007 Amended Complaint. *See* Pl. Ex. 84 at 10-11 (Dec. 1, 2005 letter From NCLN20's former counsel to the CO) ("Actual Damages Costs Of [Battle Creek Contract] - $ 306,419"); *see also id.* at Supplement "Cost Break Down Of Breach Of Contract Damages" (itemizing claims arising under Battle Creek Contract). The Battle Creek Contract claims in the December 1, 2005 "REA supplementation" were more than $100,000, but were filed without the required certification, a deficiency that cannot be corrected by earlier or later filings. *See Black Star*, 5 Cl. Ct. at 115 ("[T]he certification cannot be made in a piecemeal fashion[.]") (citation omitted); *see also W. H. Moseley Co.*, 230 Ct. Cl. at 406 ("[T]he Government may not be estopped, by any asserted 'waiver' by the contracting officer, of that statutory requirement, to claim that the proper certification is lacking."). Therefore, the December 1, 2005 "REA supplementation" does not satisfy the requirements of the CDA with respect to the Third and Fourth Claims of the September 27, 2007 Amended Complaint.

Fourth, the October 26, 2006 Claims concern the same claims and damages as set forth in the Third and Fourth Claims of the September 27, 2007 Amended Complaint. *Compare* Pl. Ex. Binder 3 at 15-16 (NCLN20's Oct. 26, 2006 Claims) ("[The CO] unfairly and in bad faith maliciously and with ill will, personal bias and animosity exhibited toward NCLN20 and with the intent to grievously injure NCLN20 and to deprive it of all of the benefits of the [Battle Creek Contract] . . . in bad faith rejected [NCLN20's] cost proposal and the extension of the [Battle Creek Contract][.]"); *see also id.* at 19 ("[The CO had] a willful and malicious intent to deceive and discriminate against NCLN20 and deprive NCLN20 of its benefits and rights under the [Battle Creek Contract][.]"); *see also id.* at 22 (NCLN20 "was caused to suffer and sustain and is therefore entitled to additional actual monetary compensatory damages of lost profits from the [Battle Creek Contract] of $67,009 and to suffer and sustain unpaid invoices of $97,775, and under-paid invoices of $75,143.00.") *with* Amend. Compl. ¶¶ 80-103 (Third and Fourth Claims) (alleging same bad faith and wrongful termination claims and damages as in October 26, 2006 claims submitted to the CO). The Exhibits to the October 26, 2006 Claims also substantiate these claims and damages. *See* Pl. Ex. Binder 3 at 15-16, 19, 22 (NCLN20's Oct. 26, 2006 Claims) (NCLN20 "is also attaching its <u>clear and strong evidence</u> supporting its claims (see Exhibit Binders I and II, with Appendix and Exhibits A thru [sic] R[.]") (emphasis in original); *see also* Pl. Ex. K (invoices for Battle Creek Contract); Pl. Ex. L (correspondence and invoices concerning Battle Creek Contract from 2001); Pl. Ex. N (NCLN20's Aug. 29, 2001 Cost Proposal for Six Month Extension Of Battle Creek Contract).

Although the October 26, 2006 Claims were entitled "NCLN20's Certified Restated, Supplemented and Amended Claims for Monetary Damages for Anticipatory Breaches of Contract # GS05PO1GCD0009," *i.e.*, the Michigan Guard Contract, sections of the October 26, 2006 Claims concern the Battle Creek Contract and set forth the Third and Fourth Claims and requested damages in the September 27, 2007 Amended Complaint. *See, e.g.*, Pl. Ex. Binder 3 at 16, 19, 22; Pl. Ex. K; Pl. Ex. L; Pl. Ex. N.

Therefore, the October 26, 2006 Claims satisfy the requirements of the CDA with respect to the Third and Fourth Claims of the Amended Complaint. Again, the October 26, 2006 filing asserts the same Battle Creek Contract claims and damages as in the Third and Fourth Claims of the September 27, 2007 Amended Complaint. *Compare* Pl. Ex. Binder 3 at 15-16, 19, 22 (Oct. 26, 2006 Claims) *with* Amend. Compl. ¶¶ 80-103 (Third and Fourth Claims). In addition, these "claims" were provided with a written demand to the CO seeking a sum certain under the Battle Creek Contract. *See* Pl. Ex. Binder 3 at 22 ("NCLN20 was caused to suffer and sustain and is therefore entitled to additional actual monetary compensatory damages of lost profits from [Battle Creek Contract] of $67,009 and to suffer and sustain unpaid invoices of $97,775, and under-paid invoices of $75,143.00."); *see also James M. Ellett Constr. Co.*, 93 F.3d at 1542 ("Under the FAR, there are three requirements a nonroutine submission must meet to be a 'claim.' It must be: (1) a written demand or assertion, (2) seeking as a matter of right, (3) the payment of money in a sum certain.") (citing 48 C.F.R. § 33.201).[17] In addition, NCLN20's October 26, 2006 Claims were "in dispute" for purposes of the CDA since, for over four years, the invoices either were underpaid, unpaid, or payment apparently was withdrawn. *See, e.g.*, Pl. Ex. 56 (Oct. 16, 2001 letter from NCLN20's President to the CO forwarding NCLN20's bank statements showing payment for subject invoices were withdrawn); *see also Kalamazoo Contractors* v. *United States*, 37 Fed. Cl. 362, 368 (1997) ("According to the United States Court of Appeals for the Federal Circuit, a routine request for payment . . . must be . . . 'in dispute' when submitted[.]") (citing *James M. Ellett*, 93 F.3d at 1542). In any case, as a matter of law, the October 26, 2006 claims were "in dispute," because they were submitted in a "non-routine" document, *i.e.*, "Claims For Monetary Damages." *See* Pl. Ex. Binder 3 (NCLN20's Oct. 26, 2006 Claims); *see also Reflectone*, 60 F.3d at 1576 ("[N]either the CDA, its legislative history, nor the FAR, nor its history, suggests that a dispute must pre-date the contractor's submission of the claim to the CO *when the claim is in the form of a non-routine demand as of right*.") (emphasis added); *see also id*. at 1576-77 ("Routine requests" include vouchers, invoices, or other routine requests for payments, but do not include REAs, a remedy payable only when unforeseen or unintended circumstances increase contract performance costs.).

The October 26, 2006 Claims also explicitly requested a "final resolution" by the CO, as required by 41 U.S.C. § 605(a). *See* Pl. Ex. Binder 3 ("[I]t is requested that the Contracting Officer, within the next sixty (60) days . . . issue a final decision from which an appeal may be taken under the 'Disputes' clause of the Contract."); *see also Scan-Tech Sec.*, 46 Fed. Cl. at 331 ("[T]he claim must, either explicitly or implicitly, request a contracting officer's final decision.").

---

[17] FAR 33.201 defines an "issue in controversy" as "a material disagreement between the Government and the contractor that (1) may result in a claim or (2) is all or part of an existing claim." 48 C.F.R. 33.201.

In addition, the October 26, 2006 Claims, including those arising from the Battle Creek Contract and supporting exhibits, were certified in accordance with the CDA:

> I, Stephen Jones, President of NCLN20, certify that:
>
> (a) The attached *Certified Restated, Supplemented, and Amended Claims For Monetary Damages For Breaches of Contract # GS05PO1GCD0009* is made in good faith;
>
> (b) The supporting data is accurate and complete to the best of my knowledge and belief;
>
> (c) The amount requested accurately reflects the contract adjustment for which NCLN20 believes the government is liable; and
>
> (d) I am duly authorized to certify this claim on behalf of the Company.

Pl. Ex. Binder 3 (emphasis in original).

Finally, as a matter of law, when a claim exceeds $100,000, the CO either must issue a decision within sixty days of the filing of the claim or notify the claimant as to *when* a final decision will issue. *See* 41 U.S.C. § 605(c)(2); *see also S. Cal. Edison* v. *United States*, 58 Fed. Cl. 313, 320 (2003) ("For claims in excess of $100,000, the CDA does not set a specific time period within which a contracting officer must make a decision. Rather it permits the contracting officer, within sixty days of the filing of the claim, either to issue a decision or to notify the claimant of when the final decision eventually will be issued."). In this case, the CO issued a Final Determination and Findings regarding NCLN20's August 31, 2005 REA on April 13, 2007. *See* Pl. Ex. 82 (Although the REA was undated, it was submitted electronically via facsimile "to this office after close of business on August 31, 2005[.]"). Additionally, the Government conceded that the CO timely received and reviewed NCLN20's October 26, 2006 Claims. *See* Gov't Answer ¶ 69 ("Admits the allegations contained in the first two sentences of paragraph 69b" of NCLN20's Amended Complaint.); *see also* Dec. 1, 2006 Gov't Status Report (reporting that the GSA received the October 26, 2006 Claims from NCLN20 on or around November 1, 2006); April 24, 2007 Gov't Status Report at 2 ("On or about November 1, 2006, the FPS [Contracting Officer] received a supplemental REA[18] from NCLN20. . . . The contracting officer has reviewed the audit and [NCLN20's] REAs.").

---

[18] The Government inaccurately describes NCLN20's October 26, 2006 filing as an "REA." *See, e.g.*, April 24, 2007 Gov't Status Report at 2. The October 26, 2006 filing, in fact, was entitled: "Certified Restated, Supplemented, and Amended *Claims* For Monetary Damages[.]" *See* Pl. Ex. Binder 3 at ii (emphasis added).

The CO's April 13, 2007 Determinations And Findings, however, concluded:

> any payments associated with an expired [Battle Creek Contract] for alarm dispatch services at the Battle Creek Mega Center, which expired September 30, 2001 continues to be on hold regarding close out transactions because this [termination for default] will be released.

Pl. Ex. 83.

Because the CO failed to issue a final decision regarding NCLN20's October 26, 2006 Battle Creek Contract claims in the April 13, 2007 decision or notify NCLN20 as to *when* he would issue a final decision on those claims, as a matter of law, those claims are considered as denied.[19] *See Case, Inc.* v. *United States*, 88 F.3d 1004, 1008-09 (Fed. Cir. 1996) ("A CDA action may be brought in the Court of Federal Claims or before a board of contract appeals only if . . . the contracting officer has failed to issue a final decision on the contractor's claim or to notify the contractor of the time within which a decision will be issued, and at least 60 days have passed since the date the claim was submitted for a decision. . . . In the latter case, the claim is 'deemed denied.'") (citations omitted).

In addition, the September 27, 2007 Amended Complaint is not barred by the six year statute of limitations, because NCLN20 submitted monetary claims alleged in the Amended Complaint to the CO on August 31, 2005 and October 26, 2006, and filed the Amended Complaint well within 12 months of the CO's April 13, 2007 Final Decision on those monetary claims. *See* 41 U.S.C. § 609(a)(3) ("Any [contractor action] shall be filed within twelve months from the date of the receipt by the contractor of the decision of the contracting officer concerning the claim, and shall proceed de novo in accordance with the rules of the appropriate court."); *see also* Pl. Ex. 3 (NCLN20's Aug.

---

[19] On July 18, 2007, the CO informed NCLN20 that:

> [t]he withholding of funds on the [Battle Creek] Contract was due to the termination for default (T4D) dated September 28, 2001 of the [Michigan Guard] Contract. NCLN20 was liable for re-procurement costs on the [Michigan Guard] contract until April 18, 2007, when the T4D was changed to a Termination For Convenience of the Government[.] Please complete the enclosed Release of Claims for the [Battle Creek] contract. . . . Sign and return to me so we can process these invoices for payment.

Pl. Resp. II Ex. A.

To date, the Government apparently has not received the requested forms necessary for payment of the Battle Creek Contract invoices. *See* Dobbs Decl. II ¶ 6 ("[W]e have requested that NCLN20 submit certain information using prescribed directions so DHS can make payment upon them, but to date, I have not received such invoices.").

A dispute as to whether interest is owed on these payments may account for NCLN20's delay in submitting these forms. *See* Pl. Resp. Ex. C ¶ 13(f)(iii) (Jan. 9, 2008 Affidavit of Mr. Stephen Jones, President of NCLN20) (characterizing the CO's July 18, 2007 letter as a "conditional and limited" "settlement offer" that NCLN20 has rejected.).

31, 2005 REA regarding the Michigan Guard Contract); Pl. Ex. Binder 3 (NCLN20's Oct. 26, 2006 Certified Restated, Supplemented, and Amended Claims For Monetary Damages); Pl. Ex. 83 (April 13, 2007 CO Determinations and Findings).

Accordingly, the court has jurisdiction to adjudicate the Third and Fourth Claims of the September 27, 2007 Amended Complaint.

## IV. CONCLUSION.

For these reasons, the Government's October 26, 2007 Motion For Partial Dismissal is denied. The court will convene a status conference on or before June 13, 2008, to set a trial date.

**IT IS SO ORDERED.**

s/ Susan G. Braden
**SUSAN G. BRADEN**
**Judge**

# COURT APPENDIX
# CHART LISTING FILINGS ALLEGED TO CONSTITUTE VALID "CLAIMS" UNDER THE CONTRACT DISPUTES ACT, 41 U.S.C. §§ 605(a)-(c).

| **Filing** | **Why It Meets/Does Not Meet 41 U.S.C. §§ 605(a)-(c) Requirements?** |
|---|---|
| Oct. 16, 2001 letter from NCLN20 President to the CO. *See* Pl. Ex. 56 ("I am asking to beg your assistance in paying the proceeds of our final invoices[.]"). | Does not meet requirements. Does not implicitly or explicitly request a "final decision" from the CO. *See* 41 U.S.C. § 605(a) ("All claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer *for a decision*.") (emphasis added). |
| Oct. 16, 2001 letter from NCLN20's Chief of Operations to the CO. *See* Pl. Ex. 57 ("The contract manager discovered a computation problem with the [employee hour] spreadsheet. . . . For your review, I have included a monthly breakdown that shows the invoice total versus the correct total and the discrepancy in payment."). | Does not meet requirements. Does not implicitly or explicitly request a "final decision" from the CO. *See* 41 U.S.C. § 605(a) ("All claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer *for a decision*.") (emphasis added). |
| NCLN20's August 31, 2005 REA for the Michigan Guard Contract. *See* Pl. Ex. 3 at 1-11 (NCLN20's August 31, 2005 REA addressing claims only from the Michigan Guard Contract, not the Battle Creek Contract). | Does not meet requirements. Does not certify claims relating to the Battle Creek Contract, the subject of the Third and Fourth Claims of the September 27, 2007 Amended Complaint. *See* 41 U.S.C. § 605(a) ("All claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision."). |
| December 1, 2005 letter from NCLN20's Prior Counsel to the CO. *See* Pl. Ex. 84 at 1-14 (No certification included in or attached to December 1, 2005 letter). | Does not meet requirements. Battle Creek Contract "claims" addressed in letter were more than $100,000, but no certification was attached. *See* 41 U.S.C. § 605(c)(1) (For claims over $100,000, "the contractor . . . [must] certify that the claim is made in good faith, that the supporting data are accurate and complete to the best of his knowledge and belief, that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable, and that the certifier is duly authorized to certify the claim on behalf of the contractor."). |

| | |
|---|---|
| October 26, 2006 Certified Restated, Supplemented, and Amended Claims For Monetary Damages. *See* Pl. Ex. Binder 3 at 15-16 (NCLN20's Oct. 26, 2006 Certified Restated, Supplemented, and Amended Claims For Monetary Damages For Anticipatory Breaches of the Michigan Guard Contract) ("[The CO] unfairly and in bad faith maliciously and with ill will, personal bias and animosity exhibited toward NCLN20 and with the intent to grievously injure NCLN20 and to deprive it of all of the benefits of the [Battle Creek Contract] . . . in bad faith rejected [NCLN20's] cost proposal and the extension of the [Battle Creek Contract][.]"); *Id*. at 19 ("[The CO had] a willful and malicious intent to deceive and discriminate against NCLN20 and deprive NCLN20 of its benefits and rights under the [Battle Creek Contract][.]"); *Id*. at 22 (NCLN20 "was caused to suffer and sustain and is therefore entitled to additional actual monetary compensatory damages of lost profits from the [Battle Creek Contract] of $67,009 and to suffer and sustain unpaid invoices of $97,775, and under-paid invoices of $75,143.00."). | Meets requirements. Battle Creek Contract claims asserted in the Third and Fourth Claims of the September 27, 2007 Amended Complaint are contained in the filing. Filing is a valid "claim" for purposes of the CDA. *See* 41 U.S.C. § 605(a); *see also Kalamazoo Contractors*, 37 Fed. Cl. at 368 ("According to the United States Court of Appeals for the Federal Circuit, a routine request for payment must meet four requirements in order to be considered a valid claim under the CDA. The request must be: (1) "in dispute" when submitted; (2) a written demand or assertion; (3) seeking as a matter of right; (4) the payment of money in a sum certain."); *Reflectone*, 60 F.3d at 1576-77 ("Non-routine requests" are in dispute as matter of law and include REAs). Filing explicitly requests final decision from the CO. *See* Pl. Ex. Binder 3 at 25-27 (Oct. 26, 2006 Request For Final Decision); *see also Scan-Tech Sec.*, 46 Fed. Cl. at 331 ("[T]he claim must, either explicitly or implicitly, request a contracting officer's final decision."). Claims and supporting data in filing are duly certified. *See* Pl. Ex. Binder 3 (Oct. 26, 2006 Certification Of Claims For Money Damages Due To Breach Of Contract by NCLN20's President); *see also* 41 U.S.C. § 605(c)(1) (requiring all claims over $100,000 to be duly certified). The CO did not issue final decision on Battle Creek Contract claims asserted therein within 60 days, or notify NCLN20 as to when he would issue final decision within 60 days, from receipt of filing. *See* Pl. Ex. 83 (April 13, 2007 Contracting Officer's Determination And Findings not rendering final decision on Battle Creek Contract claims, nor disclosing when a final decision would issue); *see also* 41 U.S.C. § 605(c)(2); *S. Cal. Edison*, 58 Fed. Cl. at 320 (Within 60 days of receipt of claims in excess of $100,000, the CO must either make final decision or disclose timing of final decision.). |