# In the United States Court of Federal Claims

No. 02-1282C
Filed: July 21, 2011
**TO BE PUBLISHED**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| | Contracts; |
| | Affirmative Defense, RCFC 8(c); |
| | Contract Disputes Act of 1978, 41 U.S.C. §§ 601-13, 41 U.S.C. §§ 7101-7109; |
| | Federal Acquisition Regulation, 48 C.F.R. §§ 14.407-3(a) (mistake in bid), 14.407-3(g)(2) (verified bid), 14.408-1 (method of contract award), 49.402-3(j) (failure to perform may be excusable), 52.214-10 (contract award—sealed bidding), 52.249-8 (default termination and notice to cure), 52.449-8(c) (extraordinary condition where contractor is not liable for excess costs); |
| NCLN20, INC., | Interest On Disputed Amount Due Contractor, 41 U.S.C. § 611; |
| Plaintiff, | Michigan Private Security Guard Licenses, Mich. Comp. Law §§ 338.1053, 338.1065; |
| v. | Motion *In Limine*; |
| | Prompt Payment Act, 31 U.S.C. §§ 3901-07; |
| THE UNITED STATES, | Qualifying Small Business, 13 C.F.R. § 124.108; |
| Defendant. | Request for Equitable Adjustment; |
| | Small Business Act of 1958, 15 U.S.C. § 637(a)(1)(C) (2006) (contract award to small business owned and controlled by socially and economically disadvantaged individuals); |
| | Restatement (Second) of Contracts § 251(2) (1981). |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Clarence B. Tucker, Sr.**, Clarence B. Tucker, Sr., PLLC, Detroit, Michigan, for Plaintiff.

**Douglas K. Mickle**, United States Department of Justice, Washington, D.C., for Defendant.

## MEMORANDUM OPINION AND FINAL ORDER

**BRADEN, *Judge*.**

This case concerns two contracts between NCLN20, Inc. ("NCLN20"), and the Federal Protective Service of the General Services Administration ("GSA").  One concerned security guard services for federal facilities in the State of Michigan ("the Michigan Guard Contract"); the other concerned alarm monitoring and public-safety related telecommunications services in the State of Michigan ("the Battle Creek Contract").[1]

To facilitate review of this Memorandum Opinion and Order, the following outline is provided:

I.    RELEVANT FACTS.

     A.    The General Services Administration's Michigan Guard Contract.

          1.    The July 31, 2001 Solicitation And Plaintiff's August 16, 2001 Bid.

          2.    Plaintiff's August 23, 2001 Mistake In Bid.

          3.    The August 24, 2001 Preliminary Notice Of Award And September 7, 2001 Formal Notice Of Award.

          4.    Plaintiff's Attempt To Commence Performance.

          5.    The September 26, 2001 Notice And September 28, 2001 Termination For Default.

          6.    The May 23, 2002 General Services Administration Office Of Inspector General Report.

     B.    The General Services Administration's Battle Creek Contract.

---

[1] This case was assigned to the undersigned judge on August 15, 2003.  Thereafter, several intervening obstacles delayed adjudication as discussed herein.

Notably, the health of NCLN20's second counsel, Clarence Tucker, Sr., was impaired and later deteriorated, so that the initial phase of trial in January 2009 had to be suspended.  Thereafter, NCLN20 became unable to fund the case, resulting in an agreement by the parties to admit all exhibits and deposition testimony, in lieu of resuming trial.  *See* July 21, 2011 Stipulated Order Regarding Trial Exhibits, no. 145.

The court would be remiss if it did not acknowledge the extraordinary diligence of Mr. Tucker in undertaking the representation of NCLN20 on January 31, 2006 and continuing to represent NCLN20, despite his failing health and lack of client resources.  To his credit, Mr. Douglas K. Mickle, lead counsel for the Department of Justice, afforded Mr. Tucker numerous accommodations, when he could have pressed for advantage.  Both advocates deserve the court's recognition and appreciation for their professionalism in assisting the court in reaching a final adjudication of this case.

   1. **The May 21, 1999 Award.**

   2. **The October 25, 1999 Amendment And August 23, 2001 Six-Month Extension.**

   3. **Plaintiff's Requests For Payment Of Unpaid Invoices.**

  C. **The General Services Administration's April 13, 2007 Conversion Of The September 28, 2001 Termination Of The Michigan Guard Contract For Default To A Termination For Convenience.**

  D. **The April 18, 2008 Contract Release Regarding The Battle Creek Contract.**

II. **PROCEDURAL HISTORY.**

III. **DISCUSSION.**

  A. **Jurisdiction.**

  B. **Standing.**

  C. **Whether The Government Is Barred From Defending Against Claims Alleged In The September 27, 2007 First Amended Complaint Because Of An Admission Or Waiver.**

  D. **Issues Raised In The September 27, 2007 First Amended Complaint Regarding The Michigan Guard Contract.**

   1. **Whether The General Services Administration Breached The Michigan Guard Contract Or Violated The Duty Of Good Faith And Fair Dealing.**

    a. **By Requiring That Plaintiff Provide Additional Guards After The Award Was Made.**

    b. **By Contributing To Delay In Plaintiff's Start-Up Efforts.**

   2. **Whether The General Services Administration's September 28, 2001 Termination For Default Was Lawful.**

    a. **Based On The Contracted Date Performance Was To Commence.**

    b. **Based On The Contractual Notice And Cure Requirements.**

    c. **Based On Plaintiff's Anticipatory Repudiation.**

          d.      **Based On Later Discovered Evidence Concerning Plaintiff's Compliance With The Solicitation.**

     3.      **Whether The April 13, 2007 Conversion To A Termination For Convenience Was Improper Due To Bad Faith Or Abuse Of Discretion By The General Services Administration.**

          a.      **Based On Animus, And/Or Racial Bias.**

          b.      **Based On A Failure To Honor The Contractual Bargain.**

          c.      **Based On Disparate Treatment.**

          d.      **Based On The Contracting Officer's Unlawful Delegation Of Duties.**

          e.      **Based On NCLN20's Mistake In Bid.**

**E.**      **Issues Raised In The September 27, 2007 First Amended Complaint Regarding The Battle Creek Contract.**

     1.      **Whether The General Services Administration Violated The Duty Of Good Faith And Fair Dealing Or Acted In Bad Faith In Administering The Battle Creek Contract.**

     2.      **Whether The General Services Administration Entered Into An Implied-In-Fact Agreement With Plaintiff To Extend The Battle Creek Contract.**

     3.      **Interest On Withheld Payments to NCLN20.**

**IV.**    **CONCLUSION.**

**<u>Court Appendix: CDA Interest Rates</u>**

\* \* \*

# I.    RELEVANT FACTS.[2]

## A.    The General Services Administration's Michigan Guard Contract.

### 1.    The July 31, 2001 Solicitation And Plaintiff's August 16, 2001 Bid.

On July 31, 2001, GSA issued an Invitation For Bid on Solicitation No. GS05PO1GCD0009 ("the Solicitation") for an indefinite delivery, fixed-price requirements service contract for armed and unarmed uniformed security guard labor, services, and supporting equipment and supplies in GSA-controlled and GSA-supported buildings in the State of Michigan. JX 1 at 1-3. GSA set aside the Solicitation for award under the Small/Disadvantaged Business Development Program of the Small Business Administration ("SBA").[3]  JX 1 at 1. Arthur S. Dobbs was designated as the Contracting Officer ("CO") and Roger R. Pinnau was designated as the Alternate Administrative Contracting Officer ("AACO").[4]  JX 1 at 153-54.

The Michigan Guard Contract had a one-year base term with four consecutive one-year option periods.  JX 1 at 1-2, 22.  Performance was to commence either on October 1, 2001, or 30 calendar days from the date of award, whichever was later.  JX 1 at 22.  The contractor, however, was authorized to commence performance in less than thirty days after award, "if that is mutually agreed to in writing by both the Contractor and the Contracting Officer."  JX 1 at 39.

On August 16, 2001, NCLN20, a registered SBA "minority business enterprise," submitted an offer.  JX 2 at 1-35.  In the offer, NCLN20 did not identify any joint venture

---

[2]  The relevant facts recited herein were derived from: Joint Trial Exhibits ("JX 1-86"); Plaintiff's Supplemental Trial Exhibits ("PX 1000-1088; PX 1091-1097"); the transcripts of January 26-27, 2009 trial proceedings ("1/26/09 TR 1-174; 1/27/09 TR 175-332"); and the personnel files of Mr. Roger R. Pinnau.  Five binders of exhibits submitted in support of Plaintiff's September 27, 2007 First Amended Complaint ("AC1-AC5") are incorporated into evidence by reference at PX 1007-1011.

[3]  The Small Business Act of 1958 provides: "It shall be the duty of the [Small Business] Administration and it is hereby empowered, whenever it determines such action is necessary or appropriate . . . to make an award to a small business concern owned and controlled by socially and economically disadvantaged individuals which has previously completed its period of Program Participation[.]"  15 U.S.C. § 637(a)(1)(C) (2006); *see also* 13 C.F.R. § 124.101 (2011) (a qualifying small business is one "owned and controlled by one or more socially and economically disadvantaged individuals who are of good character and citizens of and residing in the United States, and [that] demonstrates potential for success.").

[4]  The "Administrative Contracting Officer (ACO) may act as the CO during the CO's absence/unavailability."  JX 1 at 153.  During the "presence or availability of the CO," the duties of the ACO may include analyzing proposals, monitoring contractor performance, acting as the government's representative, ensuring compliance with the contract requirements, and explaining and interpreting the contract.  *Id.*  An Alternate ACO (AACO) "has the same authority as the ACO."  JX 1 at 154.

partner.  JX 2 at 31.  On August 20, 2001, the CO issued a Memorandum For The Record, stating that NCLN20 submitted the lowest priced complete and responsive bid, having proposed a total price of $32,962,000 for five years.  JX 3 at 1-2.

On August 21, 2001, NCLN20 agreed to enter into a relationship with B&C Service Co. ("B&C") and its principal, Mark Zerefos, to obtain a security guard license.  PX 1083 at 2. NCLN20's Board adopted a resolution whereby NCLN20 would operate as a security guard service company using B&C's license.  PX 1083 at 2; PX 1005; 1/27/09 TR 293 (Thibault testifying that Mr. Zerefos "had a security license for that state and [we] were basically acting on his license.")

### 2.    Plaintiff's August 23, 2001 Mistake In Bid.

On August 22, 2001, the AACO faxed a Notification of Apparent Low Bidder to NCLN20, together with a request to verify that there was no Mistake in Bid ("MIB").[5]  JX 5 at 1-2.

On August 23, 2001, NCLN20's accountant advised the CO that there was a $923,000.00 mistake in NCLN20's offer.  AC1, Tab E at 1 ("A spread sheet formula was incorrect and thus calculated a lower average hourly rate.").  On that same day, a series of telephone conversations took place between NCLN20's President and the CO.  AC3, Tab 46 at 3 (7/9/04 Dobbs Decl.). After consulting with GSA's counsel, the CO advised NCLN20 that the apparent failure to check the accuracy of its offer was a "mistake in judgment," not a clerical error, so the offer could not be corrected.  *Id.*

On August 24, 2001, NCLN20's President "officially and irrevocably" withdrew the MIB.  JX 7 at 1.  Unsatisfied, the CO requested that NCLN20

> sign this letter of accord and satisfaction stating that you are voluntarily, intentionally and irrevocably withdrawing your mistake in bid claim. Upon countersigning, you may proceed with performance provided such performance is in full compliance with the terms of the contract.

JX 77 at 1.

---

[5]  FAR 14.407-3(a) provides:

> If a bidder requests permission to correct a mistake and clear and convincing evidence establishes both the existence of the mistake and the bid actually intended, the agency head may make a determination permitting the bidder to correct the mistake; provided, that if this correction would result in displacing one or more lower bids, such a determination shall not be made unless the existence of the mistake and the bid actually intended are ascertainable substantially from the invitation and the bid itself.

48 C.F.R. § 14.407-3(a) (2011).

On the same day, NCLN20's President signed and returned that letter.  *Id.*

### 3.   The August 24, 2001 Preliminary Notice Of Award And September 7, 2001 Formal Notice Of Award.

On August 24, 2001, the CO sent a preliminary notice to advise NCLN20 that the company was awarded the Michigan Guard Contract, a "formal notice of award" would be forthcoming within two business days, and a "post-award" meeting would be scheduled during the week of August 27, 2001.  JX 6 at 1.

On the same day, NCLN20 was advised that counsel had represented other guard companies in disputes with GSA involving the same CO, and that no FAR provision disallowed MIBs for a mistake in business judgment.  JX 63 at 4 (10/11/04 Jones Decl.).  On August 27, 2001, based on this advice, NCLN20's President informed the CO that the Michigan Guard Contract should be "recalculated" based on the MIB.  *Id.*  The CO responded that he would consult again with GSA's Legal Department.  *Id.*

On August 29, 2001, GSA and NCLN20 participated in a "post-award" meeting by teleconference, even though NCLN20 had not yet received formal notice of award.  JX 63 at 5 (10/11/04 Jones Decl.); JX 84 at 4 (6/30/09 Dobbs Dep.).  NCLN20 stated that it would be prepared to perform on October 1, 2001.  AC3, Tab 46 at 4 (7/9/04 Dobbs Decl.).  The CO advised NCLN20 that the incumbent contractor, Unlimited Security, Inc. ("USI"), was interested in selling weapons, equipment, and uniforms.  JX 8 at 2; JX 84 at 6 (6/30/09 Dobbs Dep.); JX 63 at 5 (10/11/04 Jones Decl.).  The CO also recommended that NCLN20 hire Randy McKay as Contract Manager because he served in that position for USI.  JX 63 at 5 (10/11/04 Jones Decl.).  NCLN20 offered Mr. McKay a position and he accepted.  JX 8 at 2.

On August 30, 2001, NCLN20 was informed by counsel that

> there was no legal reason that the Mistake in Bid could not be recalculated unless the contracting officer chose not to. . . .  [T]his could only be done in special circumstances where the contracting officer had additional information that allowed the contracting officer to verify the information independently.

JX 63 at 6 (10/11/04 Jones Decl.).

On September 6, 2001, NCLN20 advised the CO that GSA had not yet formally awarded the Michigan Guard Contract to NCLN20.  JX 9 at 2.  NCLN20 also advised that it intended to commence performance on October 1, 2001, but also intended to pursue the MIB claim.  *Id.*  On September 7, 2001, the CO responded that NCLN20's MIB claim would be evaluated, pursuant to FAR 14.407-3(g)(2).[6]  JX 13 at 1.

---

[6]  FAR 14.407-3(g)(2) provides: "If the bid is verified, the contracting officer shall consider the bid as originally submitted."  48 C.F.R. §14.407-3(g)(2) (2011).

On that same date, GSA sent NCLN20 a formal notice of award for the one-year base period beginning October 1, 2001, with four one-year renewal options, for a five-year fixed price of $32,962,000.00.  JX 10 at 1-3; JX 11; JX 12; JX 84 at 6 (6/30/09 Dobbs Dep.).   NCLN20 did not receive this letter until September 10, 2001.  1/26/09 TR 70 (Jones Test.); 1/27/09 TR 187 (Abercrombia Test.).

On September 8, 2001, NCLN20 submitted a memorandum to the CO requesting correction of the MIB together with corrected worksheets.  JX 14.

### 4.    Plaintiff's Attempt To Commence Performance.

On September 10, 2001, a NCLN20 employee traveled to Detroit to purchase handguns, obtain the permits and licenses required under Michigan law, and meet with GSA district personnel.  JX 63 at 7 (10/11/04 Jones Decl.); 1/27/09 TR 287 (Thibault Test.).

On September 14, 2001, GSA informed NCLN20's President that USI had decided not to sell weapons, equipment, or uniforms to NCLN20.  AC3, Tab 46 at 8 (7/9/04 Dobbs Decl.).  As a result, NCLN20 had to increase its order from another source from 69 weapons to 110 weapons.  JX 37 at 2.  On that same date, GSA sent an internal e-mail stating:

> We have been advised that in some regions there is a shortage of contract guards meeting the GSA Guard II requirements.  During this time of crisis it is imperative that GSA provide guard services to our customers to the maximum extent possible.  Thus, during this period, regions may have to use guards lacking some or most of the existing Guard II requirements.

JX 67 at 1.

On September 16, 2001, the AACO sent the CO an e-mail reporting "significant flaws" in NCLN20's August 16, 2001 Bid for the Michigan Guard Contract, including: only a single employee assigned to be responsible for contract start-up; failure to initial and sign several sections of the bid; failure to identify contract vehicles with specificity; failure to devote sufficient time and personnel to start-up activities; failure to complete all entries in the bid; and omission of page K-9 (Small Business Program Representations).  JX 18 at 1-3.

On September 17, 2001, NCLN20 filed a protest at the Government Accountability Office ("GAO") challenging GSA's rejection of NCLN20's MIB.  JX 21 at 1-77.

On September 18, 2001, the CO advised NCLN20 that GSA decided to add between nineteen and twenty-seven additional posts at the Social Security Administration office locations in Michigan to be filled by October 1, 2001, the date that contract performance was scheduled to commence.  AC3, Tab 46 at 8 (7/9/04 Dobbs Decl.); JX 63 at 8-9 (10/11/04 Jones Decl.).

On September 19, 2001, GSA sent an e-mail to confirm that NCLN20 would be ready to begin performance on October 1, 2001.  JX 22 at 1-2.  NCLN20 responded:

> We have gone forward with all intentions of starting on Oct. 1, 2001 and I don't foresee any reason why we couldn't. . . .  My understanding is that there will be a contract modification to increase the hours and post on the contract.  One question is will [the] Government waive some of the initial [requirements] to ramp up the staffing?  Also, if we're unable to do so fast enough, because of the essential urgency, will the Government pay for the resulting overtime cost?

JX 23 at 1.

On the same date, the AACO sent an e-mail to another contractor, General Security Services Corporation ("GSSC"):

> For new (post September 11th/post-WTC attack) contract security guard posts where GSSC is unable to provide armed guards . . . you may provide unarmed guards, for the duration of September, 2001.  We will re-examine the situation at the end of the month, to see if an extension is required.  As time and resources permit, unarmed guards at armed guard posts must be replaced with armed guards.

PX 1000.

On September 20, 2001, the AACO notified NCLN20 by fax that GSA's decision to require additional guards did not require a modification of the Michigan Guard Contract: "If you read the contract, especially Section G and other Sections, you will see that the Government uses Task Orders to order new posts, not contract modifications[.]"  JX 25 at 1.  The AACO warned that "[f]ailure of NCLN20 to perform as required by the contract could result in termination for default, deductions and reductions, and/or other actions provided for in the contract[.]"  Id.  In addition, the AACO noted: "The contract's unit prices (for hours and vehicles) are firm, fixed and will not be changed due to NCLN20's cost experience."  Id.  NCLN20 was asked to confirm that it would commence performance on October 1, 2001.  Id. at 1-2.

On the same date, Wells Fargo Bank contacted the CO, inquiring whether payments to NCLN20 could be made twice a month.  AC3, Tab 39; see also AC3 Tab 46 at 10 (7/9/04 Dobbs Decl.); JX 84 at 35 (6/30/09 Dobbs Dep.).  Wells Fargo Bank was informed that no exception would be made to GSA's standard practice of making payments once a month.  AC3 Tab 46 at 10 (7/9/04 Dobbs Decl.).  As a result of the bank's inquiry, the AACO asked NCLN20 to confirm that it was financially stable.  Id.

Later that day, the AACO sent the following e-mail to the CO and other GSA officials that stated:

> I have grave doubts about NCLN20's readiness or willingness to perform [the Michigan Guard Contract], as required by the terms and conditions of the

contract, on October 1, 2001.  I recommend that the contracting officer . . . review
this matter and take appropriate action.

JX 27 at 1.

On September 21, 2001, a Federal Protective Service employee was shot and killed in the
lobby of the Federal Building in Detroit, a building where NCLN20 was to provide security
guard protective services.  JX 27 at 2; JX 84 at 8 (6/30/09 Dobbs Dep.).  NCLN20's President
telephoned the CO about this situation, but declined to discuss the status of NCLN20's
performance progress, fearing that the CO would misuse any adverse information.  JX 27 at 2.
In a second call that day, NCLN20's President and the AACO had a contentious telephone
discussion about NCLN20's readiness.  1/26/09 TR 82 (Jones Test.); JX 72 at 1 (Pinnau e-mail).
On September 22, 2001, the AACO advised the CO, their supervisors, and GSA Regional
Counsel that NCLN20 failed to comply with "contractual responsibilities to report on it's [sic]
readiness to start contract services on time, upon which lives depend."  JX 27 at 2.

On September 24, 2001, the CO again inquired if NCLN20 hired and certified all of the
required guards and obtained the necessary weapon permits and licenses.  JX 28 at 2.   In
response, NCLN20's President requested a waiver of the required weapon permits, because

NCLN20, Inc. contacted [USI], other guard contractors and several gun dealers
for the purchase and supply of the handguns.  After locating a viable supplier on
[September 14, 2001,] NCLN20, Inc. inspected the handguns for purchase.
Although NCLN20, Inc. has purchased the weapons, normal operations of the
state licensing authorities is [sic] Monday, Tuesday and Friday and the state
licensing office informed NCLN20, Inc. that they only register ten handguns per
day.  NCLN20's contract requires more than one hundred handguns.

NCLN20, Inc. complied with contract provision G-15, which requires preparation
for start of contract performance to occur "after Contract award, but prior to start
of contract performance."   GSA recognizes that Contract start-up will require
"significant . . . resources, effort and coordination with GSA and other parties
(local Government authorities, commercial suppliers and service providers[.)]"
However, GSA has allowed only fourteen (14) working days to start-up.

The local Government licensing authorities require . . . more than fourteen (14)
working days -- to register the handguns. NCLN20, Inc. requests that the
Government waive the registration requirement, allowing NCLN20, Inc. to man
the posts with unarmed guards and man a post with an armed guard as soon as a
gun registration permit is issued for that guard.

JX 28 at 2-3.

Also on September 24, 2001, NCLN20 was informed by Mr. McKay, NCLN20's
Contract Manager, that the Detroit Police Department accepted only cash for weapon registration
and that the $550 check tendered by NCLN20 would not be accepted.  JX 63 at 10 (10/11/04

Jones Decl.); JX 37 at 2; JX 40 at 1.  In response, NCLN20 mailed a new check made out to Mr. McKay, so that he could register the weapons with cash.  *Id.*

On September 25, 2001, the CO denied NCLN20's September 24, 2001 request to waive the weapon permit requirements.  JX 29 at 1-2.

> **5.    The September 26, 2001 Notice And September 28, 2001 Termination For Default.**

On September 26, 2001, the CO sent a Cure Notice to NCLN20's President, requiring that NCLN20 show proof that it had acquired the requisite weapons permits within twenty-four hours, or by the close of business on September 27, 2001 or "the Government may terminate for default under the terms and conditions of Clause 52.249-8."  JX 30 at 1-2.  The CO also made a follow-up call to remind NCLN20's President that NCLN20 was required to obtain all required weapons permits.  AC3, Tab 46 at 13 (6/9/04 Dobbs Decl.).

On September 27, 2001, NCLN20's President requested a meeting with the Chief of the Federal Protective Services Branch to complain that NCLN20 did not receive a full start-up period and to explain why the delay was beyond NCLN20's control.  JX 31 at 2-4.

On September 28, 2001, GSA issued a Determination And Findings terminating the Michigan Guard Contract for default.  JX 32-33.  On the same date, a replacement contract was awarded to USI, the next lowest responsive bidder.  JX 34 at 1-2; *see also* JX 3.

On October 3, 2001, NCLN20's Contract Manager, Mr. McKay, confirmed that on September 28, 2001, NCLN20 did not have a valid Michigan security guard license.  JX 37 at 2.

On October 26, 2001, the GAO dismissed a September 17, 2001 Protest filed by NCLN20 challenging GSA's refusal to allow a MIB correction.  Gov't App. at 529-30.

> **6.    The May 23, 2002 General Services Administration Office Of Inspector General Report.**

On October 2, 2001, NCLN20 filed a "complaint" with GSA Office of Inspector General seeking a review of the September 28, 2001 termination for default.  JX 71 at 3.

On May 23, 2002, GSA's Regional Inspector General for Auditing, Great Lakes Region, issued Report No. A020042/P/5/R02010 ("IG Report"), concluding:

> Our review showed that FPS: (i) did not grant NCLN20 a start-up period consistent with the terms of the contract; (ii) did not give NCLN20 10 days to respond to its cure notice as required by the FAR; (iii) may have exposed the Government to increased costs by not exercising a valid Option to Extend Services clause; (iv) did not give the Small Business Administration advance notice of the contract termination as required; (v) may not have administered NCLN20's claim for mistake in bid in a manner consistent with the FAR; and (vi)

appeared to be inconsistent in treatment of NCLN20 as compared to other guard services contractors.

*Id.* at 7.

The IG Report also concluded that, although it was unacceptable to commence the Michigan Guard Contract without armed guards, it "appeared that [GSA's] response to the September 11, 2001 emergency was inconsistent with its treatment of incumbent and past guard contractors as compared to NCLN20." JX 71 at 16.

**B.     The General Services Administration's Battle Creek Contract.**

**1.     The May 21, 1999 Award.**

On April 19, 1999, GSA issued Solicitation No. GS05P99GCD0001 for an indefinite delivery/indefinite quantity, fixed price requirements service contract for alarm monitoring and public-safety related telecommunications services for an eighteen-state region at GSA's "MegaCenter" in Battle Creek, Michigan. JX 51 at 1, 2; JX 84 at 3-4 (6/30/09 Dobbs Dep. at 9-10). GSA set aside this Solicitation for award under the SBA's Small/Disadvantaged Business Development Program. JX 51 at 1.

The Battle Creek Contract had a base period of one year, commencing October 1, 1999, with a one-year option, and a total two-year value of $2.1 million. JX 51 at 1; JX 54 at 2. As with the Michigan Guard Contract, Mr. Dobbs was assigned as the CO and Mr. Pinnau was assigned as the AACO. JX 54 at 3-4; JX 84 at 12 (6/30/09 Dobbs Dep.).

On June 16, 1999, NCLN20 was awarded the Battle Creek Contract. JX 54 at 1-2. On June 20, 1999, the AACO requested assurance of NCLN20's ability to perform. AC3, Tab 14. On the following day, NCLN20 responded that it was "ready, willing, and able to comply with the contract[.]" AC3, Tab 15.

Between September 1-3, 1999, NCLN20's President repeatedly requested that the AACO approve certain wage-related adjustments on the Battle Creek Contract. AC3, Tabs 16-18. On September 4, 1999, the AACO responded, expressing concern about NCLN20's repeated attempts to seek rate increases for items covered in a fixed-price contract. AC3, Tab 19 at 1. The AACO requested assurances that NCLN20 would be able to perform. *Id.*

In addition, on September 4, 1999, the AACO wrote an e-mail to his supervisor advising him of NCLN20's requested rate increases and the company's history of making such requests. JX 80 at 1-2. The AACO also reported that NCLN20's President was "irate" when questioned about such increases. *Id.* at 1.

On September 7, 1999, GSA modified the Battle Creek Contract to change the contract number from GS05P99GCD0001 to GS05P99GCD0005. AC3 Tab 7.

### 2. The October 25, 1999 Amendment And August 23, 2001 Six-Month Extension.

On October 25, 1999, the Battle Creek Contract was amended to increase health and welfare benefit payments retroactive to June 1999. JX 55 at 1. On September 1, 2000, GSA exercised the first one-year option on the Battle Creek Contract extending NCLN20's performance until September 30, 2001. AC3, Tab 88.

On August 23, 2001, the CO proposed an additional six-month extension of the Battle Creek Contract, but requested that NCLN20 submit a revised Cost Proposal on or before August 29, 2001. PX 1063. On August 29, 2001, NCLN20 did so. JX 56.

On September 19, 2001, the CO rejected NCLN20's August 29, 2001 Cost Proposal on the grounds that the rates for the extension "may be adjusted only as a result of revisions to prevailing labor rates provided by the Secretary of Labor." JX 70. Nevertheless, the CO invited NCLN20 to submit a revised Cost Proposal. *Id.* On September 20, 2001, however, NCLN20 submitted a Request For Equitable Adjustment ("REA"), requesting reconsideration of the hourly pricing for the six-month extension in conformance with published United States Department of Labor wage rates. JX 57 at 1.

On September 27, 2001, the CO informed NCLN20 that GSA "elected to not accept your cost proposal and subsequent extension of the existing contract" and that the Battle Creek Contract would end on September 30, 2001. JX 58 at 1; JX 84 at 11 (6/30/09 Dobbs Dep.). On that same date, a follow-on contract was awarded to DECO Security Services, Inc. ("DECO"). JX 58 at 1.

### 3. Plaintiff's Requests For Payment Of Unpaid Invoices.

On October 16, 2001, NCLN20 sent a letter to the CO requesting payment for Invoice Nos. 3438, 3462, 3463, and 3464 issued under the Battle Creek Contract. AC3, Tabs 56-57. NCLN20 explained that on October 11, 2001, GSA paid Invoice Nos. 3462, 3463, and 3464 in full, but on the following day GSA withdrew that same amount from NCLN20's bank account, without explanation. AC3, Tab 56; *see also* 1/26/09 TR 39 (Jones Test.). As a result, NCLN20's bank refused to honor checks that NCLN20 issued for payroll, payroll taxes, rent, liability insurance, and worker's compensation, due to insufficient funds. 1/26/09 TR 39-40 (Jones Test.).

On January 30, 2002, NCLN20 notified the AACO that it "had not been paid for services rendered and . . . had submitted an REA claim for monies owed for unpaid invoices and [sic] a result of six months of *underbilling*." AC3, Tab 58 at 1. The AACO advised NCLN20 that GSA did not owe anything on the Battle Creek Contract, due to the "excess reprocurement costs/charges incurred by NCLN20 . . . [and] NCLN20's Termination for Default on . . . [the Michigan Guard Contract] last year." *Id.*

13

C.   **The General Services Administration's April 13, 2007 Conversion Of The September 28, 2001 Termination Of The Michigan Guard Contract For Default To A Termination For Convenience.**

On March 29, 2007, the Defense Contract Audit Agency ("DCAA") concluded an audit of NCLN20 requested by of the CO. JX 43 at 1-2. The DCAA audit reviewed only NCLN20's expenditures at the time of the September 28, 2001 termination, and concluded that NCLN20 incurred $46,856.00 in start-up costs. *Id.* NCLN20's claimed lost profits were not considered.

On April 13, 2007, the CO issued a Determination And Findings that converted the September 28, 2001 termination for default to a termination for convenience. JX 44. Satisfied that the DCAA audit "established a reasonable sum to make NCLN20 whole," the CO authorized the payment of $46,856.00 to NCLN20 in start-up costs for the Michigan Guard Contract. JX 44 at 8. On April 18, 2008, the CO sent notice of the April 13, 2007 Determination And Findings to NCLN20. JX 45. To date, NCLN20 has not been paid this $48,856.00 amount, because NCLN20 decided to contest the validity of the September 28, 2001 termination for default and the April 13, 2007 conversion to a termination for convenience.

D.   **The April 18, 2008 Contract Release Regarding The Battle Creek Contract.**

On April 18, 2008, GSA and NCLN20 executed a Contract Release And Rider authorizing payment of $172,917.49 in unpaid and underpaid Battle Creek invoices (Nos. 3438, 3462, 3463, and 3464) that were withheld when the Michigan Guard Contract was terminated for default. JX 49. This sum was paid in June 2008 to NCLN20, but without interest.

## II.   PROCEDURAL HISTORY.

On September 30, 2002, NCLN20 filed a Complaint in the United States Court of Federal Claims. On January 31, 2003, the Government filed an Answer. On August 15, 2003, this case was transferred to the undersigned judge.

On October 17, 2003, the court issued an Order authorizing the parties to serve interrogatories by November 4, 2003, to be answered on or before December 4, 2003. On November 26, 2003, the Government filed a Motion To Compel Discovery. On February 27, 2004, NCLN20 filed a Motion For Leave To File Interrogatories Out Of Time. On that same date, the court issued an Order granting NCLN20's February 27, 2004 Motion and denying the Government's November 26, 2003 Motion To Compel as moot.

On March 15, 2004, the Government requested a stay to conduct settlement discussions. On March 23, 2004, the court stayed this case until June 9, 2004, for that purpose. On June 9, 2004, the Government filed a Status Report representing that settlement discussions failed and requested leave to file a dispositive motion. On June 21, 2004, the court issued a Scheduling Order, setting a July 12, 2004 deadline for any dispositive motion by the Government.

On July 12, 2004, the Government filed a Motion For Summary Judgment ("7/12/04 Gov't Mot. S.J."), together with an Appendix of exhibits. On October 19, 2004, NCLN20 filed a

Response.   On November 18, 2004, the Government filed a Reply.   On February 10, 2005, NCLN20 filed a Sur-Reply.   Thereafter, in reviewing the parties' submissions, the court noted that NCLN20 never filed certified claims to the CO before filing the September 30, 2002 Complaint, a jurisdictional prerequisite.   The court, *sua sponte*, requested that the parties address this issue.

On August 31, 2005, by consent of the parties, NCLN20 submitted a certified "Request for Equitable Adjustment" ("REA") to the CO regarding claims arising from the Michigan Guard Contract.   On September 23, 2005, the court convened a telephone status conference to determine how to proceed with the Government's July 12, 2004 Motion For Summary Judgment, in light of NCLN20's certified REA.   With consent of the parties, on October 3, 2005, the court stayed the case pending a final decision by the CO.   On December 5, 2005, the Government advised the court that, although NCLN20 submitted certain information to the CO, additional information was still required.

On January 31, 2006, NCLN20 designated Clarence B. Tucker, Sr., as replacement counsel.   On March 6, 2006, the Government advised the court that NCLN20's new counsel only recently acquired the client's case files, and was attempting to determine whether to supplement or amend the August 31, 2005 REA.   The Government also reported that, at the request of the CO, the DCAA had commenced an audit of GSA's September 28, 2001 termination of the Michigan Guard Contract for default and NCLN20's August 31, 2005 REA.   On June 5, 2006, the Government advised the court that DCAA's audit would be completed by July 31, 2006, after which a final decision regarding NCLN20's August 31, 2005 REA would follow within sixty days.

On September 5, 2006, the Government advised the court that the DCAA still had not received certain documents from NCLN20, despite repeated requests. NCLN20 responded that the problem was caused by prior counsel's lack of cooperation, but promised that the relevant documents would be forthcoming by mid-October 2006.

On October 26, 2006, NCLN20 submitted certified Amended Claims For Money Damages to the CO, together with supporting documentation.   On December 1, 2006, the Government advised the court that the DCAA's audit could now proceed and would be completed on or before February 28, 2007.

On March 5, 2007, the court contacted all counsel to inquire about the status of the DCAA audit.   On March 7, 2007, the Government represented that the DCAA audit would be completed within two or three weeks and, absent unforeseen circumstances, a final decision would be issued by the CO by early April 2007.   On March 15, 2007, NCLN20 responded complaining that DCAA's inquiry appeared to be limited only to NCLN20's Michigan Guard Contract start-up costs and did not calculate lost profits.

On March 29, 2007, the DCAA issued an Audit Report, concluding that NCLN20 incurred $46,856.00 in net expenses as a result of the September 28, 2001 termination of the Michigan Guard Contract for default. JX 43 at 1-2.  On March 30, 2007, the Government filed a

Status Report advising the court that the CO would issue a final decision regarding NCLN20's August 31, 2005 REA "within a few weeks."

Accordingly, on April 13, 2007, after considering NCLN20's August 31, 2005 REA, the CO issued a Determination And Findings that converted GSA's September 28, 2001 termination of the Michigan Guard Contract for default to one for convenience, concluding that NCLN20 was entitled to receive $46,856.00 for start-up costs associated with the Michigan Guard Contract, in addition to withheld invoices on the Battle Creek Contract. JX 44. Thereafter, the Government forwarded to the court the DCAA's March 29, 2007 Audit Report and the CO's April 13, 2007 Determinations and Findings.

On May 9, 2007, the court convened a status conference, during which the Government argued that the September 30, 2002 Complaint was now moot because of the April 13, 2007 conversion to a termination for convenience. The Government conceded, however, that NCLN20's claims for lost profits on the Michigan Guard Contract were not audited, because the CO had determined that he did not act in bad faith. The court encouraged the parties to explore settlement and scheduled a status conference for July 10, 2007.

During the July 10, 2007 status conference, NCLN20 informed the court that the settlement discussions were not productive and requested to proceed with litigation. Because the basis for GSA's termination changed, the Government agreed to allow NCLN20 to file a First Amended Complaint.[7]

On September 27, 2007, with the consent of the Government, NCLN20 filed a First Amended Complaint ("Amend. Compl."), together with five binders of Exhibits ("AC1-AC3").

On October 26, 2007, the Government filed an Answer ("10/26/07 Answer"), together with a Motion For Partial Dismissal. On January 11, 2008, NCLN20 filed a Response. On February 18, 2008, the Government filed a Reply. On March 17, 2008, NCLN20 filed a Sur-Reply.

On June 4, 2008, the court issued a Memorandum Opinion and Order denying the Government's October 26, 2007 Motion For Partial Dismissal and determining that the claims alleged in the September 27, 2007 First Amended Complaint satisfied the requirements of the Contract Disputes Act of 1978, 41 U.S.C. §§ 601-13 (2006) ("CDA"), with respect to the Battle Creek Contract. *See NCLN20, Inc.* v. *United States*, 82 Fed. Cl. 103, 120-25 (2008). On June 16, 2008, the Government filed a Supplemental Answer to the September 27, 2007 First Amended Complaint. Discovery commenced.

---

[7] On July 17, 2007, NCLN20 filed a Notice Of Attorney Liens. On July 19, 2007, the court issued an Order striking this filing because it contravened the Anti-Assignment Act. *See* 31 U.S.C. § 3727(b) (2006) ("An assignment may be made only after a claim is allowed, the amount of the claim is decided, and a warrant for payment of the claim has been issued.").

On December 1, 2008, the Government filed a Motion For Partial Summary Judgment ("Gov't S.J. Mot."). On December 22, 2008, the court issued an order indicating that, because material facts were at issue, the Government's December 1, 2008 Motion For Partial Summary Judgment would be ruled on after trial.

On January 21, 2009, the court issued a Scheduling Order setting the first portion of the trial for January 26-28, 2009, in San Francisco, California. On January 26, 2009, prior to the start of trial, NCLN20 filed a Motion *In Limine*, seeking to strike the Government's December 1, 2008 Motion For Partial Summary Judgment because the Government was bound by the legal conclusions contained in the May 23, 2002 GSA IG Report. 1/26/09 Mot. at 1. In addition, NCLN20 moved to strike the depositions of Vito Danzo and Gayle Toben proffered in support of the Government's December 1, 2008 Motion For Partial Summary Judgment. *Id.* at 8-14. During trial on January 26 and 27, 2009, the following witnesses testified in NCLN20's case-in-chief: Steven Jones, NCLN20's President; Karim Abercrombia, NCLN20's Chief of Operations; and John Thibault, an employee of NCLN20. 1/26/09 TR 1-174; 1/27/09 TR 175-332. These proceedings were suspended, however, due to the health of NCLN20's counsel. *See supra* note 1. Subsequently, the parties agreed to submit all proffered exhibits and deposition testimony in lieu of trial.[8]

On February 20, 2009, the Government filed a Motion requesting that the court take judicial notice of Michigan law or certify to the Michigan Supreme Court the question of whether NCLN20 was licensed as a security guard company at the time of the September 28, 2001 termination for default. On March 9, 2009, NCLN20 filed a Response. On March 23, 2009, the Government filed a Reply.

On April 22, 2009, to ascertain the credibility and weight to be afforded this witness, the court attended the deposition of Mr. Pinnau, the AACO assigned to the Michigan Guard Contract. JX 82 at 1-48 (4/22/09 Pinnau Dep.). At the request of the court, on April 27, 2009, the Government submitted the confidential personnel files of Mr. Pinnau and Mr. Arthur S. Dobbs, Contracting Officer for *in camera* review.

On September 22, 2009, NCLN20 filed an Expert Damage Report.[9] On November 23, 2009, NCLN20 filed an Exhibit List Index ("PX 1006-1038").

On February 1, 2010, NCLN20 filed a Post-Trial Brief ("Pl. PT Br."), together with a Second Index of Supplemental Trial Exhibits ("PX 1039-1088"). On May 10, 2010, the Government filed a Post-Trial Brief ("Gov't PT Br."), together with additional Joint Exhibits (JX 85-86). On September 7, 2010, NCLN20 filed a Post-Trial Reply Brief ("Pl. Rep."). On December 16, 2010, NCLN20 filed additional exhibits (PX 1052, 1083, 1085, 1086) that were

---

[8] For a list of exhibits and depositions entered into evidence in this case, *see* July 21, 2011 Stipulated Order Regarding Trial Exhibits, no. 145.

[9] On September 29, 2009, the Government moved to strike this Report, but that motion was withdrawn after the Government cross-examined NCLN20's expert in a December 14, 2009 deposition. JX 86.

referenced but not produced in NCLN20's February 1, 2010 Second Index of Supplemental Trial Exhibits.

## III.   DISCUSSION.

### A.   Jurisdiction.

The United States Court of Federal Claims has "jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."   28 U.S.C. § 1491(a)(1) (2006).  The Tucker Act, however, is "only a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages." *United States* v. *Mitchell*, 445 U.S. 535, 538 (1980) (citing *United States* v. *Testan*, 424 U.S. 392, 398 (1976)).  Therefore, to satisfy the jurisdictional requirements of the Tucker Act, a plaintiff must identify and plead a constitutional provision, federal statute, independent contractual relationship, and/or executive agency regulation that provides a substantive right to money damages.   *See Todd* v. *United States*, 386 F.3d 1091, 1094 (Fed. Cir. 2004) ("[J]urisdiction under the Tucker Act requires the litigant to identify a substantive right for money damages against the United States separate from the Tucker Act itself."); *see also Roth* v. *United States*, 378 F.3d 1371, 1384 (Fed. Cir. 2004) ("Because the Tucker Act itself does not provide a substantive cause of action . . . a plaintiff must find elsewhere a money-mandating source upon which to base a suit.").

The September 27, 2007 First Amended Complaint alleges that NCLN20 is entitled to money damages under the Michigan Guard Contract and the Battle Creek Contract.  Amend. Compl. ¶¶ 59-103.  To this extent, NCLN20 meets the jurisdictional requirements of the Tucker Act.  *See* 28 U.S.C. § 1491(a)(1) (2006).[10]  NCLN20, however, also must satisfy the mandatory requirements of the CDA, 41 U.S.C. §§ 601-13 (2006),[11] before the court can exercise subject

---

[10]  In NCLN20's February 1, 2010 Post-Trial Brief, NCLN20 asserts that GSA and its officers engaged in tortious activity in their dealings with NCLN20.  Pl. PT Br. at 116-17.  The court, however, does not have jurisdiction over tort claims against the Government or its officials.  *See* 28 U.S.C. § 1491(a)(1) (2006) (The United States Court of Federal Claims has "jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases *not sounding in tort*." (emphasis added)); *see also Edelmann* v. *United States*, 76 Fed. Cl. 376, 381 (2009) (holding that the United States Court of Federal Claims does not have jurisdiction over tort claims).

[11]  Effective January 4, 2011, Congress amended certain provisions of the CDA, and recodified the Act, as amended, at 41 U.S.C. §§ 7101-7109.  *See* Public Contracts Act of Jan. 4, 2011, Pub. L. No. 111-350, § 3, 124 Stat. 3677, 3816-26.  Although the Public Contracts Act repealed 41 U.S.C. §§ 601-13, any "rights and duties that matured, penalties that were incurred,

18

matter jurisdiction.  *See B.D. Click Co., Inc.* v. *United States*, 1 Cl. Ct. 239, 241 (1982) ("The plaintiff has failed to produce or cite any evidence establishing either that it submitted a written claim to the contracting officer or that the contracting officer rendered a final decision. . . . Consequently, the court lacks subject matter jurisdiction to consider plaintiff's claims[.]").

In order to have jurisdiction under the CDA, a plaintiff must have submitted a written and certified claim to the CO and obtained a final decision by the CO on the claim.  *See M. Maropakis Carpentry, Inc.* v. *United States*, 609 F.3d 1323, 1327 (Fed. Cir. 2010) (CDA jurisdiction "requires both a valid claim and a contracting officer's final decision on that claim").  Although the CDA does not define the term "claim," the United States Court of Appeals for the Federal Circuit has stated that a "claim" is a "written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain."  *England* v. *The Swanson Grp., Inc.*, 353 F.3d 1375, 1380 (Fed. Cir. 2004).  For claims over $100,000, a failure to "issue a decision" or "notify the contractor of the time within which a decision will be issued" within sixty days of receipt of the claim is "deemed to be a decision by the [CO] denying the claim[.]"  41 U.S.C. § 605(c)(2), (5) (2006).

For claims over $100,000, Congress also requires that "the contractor . . . certify that the claim is made in good faith, that the supporting data are accurate and complete to the best of his knowledge and belief, that the amount requested accurately reflects the contract adjustment for which the contractor believes the [G]overnment is liable, and that the certifier is duly authorized to certify the claim on behalf of the contractor."  41 U.S.C. § 605(c)(1) (2006).

On October 26, 2006, NCLN20 submitted an Amended Claim For Money Damages that met the requirements of presenting a claim for a sum certain and requested a final decision on the Michigan Guard and Battle Creek Contracts.  AC3, at 1-24.  The October 26, 2006 Amended Claims contains an authorized certification that the claims were made in good faith, that the supporting data are accurate, and that the amount requested accurately reflects the contract adjustment for which NCLN20 believes the Government is liable.  AC3, at 25-27.  On April 13, 2007, as a result of NCLN20's claim, the CO issued a final decision on the Michigan Guard Contract converting the termination for default to a termination for convenience.  JX 44.  The CO failed to issue a decision or indicate a time period in which he would issue a final decision on the Battle Creek Contract, and therefore that claim is deemed denied.  *Id.*

Since NCLN20 has satisfied the jurisdictional prerequisites of the CDA, the court may adjudicate the claims in the September 27, 2007 First Amended Complaint regarding both the Michigan Guard Contract (Claims 1 and 2) and the Battle Creek Contract (Claims 3 and 4).  Tort claims against GSA or its officials raised in NCLN20's February 1, 2010 Post Trial Brief are dismissed, pursuant to RCFC 12(b)(1).  *See* Pl. PT Br. at 116-17.

---

and proceedings that were begun before the date of enactment of this Act" are still governed by these sections of the United States Code. Pub. L. No. 111-350, § 7, 124 Stat. at 3855.

**B.     Standing.**

Standing must be determined "as of the commencement of suit[.]"   *Rothe Dev. Corp.* v. *Dep't of Def.*, 413 F.3d 1327, 1334 (Fed. Cir. 2005).   The party invoking federal jurisdiction bears the burden of establishing standing.   *See Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 561 (1992).   In order to establish standing, "a plaintiff must show [that] it has suffered an injury in fact that is . . . concrete and particularized and . . . actual or imminent, not conjectural or hypothetical; . . . the injury is fairly traceable to the challenged action of the defendant; and . . . it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."   *Friends of the Earth, Inc.* v. *Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81 (2000).

On June 16, 1999, NCLN20 was awarded the Battle Creek Contract.   On September 7, 2001, NCLN20 was formally awarded the Michigan Guard Contract.   Amend. Compl. ¶¶ 59-103.   On September 28, 2001, GSA terminated the Michigan Guard Contract for default and also withheld payments due NCLN20 on the Battle Creek Contract.   On April 13, 2007, the Government converted GSA's September 28, 2001 termination for default of the Michigan Guard Contract to a termination for convenience and rejected NCLN20's claims for lost profits under both contracts.   The September 27, 2007 First Amended Complaint alleges that NCLN20 incurred injury under both contracts that is fairly traceable to GSA's actions.   As such, NCLN20 has standing in the United States Court of Federal Claims to seek an adjudication of the claims alleged in the September 27, 2007 First Amended Complaint regarding both contracts.

**C.     Whether The Government Is Barred From Defending Against Claims Alleged In The September 27, 2007 First Amended Complaint Because Of An Admission Or Waiver.**

As a threshold matter, the court turns to a January 26, 2011 Motion *In Limine* filed by NCLN20 to bar the Government from defending against NCLN20's claims that GSA acted in bad faith regarding the Michigan Guard Contract.   1/26/09 Mot. at 1-16; *see also* Pl. PT Br. at 38-42, 64-66, 92.

First, NCLN20 argues that the Government has admitted that the September 28, 2011 termination for default of the Michigan Guard Contract was unjustified because the Government agreed to the authenticity of the May 23, 2002 IG Report.   Pl. PT Br. at 38-39, 42, 64.   The Government responds that it admitted only to the authenticity of the GSA IG Report, not to its facts and legal conclusions.   Gov't PT Br. at 41.   The Government, as any other party, is bound by judicial admissions.   *See Weeks Dredging & Contracting, Inc.* v. *United States*, 11 Cl. Ct. 37, 47 (1986) ("[T]hat which a defendant admits in his answer is binding upon him until he withdraws the admission by a proper amended or supplemental pleading." (emphasis omitted)).   In this case, however, the court has determined that the Government's admission of the authenticity of the IG Report was not an admission as to either the factual or legal conclusions contained therein.

Next, NCLN20 argues that the Government was required to plead the argument that the September 28, 2001 termination for default was justified due to NCLN20's failure to obtain the

required Michigan guard licenses as an affirmative defense under RCFC 8(c).[12]  Pl. PT Br. at 92. The Government did not do so in the January 31, 2003 Answer to the September 30, 2002 Complaint, the October 26, 2007 Answer to the September 27, 2007 First Amended Complaint, or the June 16, 2008 Supplemental Answer to the September 27, 2007 First Amended Complaint. Pl. PT Br. at 92.

Assuming that the Government's argument is an affirmative defense under RCFC 8(c), the United States Court of Appeals for the Federal Circuit held in *Caldera* v. *Northrop Worldwide Aircraft Servs., Inc.*, 192 F.3d 962 (Fed. Cir. 1999), that the failure to raise an affirmative defense "by responsive pleading is not necessarily fatal if raising the issue later will not result in surprise or unfair prejudice." *Id*. at 970; *see also First Annapolis Bancorp, Inc.* v. *United States*, 75 Fed. Cl. 280, 288 (2007) (holding that "[a]n affirmative defense may be waived if not pled as prescribed, but the waiver is not effective absent unfair surprise or prejudice").  The Government has been arguing that NCLN20 lacked a valid Michigan security guard license since its November 12, 2004 Motion For Summary Judgment. 7/12/04 Gov't Mot. S.J. at 12-14.  Therefore, NCLN20 was on notice of this argument three years before the September 27, 2007 First Amended Complaint was filed and four years before trial commenced. Accordingly, the court has determined that NCLN20 was not prejudiced by the Government's arguing this defense at trial.

For these reasons, the court has determined that the Government is not barred from defending against claims alleged in the September 27, 2007 First Amended Complaint because of judicial admission or waiver.  Accordingly, Plaintiff's January 26, 2011 Motion *In Limine* is denied.

**D.      Issues Raised In The September 27, 2007 First Amended Complaint Regarding The Michigan Guard Contract.**

The September 27, 2007 First Amended Complaint alleges two claims concerning the Michigan Guard Contract.  The First Claim For Relief seeks damages for GSA's "bad faith, arbitrary, capricious, malicious, material, and total anticipatory breaches and wrongful termination of [the Michigan Guard Contract] and other relief."  Amend. Compl. ¶¶ 59-73.  The Second Claim For Relief seeks damages for GSA's breach of the "implied duties of good faith and fair dealing, to cooperate and not to hinder or interfere with contract performance."  *Id*. ¶¶ 74-79.

Because NCLN20's arguments do not always clearly identify the specific acts that support each of the alleged claims for relief, and are often redundant, the court has attempted to structure an analysis that presents NCLN20's claims as they arose.  Accordingly, the court first

---

[12] RCFC 8(c) requires that a party, "[i]n responding to a pleading," state any avoidance or affirmative defense, including but not limited to "accord and satisfaction; arbitration and award; assumption of risk; contributory negligence; duress; estoppel; failure of consideration; fraud; illegality; laches; license; payment; release; res judicata; statute of frauds; statute of limitations; and waiver."  RCFC 8(c).  RCFC 8(c), however, does not list plaintiff's breach of contract as an affirmative defense.

will analyze NCLN20's claim that GSA breached the Michigan Guard Contract and/or violated the implied duty of good faith and fair dealing.  Second, the court will address whether GSA's September 28, 2001 Termination For Default was lawful or justified by anticipatory repudiation or later discovered evidence about NCLN20's compliance with the Solicitation.  Third, the court will turn to whether GSA engaged in bad faith or abused its discretion, precluding conversion of the September 28, 2001 termination for default to one of convenience.

> ### 2. Whether The General Services Administration Breached The Michigan Guard Contract Or Violated The Duty Of Good Faith And Fair Dealing.
>
> #### a. By Requiring That Plaintiff Provide Additional Guards After The Award Was Made.

NCLN20 argues that GSA breached the Michigan Guard Contract and violated the implied duty of good faith and fair dealing by requiring NCLN20 to staff an additional nineteen to twenty-seven guard posts after the September 11 terrorist attacks without amending the Michigan Guard Contract or increasing payments to NCLN20.  Pl. PT Br. at 56, 108-10, 124-27, 134-35.  NCLN20 further contends that GSA's demand to increase the number of guard posts was impossible to meet because guards had to undergo extensive background checks and training that could not be completed by the October 1, 2001 start date.  Pl. PT Br. at 108-110; *see also* 1/27/09 TR 261-72 (Abercrombia Test.).  The Government responds that NCLN20 could have secured additional guards from the contractually required reserve force or by paying existing guards overtime.  Gov't PT Br. at 46-48.

The Michigan Guard Contract was an indefinite delivery, fixed price, requirements service contract, and, as such, NCLN20 was required to meet any guard-post requirements that may arise.  JX 1 at 36; *see also Mason* v. *United States*, 615 F.2d 1343, 1346 n.5 (Ct. Cl. 1980) ("An indefinite quantities contract is a contract under which the buyer agrees to purchase and the seller agrees to supply whatever quantity of goods the buyer chooses to purchase from the seller.").  Therefore, NCLN20 assumed the risk that "the actual cost of performance [would] be higher than the price of the contract."  *Dalton* v. *Cessna Aircraft Co.*, 98 F.3d 1298, 1305 (Fed. Cir. 1996).  In fact, the Michigan Guard Contract specifically authorized GSA to issue post-award task orders to increase the number of guard posts without modifying the contract or paying additional compensation.[13]  JX 1 at 36, 40.  Therefore, the court has determined that GSA had the contractual right to require NCLN20 to staff additional guard posts through task orders

---

[13] The Michigan Guard Contract allowed GSA to issue oral task orders in response to special events, disasters, or emergencies, but a written confirmation was required within five business days.  JX 1 at 37-38.  In this case, GSA failed to provide the required written confirmation.  JX 84 at 27 (6/30/09 Dobbs Dep.).  The court, however, does not consider this to be a material breach of the Michigan Guard Contract.  *See Thomas* v. *Dep't of Hous. & Urban Dev.*, 124 F.3d 1439, 1442 (Fed. Cir. 1997) ("A breach is material when it relates to a matter of vital importance, or goes to the essence of the contract.").

without paying NCLN20 additional compensation.  GSA's request did not breach the Michigan Guard Contract.

GSA, however, could have breached the implied duty of good faith and fair dealing if it issued a task order that "unreasonably cause[d] delay or hindrance to contract performance."  *C. Sanchez & Son, Inc.* v. *United States*, 6 F.3d 1539, 1542 (Fed. Cir. 2005).  For this reason, NCLN20 asserts that it was impossible to fill the additional nineteen to twenty-seven guard posts requested, because it would be impossible to train guards before performance was scheduled to commence.  Pl. PT. Br. at 108-110; 1/27/09 TR 261-72 (Abercrombia Test.); 1/26/09 TR 55-56 (Jones Test.).  This argument, however, is unavailing when the Michigan Guard Contract required NCLN20 to maintain a reserve force of sufficient size to cover "an increase of twenty percent (20%) over and above the total Basic Service Requirement labor and service hours stated in the Contract by [GSA] for the staffing and operation of each guard post."  JX 1 at 51 (emphasis omitted).  USI used this reserve force after NCLN20 was terminated for default to fill the guard-post requirements by October 1, 2001, on only a few days' notice.  *See* JX 81 at 13-14 (6/9/09 McKay Dep.); JX 84 at 8, 27 (6/30/09 Dobbs Dep.).  NCLN20 has offered no compelling explanation for why it could not have done the same.[14]  In addition, in a September 19, 2001 e-mail, Mr. Abercrombia acknowledged that NCLN20 could have met GSA's guard-post request by paying existing guards overtime.  *See* JX 23 at 1.

For these reasons, the court has determined that GSA did not breach the Michigan Guard Contract or violate the duty of good faith and fair dealing by increasing the number of guard posts after the Michigan Guard Contract was awarded.  *See Precision Pine & Timber, Inc.* v. *United States*, 596 F.3d 817, 831 (Fed. Cir. 2010) (holding that "[t]he implied duty of good faith and fair dealing cannot expand a party's contractual duties beyond those in the express contract or create duties inconsistent with the contract's provisions").

### b.  By Contributing To Delay In Plaintiff's Start-Up Efforts.

In addition, NCLN20 argues that GSA breached the duty of good faith and fair dealing by contributing to the delay in NCLN20's start-up efforts.  First, NCLN20 asserts that GSA misled NCLN20 into relying on the incumbent contractor, USI, for weapons, uniforms, and other equipment.  Pl. PT Br. at 11, 101, 108.  The Government responds that the Michigan Guard Contract required NCLN20 to obtain all necessary equipment and supplies and that GSA only informed NCLN20 that USI might sell these items as a courtesy.  Gov't PT Br. at 55.  The court has determined that NCLN20 was required to obtain weapons, uniforms, supplies, and other equipment necessary to perform the Michigan Guard Contract.  JX 1 at 35.  NCLN20 was not required to acquire any of those items from USI, nor did USI have any duty to sell them to NCLN20.  *Id.*  When it became clear that USI would not sell these items to NCLN20, the CO promptly informed NCLN20.  JX 81 at 28 (6/9/09 McKay Dep.); JX 84 at 26 (6/30/09 Dobbs Dep.).

---

[14] The evidence suggests that NCLN20 intended to hire USI's contract guards and had done so.  *See* JX 81 at 12 (6/30/09 McKay Dep.); 1/27/09 TR 203, 210-11, 263 (Abercrombia Test.). Therefore, NCLN20 should have been able to deploy these employees, in addition to its regular guards, to fill the guard posts as USI did.

Second, NCLN20 argues that GSA encouraged it to hire Mr. McKay (USI's Contract Manager) to serve as its Contract Manager, and that Mr. McKay undermined NCLN20's efforts to commence performance of the Michigan Guard Contract.  Pl. PT Br. at 11, 73-74, 108. NCLN20 argues that Mr. McKay's simultaneous work as a Contract Manager for both NCLN20 and USI was a breach of the Michigan Guard Contract.  *Id.*  The Government replies that the Michigan Guard Contract did not prohibit Mr. McKay from serving in both roles, and NCLN20 has not shown how it was harmed by the suggestion that NCLN20 consider hiring Mr. McKay. Gov't PT Br. at 55-56.

The court has found no evidence that Mr. McKay had any special relationship with GSA or was working on behalf of GSA to undermine NCLN20's contract.  JX 81 at 3-4 (6/9/09 McKay Dep.).  GSA informed all potential contractors of Mr. McKay's availability, and it was common practice for the incumbent contract manager to work for the incoming contractor.  JX 1 at 431; JX 81 at 3-4, 16 (6/9/09 McKay Dep.); JX 84 at 6 (6/30/09 Dobbs Dep.).  Nor does the court construe the contractual provision at issue to prohibit an incumbent contract manager from working for a follow-on contractor, although the two contracts may briefly overlap.  JX 1 at 41. Assuming, *arguendo*, that NCLN20's hiring Mr. McKay was a breach of the Michigan Guard Contract, it was NCLN20, not GSA, that was in breach.

The principal reason for NCLN20's delayed start-up efforts was the inability to secure the Michigan weapons permits.  It appears that NCLN20 sent a check to Mr. McKay one to two weeks before performance was scheduled to commence, but it was made payable to the Michigan Police Department.  JX 63 at 10 (10/11/04 Jones Decl.); JX 81 at 9 (6/9/09 McKay Dep.). The Department did not accept checks.  *Id.* Therefore, NCLN20 had to mail a second check payable to Mr. McKay so he could purchase the required license.  JX 63 at 10 (10/11/04 Jones Decl.); JX 81 at 9-11, 22-23, 28 (6/9/09 McKay Dep.).  It is unclear who was responsible for this mistake, but there is no evidence that GSA was at fault.

The United States Court of Appeals for the Federal Circuit has held that "a contractor cannot recover where delays are 'concurrent or intertwined' and the contractor has not met its burden of separating its delays from those chargeable to the Government."  *Essex Electro Eng'rs, Inc.* v. *Danzig*, 224 F.3d 1283, 1292 (Fed. Cir. 2000) (internal quotation marks and citations omitted).  NCLN20 has not identified any delay attendant to NCLN20's failure to have a Michigan security guard license that was caused by GSA.  Instead, the record shows that NCLN20 decided to rely on one employee to commence start-up operations on September 10, 2001, approximately two weeks after it received a preliminary notice of award.  JX 81 at 15 (6/9/09 McKay Dep.);  JX 75 at 6 (Thibault Dep.).  The Solicitation, however, advised: "Do not assign all the start-up work to only one or two persons[.]"  JX 1 at 345; *see also* JX 81 at 15 (6/9/09 McKay Dep.).

Because NCLN20 has not satisfied its burden to show that any delay in securing weapons, uniforms, and other equipment or failure to procure a valid Michigan weapons license was caused by GSA, NCLN20 cannot establish that GSA breached the Michigan Guard Contract or that GSA violated the duty of good faith and fair dealing.

### 2.   Whether The General Services Administration's September 28, 2001 Termination For Default Was Lawful.

Default termination is "a drastic sanction which should be imposed (or sustained) only for good grounds and on solid evidence." *J.D. Hedin Constr. Co.* v. *United States*, 408 F.2d 424, 431 (Ct. Cl. 1969) (citations omitted). The Government bears the burden of demonstrating that a termination for default was justified. *Lisbon Contractors, Inc. v. United States,* 828 F.2d 759, 765 (Fed. Cir. 1987). "If the government succeeds in proving default, the plaintiff then must demonstrate that the default was excusable under the terms of the contract." *Keeter Trading Co.* v. *United States*, 79 Fed. Cl. 243, 253 (2007) (citation omitted) (internal quotation marks omitted).

### a.   Based On The Contracted Date Performance Was To Commence.

NCLN20 argues that the Michigan Guard Contract was awarded either on September 7, 2001, when the CO issued a formal award notice (JX 10), or on September 10, 2001, when NCLN20 received the formal notice (JX 63 at 7 (10/11/04 Jones Decl.)). Pl. PT Br. at 36-37, 43-44. The Michigan Guard Contract required that performance commence "within thirty (30) calendar days after the date of Contract award, or on October 1, 2001, whichever was later." JX 1 at 11 (emphasis omitted). Therefore, NCLN20 asserts that the start date should have been either October 7, 2001, or October 10, 2001. Pl. PT Br. at 36-37, 43-44; *see also* JX 71 at 7 (IG Report concluding that NCLN20's start date was October 7, 2001). The Government counters that the award occurred on August 24, 2001, when GSA sent a preliminary notice of award to NCLN20, so performance was required to commence on October 1, 2001. Gov't PT Br. at 11-14 (citing JX 6). Had the award occurred after August 31, 2011, the Michigan Guard Contract provides that the parties may agree in writing to shorten the start-up period if the contract is awarded after August 31, 2001. Gov't PT Br. at 14-15 (citing JX 1 at 39).

The Michigan Guard Contract provides that the "written award or acceptance of a bid mailed or otherwise furnished to the successful bidder within the time for acceptance specified in the bid shall result in a binding contract without further action by either party." JX 1 at 396. GSA only needed to send a written notification of award to the contractor and follow up with a formal notice to award a contract effective as of the date of the initial written notice. *See* 48 C.F.R § 14.408-1;[15] *see also Goldberger Foods, Inc.* v. *United States*, 23 Cl. Ct. 295, 302-3 (Cl.

---

[15] In the context of sealed bidding, FAR 14.408-1 provides:

(a) The contracting officer shall make a contract award (1) *by written . . . notice,* (2) within the time for acceptance specified in the bid . . . , and (3) to that responsible bidder whose bid, conforming to the invitation will be most advantageous to the Government . . . .

(c)(1) Award shall be made by mailing or otherwise furnishing a properly executed award document to the successful bidder.

(2) When a notice of award is issued, it shall be followed as soon as possible by the formal award.

Ct. 1991) (holding that a telegram followed by a formal notice of award was sufficient to create a binding contract as of the date of the telegram), *aff'd*, 960 F.2d 155 (Fed. Cir. 1992).

On August 24, 2001, GSA sent a notice to NCLN20 stating in unequivocal terms that NCLN20 was awarded the Michigan Guard Contract and that a "post award meeting" would be scheduled.  JX 6.  On that same date, NCLN20 wrote GSA a letter that "accept[ed] the award" of the Michigan Guard Contract.  JX 7.  On September 7, 2001, the CO followed up with a formal notice.  JX 10.

Even if a formal award was not made on August 24, 2001, NCLN20 and GSA nevertheless agreed in writing that October 1, 2001, was the start-up date.  JX 6 (award notice indicating that performance is expected on October 1); JX 9 at 2 (9/6/01 Jones letter)  ("As far as your request regarding the October 1, 2001 start date, that is what our bid is based on per the solicitation specifications.  We are capable to perform the guard services on the required start date."); JX 23 (9/19/01 Abercrombia letter) ("We have gone forward with all intentions of starting on Oct. 1, 2001 and I don't foresee any reason why we couldn't."); JX 15 at 5 (indicating that the start date was October 1, 2001); JX 24 at 5 (same).

Therefore, the court has determined that NCLN20 was awarded the Michigan Guard Contract on August 24, 2001, requiring NCLN20 to commence performance no later than October 1, 2001.  Even if the contract had not been awarded on that date, the parties agreed to commence performance on October 1, 2001.

### b.    Based On The Contractual Notice And Cure Requirements.

On September 26, 2001, five days before performance was to begin on the Michigan Guard Contract, GSA issued a cure notice requiring NCLN20 to provide copies of all "state required weapons permits" and assurances that it could perform within twenty-four hours or be terminated for default.  JX 30 at 1-2.  NCLN20 was unable to comply.  On September 28, 2001, three days prior to the date of contract performance, NCLN20 was terminated for default.[16]

---

(d)(1) Award is generally made by using the Award portion of Standard Form (SF) 33, Solicitation, Offer, and Award, or SF 1447, Solicitation/Contract (*see* 53.214).

(2) Use of the Award portion of SF 33, SF 26, or SF 1447, *does not preclude the additional use of informal documents, including telegrams or electronic transmissions, as notices of awards.*

48 C.F.R. § 14.408-1 (emphasis added).

[16] GSA failed to provide advance notice of the September 28, 2011 termination to the Small Business Administration as required by the Michigan Guard Contract.  JX 1 at 213.  This is not sufficient grounds to overturn a default termination unless the contractor has suffered prejudice.  *See Hannon Elec. Co.* v. *United States*, 31 Fed. Cl. 135, 150 (1994) (failure to notify the SBA is not grounds for overturning a default, since that notice is provided only "as a matter

The United States Court of Appeals for the Federal Circuit and its predecessor have held that when the Government terminates a contract without providing any required notice and timely opportunity to cure, that termination is "wrongful." *See Bailey Specialized Bldgs., Inc.* v. *United States*, 404 F.2d 355, 363 (Ct. Cl. 1968) ("It is concluded that the termination of the contract by defendant without giving the plaintiff the ten days' written notice as required by . . . the contract constituted a wrongful termination of the contract by the defendant."); *see also Johnson Mgmt. Grp. CFC, Inc.* v. *Martinez*, 308 F.3d 1245, 1249-50 (Fed. Cir. 2002) (FAR 52.249-8 allowed the Government to terminate a contract for default if the contractor failed to cure after receiving notice and a ten-day cure period).

The Michigan Guard Contract specifically incorporated FAR 52.249-8.[17]   JX 1 at 199. Thereunder, GSA could terminate for failure to deliver supplies or perform services within the time specified in the Michigan Guard Contract, that is, October 1, 2001.  *See* 48 C.F.R. § 52.249-8(a)(1)(i).  But, GSA could not terminate NCLN20 prior to that date, unless GSA gave NCLN20 a notice of a deficiency in performance and NCLN20 did not cure within ten days.  *See* 48 C.F.R. § 52.249-8(a)(2); *see also Bailey*, 404 F.2d at 363 (holding that a failure to give a contractually required ten-day cure  period constituted wrongful termination). Since GSA did not give NCLN20 a ten-day period to cure after the September 26, 2001 notice of deficiency in performance, the court has determined that GSA's September 28, 2001 termination of NCLN20 for default for failure to make progress was unlawful.

---

of information.").  In this case, NCLN20 has failed to establish how it was prejudiced by GSA's failure to inform the SBA.

[17] FAR 52.249-8(a) provides:

(1) The Government may, subject to paragraphs (c) and (d) below, by written notice of default to the Contractor, terminate this contract in whole or in part if the Contractor fails to--

> (i) Deliver the supplies or to perform the services within the time specified in this contract or any extension;

> (ii) Make progress, so as to endanger performance of this contract (but see subparagraph (a)(2) below); or

> (iii) Perform any of the other provisions of this contract (but see subparagraph (a)(2) below).

(2) The Government's right to terminate this contract under subdivisions (1)(ii) and (1)(iii) above, may be exercised if the Contractor does not cure such failure within 10 days (or more if authorized in writing by the Contracting Officer) after receipt of the notice from the Contracting Officer specifying the failure.

48 C.F.R § 52.249-8(a) (2011).

### c.      Based On Plaintiff's Anticipatory Repudiation.

The Government argues that anticipatory repudiation is a "well-recognized" exception to any requirement of notice and cure, so that once a contract is repudiated, the Government does not need to delay termination.  Gov't PT Br. at 50.  The Government asserts that NCLN20 repudiated by failing to provide assurances that it could perform.  *Id.*

In *Danzig* v. *AEC Corp.*, 224 F.3d 1333 (Fed. Cir. 2000), the United States Court of Appeals for the Federal Circuit observed that, under common law, anticipatory repudiation required "an unambiguous and unequivocal statement that the obligor would not or could not perform the contract."  *Id.* at 1337.  Current jurisprudence, however, recognizes that anticipatory repudiation may be applicable where

> reasonable grounds support the obligee's belief that the obligor will breach the contract. In that setting, the obligee "may demand adequate assurance of due performance" and if the obligor does not give such assurances, the obligee may treat the failure to do so as a repudiation of the contract.

*Id.* at 1337-38 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 251(2) (1981)).  Accordingly, "government contracts [law] has adopted [the doctrine of anticipatory repudiation], expressing it as a requirement that the contractor give reasonable assurances of performance [but only] in response to a validly issued cure notice."  *AEC Corp.*, 224 F.3d at 1338; *see also Cross Petroleum* v. *United States*, 54 Fed. Cl. 317, 326 (2002) (holding that the failure to afford a contractor notice and the contractually specified period to cure precludes the government from asserting a defense of anticipatory repudiation for failure to provide assurances).  In this case, however, GSA did not afford NCLN20 a "validly issued cure notice," instead requiring that it provide assurances within twenty-four hours.  *See AEC Corp.*, 224 F.3d at 1338; JX 30.

For these reasons, the court has determined that the Government is barred from asserting the defense of anticipatory repudiation.

### d.      Based On Later Discovered Evidence Concerning Plaintiff's Compliance With The Solicitation.

The Government argues that the September 28, 2001 termination for default was justified by NCLN20's failure to obtain a contractually required Michigan security guard license.  Gov't PT Br. at 28.  Although the CO did not cite NCLN20's failure to comply with the Michigan security guard license requirement as a reason supporting the September 28, 2001 termination for default, later discovered evidence may provide cause for termination.  *See Joseph Morton Co.* v. *United States*, 757 F.2d 1273, 1277 (Fed. Cir. 1985) ("[I]t is settled law that a party can justify a termination if there existed at the time an adequate cause, even if then unknown." (citations omitted)).

Under Michigan law, a company must possess a valid Michigan security guard license at the time of contract performance, but not when it offers to perform such services.  *See* Mich.

28

Comp. Laws § 338.1053 ("Unless licensed under this act, a . . . corporation shall not engage in the business of . . . private security guard . . . or an agency furnishing those services."); *see also* 1981-1982 Mich. Op. Atty Gen. 696, 1981-1982 Mich. OAG No. 6086, 1982 WL 183578 (Mich. A.G.) ("The Private Security Guard Act of 1968 does not require that out-of-state private security guard agencies be licensed in Michigan prior to bidding, soliciting or seeking to do business in this state.").

The Government argues that the July 31, 2001 Solicitation required a valid Michigan security guard license as a precondition to award. Gov't PT Br. at 28, 31 (citing JX 1 at 180). NCLN20 explains that B&C Service Co. ("B&C") held a valid Michigan state security guard license and NCLN20 had a joint venture and agency relationship with this firm. *See* PX 1083; 1/26/09 TR 116-130 (Jones Test.); 1/27/09 TR 284-300, 303-305, 314-315, 318-329 (Thibault Test.). The Government responds that NCLN20 may not rely on another company's security guard license and that NCLN20's proposal was not submitted to GSA as a joint venture. Gov't PT Br. at 28-31, 34-35.

The record reflects that NCLN20 did not have a valid Michigan security guard license on August 16, 2001, when it submitted an offer to GSA or on September 28, 2001, when GSA terminated NCLN20 for default. 1/26/09 TR 118-19 (Jones Test.); 1/27/09 TR 274 (Abercrombia Test.); JX 76 at 13, 25-28 (5/6/08 Toben Dep.) (testifying that Mr. Zerefos did not apply for a license until September 21, 2001, but the license did not issue, because the requisite fingerprint cards were not submitted). The earliest evidence of NCLN20's attempt to obtain a security guard license is from August 21, 2001, when NCLN20 entered into an agreement with B&C's principal, Mr. Zerefos, that he would either obtain a Michigan security guard license for NCLN20 or would allow NCLN20 to use B&C's existing security guard license. PX 1083 at 2-3. Although NCLN20 could use the security guard license of a joint venture partner under the Michigan Guard Contract, NCLN20 never disclosed B&C as a joint venture partner to GSA. JX 2 at 31. Moreover, under Michigan law, security guard licenses cannot be assigned, and therefore NCLN20 was prohibited from relying on B&C's security guard license. *See* Mich. Comp. Laws § 338.1065 ("A license issued under the provisions of this act is not assignable, and is personal to such licensee.").

NCLN20's argues that the July 31, 2001 Solicitation was ambiguous as to the precise time when an offeror must possess a Michigan security guard license (*i.e.*, at the time a proposal is submitted, before an award, or by the start-up date) and that this requirement should be construed against GSA. Pl. PT Br. at 75-77, 80; *see also United States* v. *Seckinger*, 397 U.S. 203, 216 (1970) ("[O]ur interpretation adheres to the principle, that as between two reasonable and practical constructions of an ambiguous contractual provision, . . . the provision should be construed less favorably to that party which selected the contractual language.").

The court has determined that the July 31, 2001 Solicitation is not ambiguous. Clauses K-15 and H-14 of the Michigan Guard Contract require that an offeror provide proof of a valid Michigan security guard license at the time the proposal is submitted. JX 1 at 180, 344. Clause C-6 requires that the contractor also comply with all other applicable laws by the time contract performance commences. JX 1 at 43. Therefore, the court has determined that the Solicitation

requires that a contractor possess a valid Michigan security guard license as of the date a proposal is submitted.

Nevertheless, the court has determined that NCLN20's failure to comply with the Solicitation does not justify the September 28, 2001 termination for default or invalidate the Michigan Guard Contract because GSA had the ability to ascertain NCLN20's license compliance prior to award and either failed to do so or waived that requirement.  *See* JX 1 at 180 (requiring that the Contractor submit copies of contract related licenses "prior to Contract Award"); JX 2 at 25 (requiring a photocopy of the contractor's security guard license).  Despite the fact that NCLN20 failed to provide documentation, GSA nevertheless awarded the contract to NCLN20.

Moreover, once the contract was awarded, the fact that NCLN20 did not have the security guard licenses prior to performance does not mean that this failure would result in immediate termination.  GSA would still have had to give NCLN20 notice of this defect and a ten-day cure period in order to terminate the contract prior to contract performance.  *See* 48 C.F.R. § 52.249-8(a)(1)-(2) (allowing termination for default without a cure notice and ten-day cure period only when  the contractor fails to "deliver the supplies or to perform the services within the time specified in this contract or any extension").  Had it been given this cure notice and ten-day cure period, NCLN20 could have performed under a temporary Michigan security guard license.  *See* Mich. Comp. Laws § 338.1057(4) (authorizing issuance of temporary security guard licenses for a period of 120 days).

Therefore, the court has determined that NCLN20's lack of a Michigan security guard license prior to performance does not justify the Government's September 28, 2001 termination for default.[18]

\* \* \*

For these reasons, the court has determined that the September 28, 2001 termination for default was unlawful.  As such, the September 28, 2001 termination for default must be converted to a termination for convenience.  *See* 48 C.F.R. § 52.249-8(g) (2011) ("If, after termination, it is determined that the Contractor was not in default, or that the default was excusable, the rights and obligations of the parties shall be the same as if the termination had been issued for the convenience of the Government.") (incorporated by reference at JX 1 at 199); *see also Keeter Trading*, 79 Fed. Cl. at 262 ("[I]n government contract cases in which a

---

[18] To the extent the Government argues that the security guard license issue precludes an investigation as to whether GSA acted in bad faith, (*see* Gov't PT Br. at 28), the United States Court of Federal Claims has emphasized that bad faith on the part of the Government will invalidate a termination for default and preclude a constructive termination for convenience even if the contractor was actually in default at the time of termination.  *Keeter Trading*, 79 Fed. Cl. at 252 ("[E]ven in cases in which a contractor has technically defaulted on its contractual obligations, the court will not uphold a default termination where the agency has acted in bad faith in administering the contract.").

termination for default is found to be improper, it will be converted to a termination for the convenience of the government, and damages calculated accordingly.").

> 3.  **Whether The April 13, 2007 Conversion To A Termination For Convenience Was Improper Due To Bad Faith Or Abuse Of Discretion By The General Services Administration.**

The United States Court of Appeals for the Federal Circuit has held that a termination for convenience will be upheld unless the contractor can establish bad faith or clear abuse of discretion.  *See T & M Distribs., Inc.* v. *United States*, 185 F.3d 1279, 1283 (Fed. Cir. 1999) ("In the absence of bad faith or clear abuse of discretion, the contracting officer's election to terminate for the government's convenience is conclusive."); *see also Krygoski Constr. Co., Inc.* v. *United States*, 94 F.3d 1537, 1541 (Fed. Cir. 1996) ("When tainted by bad faith or an abuse of contracting discretion, a termination for convenience causes a contract breach.").  In *Am-Pro Protective Agency, Inc.* v. *United States*, 281 F.3d 1234 (Fed. Cir. 2002), the United States Court of Appeals for the Federal Circuit held that the presumption that Government officials act in good faith may only be overcome by clear and convincing evidence.  *Id.* at 1239 ("[W]e believe that clear and convincing most appropriately describes the burden of proof applicable to the presumption of the governments good faith.").  In addition, the plaintiff must show "specific intent to injure" the plaintiff.  *Id.* at 1241.

NCLN20 has advanced a number of arguments to establish bad faith or an abuse of discretion by GSA that the court examines below.

> a.  **Based On Animus, And/Or Racial Bias.**

NCLN20 argues that GSA's September 28, 2001 termination for default was motivated by animus and racial bias.  Pl. PT Br. at 2-3, 53-54, 58, 64, 100, 104, 106-107.  Specifically, NCLN20 asserts that the AACO's bad faith and animus toward NCLN20 originated in a 1999 disagreement over the Battle Creek Contract and, at that time, the AACO indicated that he would seek revenge against NCLN20 at a later date.  1/26/09 TR 89-92 (Jones Test.).  The Government responds that there is no evidence in the record of animus or racial bias towards NCLN20.  Gov't PT Br. at 42-44.  Assuming *arguendo* that the AACO harbored animus, the Government asserts NCLN20 was not harmed because the CO made all key decisions regarding the Michigan Guard Contract.  *Id.* at 45-46.

The court has reviewed the record with extra care, including the AACO's personnel files that were produced at the court's request and the testimony of his supervisors.  The record establishes that the AACO was a difficult person, whose style of communication was inept, argumentative, and unprofessional.  JX 16, 18-19, 22.  While the AACO's communications with NCLN20 often were accusatory and condescending, the conflict between the AACO and NCLN20 was exacerbated by NCLN20's management and failure to adhere to the specific requirements of the Michigan Guard Contract.  Under these circumstances, the court has determined that NCLN20 has not demonstrated bad faith or animus on the part of the AACO or specific intent to injure NCLN20.  Although NCLN20's frustration with the AACO was

understandable, that alone is not sufficient to overcome the presumption that the AACO acted in good faith in administering the Michigan Guard Contract.

In addition, there is no evidence in the record to suggest that the AACO was racially biased.  The only mention of racial bias in the record is Mr. Abercrombia's testimony that he did not attribute any of the AACO's actions regarding NCLN20 to racial bias.  1/27/09 TR 228 (Abercrombia Test.).

### b.      Based On A Failure To Honor The Contractual Bargain.

The United States Court of Appeals for the Federal Circuit and its predecessor also have held that entering a contract with no intention of honoring it, or terminating a contract to find a better bargain, are grounds for invalidating a termination for convenience.  *See Salsbury Indus.* v. *United States,* 905 F.2d 1518, 1521 (Fed. Cir. 1990) ("[W]hen the government contracts with a party knowing full well that it will not honor the contract, it cannot avoid a breach claim by adverting to the convenience termination clause."); *see also Torncello* v. *United States*, 681 F.2d 756, 772 (Ct. Cl. 1982) (holding that it was bad faith to terminate for convenience to acquire a better bargain from another source).

NCLN20 argues that GSA entered into the contract with NCLN20 with no intention of fulfilling its promises, as it had a preference for USI, which offered lower prices than NCLN20.  Pl. PT Br. at 51-57.  As a result, GSA prematurely terminated NCLN20 to divert the Michigan Guard Contract to USI by "drumming up feigned claims of NCLN20's unreadiness," issuing a verbal change order, and demanding a start date that was not in accordance with the contract and was impossible to achieve.  Pl. PT Br. at 109-110.

Contrary to NCLN20's argument, USI did not offer to perform the Michigan Guard Contract at a lower cost than NCLN20.[19]  *See* JX 3 at 1-2; JX 82 at 36 (4/22/09 Pinnau Dep.)  The court has found no evidence that GSA entered into the Michigan Guard Contract without the intention of honoring it, or that GSA expressed any specific preference for the incumbent, USI, other than the fact that USI was awarded the Michigan Guard Contract after NCLN20 was terminated for default.  JX 34 at 1.

### c.      Based On Disparate Treatment.

NCLN20 also asserts that GSA treated it differently from three other contractors.  Pl. PT Br. at 46-48, 111.  First, NCLN20 points to a guard contract in Ohio[20] where the contractor was unprepared to start performance, but the same CO assigned to the Michigan Guard Contract granted the Ohio contractor several extensions of time. Pl. PT Br. at 47 (citing JX 84 at 29 (6/30/09 Dobbs Dep.)).  The Government responds that, in administering the Michigan Guard Contract, the CO was mindful of his previous mistakes regarding the Ohio contract and the

---

[19] This assertion is based on an erroneous reading of the AACO's testimony.  Pl. PT Br. at 53-55; *see* also JX 82 at 36 (4/22/09 Pinnau Dep.).

[20] The record does not reflect the name of this contractor.

heightened security concerns after 9/11. Gov't PT Br. at 53-54; JX 84 at 35-36 (6/30/09 Dobbs Dep.). For these reasons, the CO decided not to extend the start-up period for NCLN20. *Id.*

NCLN20 also points to GSA's treatment of Knight Protective Services ("KPS"), a firm that was awarded the Michigan Guard Contract in 2003. Pl. PT Br. at 90. KPS did not have a Michigan security guard license until after GSA had awarded the contract and was afforded ninety days to commence performance. JX 46; JX 47; JX 81 at 14, 19 (6/9/06 McKay Dep.). The Government does not deny these allegations, but responds that KPS acquired the required license before performance was scheduled to begin, as required by Michigan law. Gov't PT Br. at 54; JX 46; JX 47.

Finally, NCLN20 points out that on September 19, 2001, the AACO sent an e-mail to another contractor, General Security Services Corporation ("GSSC"), stating:

> For new (post September 11th/post-WTC attack) contract security guard posts where GSSC is unable to provide armed guards . . . you may provide unarmed guards, for the duration of September, 2001. We will re-examine the situation at the end of the month, to see if an extension is required. As time and resources permit, unarmed guards at armed guard posts must be replaced with armed guards.

PX 1000.

The Government responds that GSSC presented a different situation: that firm proposed to add unarmed guards in addition to the armed guards already in place, whereas NCLN20 proposed to provide unarmed guards only until NCLN20 received its licenses. Gov't PT Br. at 53; JX 82 at 28 (4/22/09 Pinnau Dep.).

Although GSA clearly treated other contractors differently, the court has determined that the CO and AACO acted within the boundaries of their discretion in interacting with NCLN20 regarding the Michigan Guard Contract.

### d.    Based On The Contracting Officer's Unlawful Delegation Of Duties.

Finally, NCLN20 contends that the CO illegally delegated responsibility for the Michigan Guard Contract to the AACO and his GSA supervisors. Pl. PT Br. at 53-54, 57-61, 106. In addition, NCLN20 challenges the role of GSA's Regional Counsel in administering the September 28, 2001 default termination and the role of the Department of Justice ("DOJ") in the April 13, 2007 conversion of the September 28, 2001 termination for default to one for convenience. Pl. PT Br. at 57-61, 99.

The record reflects that the AACO played a significant role in the administration of the Michigan Guard Contract because of the CO's health problems.  1/27/09 TR 216 (Abercrombia Test.).  The Michigan Guard Contract specifically authorized this role:

> During the presence or availability of the CO, the duties of the ACO[21] may include, but are not limited to: analyze, negotiate and recommend approval/disapproval of Contractor Proposals, Offers or Quotations; review and approve/disapprove Contractor invoices, billing and supporting financial data; authorize and approve/disapprove Government Delivery Orders; coordinate with the Contractor, and provide guidance to the COR and ACOR, all in accordance with the terms of the contract.  The ACO may explain and interpret all parts of the Contract.

JX 1 at 153-54.

Moreover, contrary to NCLN20's argument, the record evidences that the CO authorized all key decisions regarding the administration of the Michigan Guard Contract, including the mistake in bid, notice of award, request for additional guards, September 26, 2001 cure notice, September 28, 2001 default termination, and April 13, 2007 convenience termination.  JX 13; JX 29; JX 32; JX 33; JX 44; JX 45; JX 83 at 6 (6/26/09 Cohen Dep.); JX 84 at 5-10 (6/30/09 Dobbs Dep.).

In *Schlesinger* v. *United States*, 390 F.2d 702 (Ct. Cl. 1968), the Court of Claims held that a termination for convenience was invalid when the Navy failed independently to exercise its discretion, and instead delegated contractual duties to the Senate Subcommittee on Government Operations.  *Id.* at 709; *see also Fairfield Scientific Corp.* v. *United States*, 611 F.2d 854, 862 (Ct. Cl. 1979) ("If the contracting officer was improperly influenced by plaintiff's competitor or by anyone else to terminate the contract for default rather than to exercise his own independent judgment in the light of the factors set out in the regulations, it would represent an abdication rather than an exercise of his discretion.").  In this case, however, the CO did not abdicate his responsibility and properly communicated with GSA supervisors, GSA Regional Counsel, and, after the filing of this lawsuit, DOJ Counsel.

Therefore, the court has determined that the CO did not improperly delegate his duties under the Michigan Guard Contract.

### e.  Based On NCLN20's Mistake In Bid.

NCLN20 argues that GSA improperly terminated NLCN20 due to its claim of MIB.  Pl. PT Br. at 46, 105.  The primary evidence for this argument comes from a single comment by the CO that the MIB claim "disturbed me because the NCLN20 attorney. . . [had] filed a MIB with the Great Lakes Region (5) in 1997 as an attorney representing Allstate Security (ASIS)."  JX 71 at 10.  As a result of this single comment the IG Report concluded that the MIB may have "influenced the decision about extending the incumbent contractor's guard contract."  *Id.*  The

---

[21] "The Alternate ACO ('AACO') has the same authority as the ACO."  JX 1 at 154.

court has concluded, however, that this single piece of evidence is not sufficient to demonstrate by clear and convincing evidence that GSA acted in bad faith.

* * *

The court has determined that NCLN20 has not demonstrated that GSA acted in bad faith or abused its discretion and is therefore not entitled to recoup any lost profits. *See Krygoski*, 94 F.3d at 1545 (Fed. Cir. 1996) (holding that termination for convenience damages exclude "anticipatory profits"); *see also Kalvar Corp., Inc.* v. *United States*, 543 F.2d 1298, 1304 (Ct. Cl. 1976) ("In the absence of bad faith or clear abuse of discretion, the effect of the constructive termination for convenience is to moot all breach claims and to limit recovery to costs which would have been allowed had the contracting officer actually invoked the [termination for the convenience of the government] clause.").

In the Michigan Guard Contract, terminations for convenience are governed by 48 C.F.R. § 52.249-2,[22] the regulation concerning fixed-price contracts. *See* JX 1 at 199 (incorporating by

---

[22] FAR 52.249-2(g) addresses compensation to the contractor for a termination for convenience in a fixed-price contract:

If the Contractor and the Contracting Officer fail to agree on the whole amount to be paid because of the termination of work, the Contracting Officer shall pay the Contractor the amounts determined by the Contracting Officer as follows, but without duplication of any amounts agreed on under paragraph (f) of this clause:

(1) The contract price for completed supplies or services accepted by the Government (or sold or acquired under subparagraph (b)(9) of this clause) not previously paid for, adjusted for any saving of freight and other charges.

(2) The total of--

(i) The costs incurred in the performance of the work terminated, including initial costs and preparatory expense allocable thereto, but excluding any costs attributable to supplies or services paid or to be paid under subparagraph (g)(1) of this clause;

(ii) The cost of settling and paying termination settlement proposals under terminated subcontracts that are properly chargeable to the terminated portion of the contract if not included in subdivision (g)(2)(i) of this clause; and

(iii) A sum, as profit on subdivision (g)(2)(i) of this clause, determined by the Contracting Officer under 49.202 of the Federal Acquisition Regulation, in effect on the date of this

reference 48 C.F.R. § 52.249-2 (2011)).   Under FAR 52.249-2, the contractor is "entitled to recover all allowable costs incurred in the performance of the terminated work, a reasonable profit on the work done, and certain additional costs associated with the termination." *Best Form Fabricators, Inc.* v. *United States*, 38 Fed. Cl. 627, 638 (1997).   Therefore, "[w]hen a fixed-price contract is terminated for convenience, it is essentially converted into a cost reimbursement contract." *White Buffalo Constr., Inc.* v. *United States*, 52 Fed. Cl. 1, 4 (2002).

Although NCLN20 did not commence work on the Michigan Guard Contract, it is entitled to start-up costs.   The DCAA audit determined that NCLN20 incurred $46,856.00 in start-up costs associated with the Michigan Guard Contract.   JX 43 at 1-2.   NCLN20 has proffered no evidence contesting this sum.   Under the CDA, NCLN20 is entitled to interest on this amount "from the date the contracting officer receives the claim . . . until payment thereof." 41 U.S.C. § 611.   Therefore, NCLN20 is entitled to interest on this sum from the time October 26, 2006 until it receives payment, to be calculated in accordance with the interest rates established by the Department of the Treasury.   *See* Court Appendix.

### E.    Issues Raised In The September 27, 2007 First Amended Complaint Regarding The Battle Creek Contract.

The September 27, 2007 First Amended Complaint alleges two claims concerning the Battle Creek Contract.   NCLN20's first claim for relief alleges that GSA acted in bad faith in the administration of the Battle Creek Contract.   Amend. Compl. ¶¶ 80-97.   The second claim for relief alleges that GSA violated the implied duty of good faith and fair dealing to cooperate and not hinder or interfere with NCLN20's performance of the Battle Creek Contract.   *Id*. ¶¶ 98-103.

---

contract, to be fair and reasonable; however, if it appears that the Contractor would have sustained a loss on the entire contract had it been completed, the Contracting Officer shall allow no profit under this subdivision (iii) and shall reduce the settlement to reflect the indicated rate of loss.

(3) The reasonable costs of settlement of the work terminated, including--

(i) Accounting, legal, clerical, and other expenses reasonably necessary for the preparation of termination settlement proposals and supporting data;

(ii) The termination and settlement of subcontracts (excluding the amounts of such settlements); and

(iii) Storage, transportation, and other costs incurred, reasonably necessary for the preservation, protection, or disposition of the termination inventory.

48 C.F.R 52.249-2(g).

Both claims allege that GSA entered into an implied-in-fact agreement to extend the Battle Creek Contract and seek relief for the alleged extension.  Id. ¶¶ 97, 103.

> **4.  Whether The General Services Administration Violated The Duty Of Good Faith And Fair Dealing Or Acted In Bad Faith In Administering The Battle Creek Contract.**

NCLN20 argues that GSA breached the duty of good faith and fair dealing or acted in bad faith by withholding amounts due to NCLN20 and withdrawing funds previously paid to NCLN20.  Pl. PT Br. at 111-16.  The Battle Creek Contract required GSA to pay NCLN20 on a monthly basis.  JX 51 at 69.  In September 2001, GSA owed NCLN20 payment for performance of the services on the Battle Creek Contract totaling $172,917.49, as reflected in NCLN20 Invoice Nos. 3438, 3462, 3463, and 3464.  JX 49 at 3-4; 1/27/09 TR 236 (Abercrombia Test.).  GSA, however, declined to pay these outstanding invoices to cover any costs of re-awarding the terminated Michigan Guard Contract.  See JX 49.[23]  GSA continued to withhold these amounts due after the April 13, 2007 conversion for a termination for convenience because GSA insisted that NCLN20 did not submit acceptable invoices.  JX 44 at 8.  As a result, it was not until June 2008 that NCLN20 was paid $172,917.49 for these outstanding invoices.  This amount, however, did not include accrued interest on this sum or attorney fees.  Id.

The Government responds that GSA did not violate the Battle Creek Contract because GSA was entitled to withhold payments due as a result of the September 28, 2001 default termination of the Michigan Guard Contract.  Gov't PT Br. at 59.  Moreover, NCLN20 introduced no evidence that either the CO or AACO were involved with any withdrawal of funds out of NCLN20's bank account.  Id.  The Government concedes, however, that GSA continued to withhold payments from NCLN20 after the April 13, 2007 conversion, but only because NCLN20 failed to submit appropriately documented invoices.  Gov't PT Br. at 61.  Once documentation was submitted, the invoices were paid.  Id.

As a matter of law, the Government is entitled to offset contractual amounts due where a contractor is terminated for default.  See J.G.B. Enters., Inc. v. United States, 497 F.3d 1259, 1261 (Fed. Cir. 2007) ("It is undisputed that the [G]overnment has the right to offset debts owed to its contractor with a debt owed to it by the same contractor absent explicit contractual, statutory, or regulatory language stating otherwise.") (citing United States v. Munsey Trust Co., 332 U.S. 234, 239 (1947)).  This right "extends not only to debts on that contract but to any other contract between the government and the same contractor."  Id.; see also Cecile Indus., Inc. v. Cheney, 995 F.2d 1052, 1054 (Fed. Cir. 1993) (The right to offset debts to the United States against contract payments due to the debtor "extends to offsets between separate contracts which the debtor may have with the Government."); Project Map, Inc. v. United States, 486 F.2d 1375, 1375 (Ct. Cl. 1973) (allowing the Government to offset debts of one contract against payments

---

[23] NCLN20 asserts that GSA's payment for the last month of service was deposited into NCLN20's bank account and that GSA subsequently withdrew that payment without notice.  1/27/09 TR 237-38 (Abercrombia testifying that the decision to take the money out of NCLN20's bank account without notice was motivated by the AACO or CO's desire to "exact[] some kind of punishment [regarding the Michigan Guard Contract]").

due in another contract).  With respect to NCLN20's assertion that the Government actually took funds from NCLN20's bank account, the court has not been provided with sufficient evidence to support the claim.

For these reasons, the court has determined that GSA did not violate the duty of good faith and fair dealing regarding the administration of the Battle Creek Contract.

### 5.  Whether The General Services Administration Entered Into An Implied-In-Fact Agreement With Plaintiff To Extend The Battle Creek Contract.

On June 16, 1999, NCLN20 was awarded the Battle Creek Contract for a base period of one year, commencing October 1, 1999, with a one-year option.  JX 54 at 1-2.  On September 1, 2000, GSA exercised the first one-year option on the Battle Creek Contract, extending NCLN20's performance until September 30, 2001.  AC3, Tab 10. NCLN20 argues that by a verbal agreement with the CO, it entered into an implied-in-fact contract to extend the Battle Creek Contract for another six months.  Pl. PT Br. at 130-34 (citing 1/26/09 TR 31, 37 (Jones Test.); 1/27/09 TR 235 (Abercrombia Test.)).  The Government responds that the CO negotiated with NCLN20, but never made an offer to extend the Battle Creek Contract past September 30, 2001.  Gov't PT Br. at 62-63.

Although NCLN20 proffered testimony that a verbal award was made, this testimony was rebutted.  On August 23, 2001, the CO proposed a six-month extension, but requested that NCLN20 submit a revised cost proposal.  PX 1063 (CO writing that "we are *proposing* to extend the contract an additional six months" and requesting a "cost proposal" (emphasis added)).  On August 29, 2001, NCLN20 submitted a cost proposal.  JX 56.  On September 19, 2001, however, the CO rejected NCLN20's August 29, 2001 cost proposal because the quoted labor prices were too high.  JX 70; 1/26/09 TR 36-38 (Jones Test.); 1/27/09 TR 226 (Abercrombia Test.).  Nevertheless, the CO invited NCLN20 to submit another revised cost proposal.  JX 70.  Instead, on September 20, 2001, NCLN20 sent the CO a REA, requesting that the six-month extension be reconsidered with wages and benefits that conform to U.S. Department of Labor Wage Determinations.  JX 57 at 1.  On September 27, 2001, the CO rejected the REA and awarded a follow-on contract to DECO.  JX 58; JX 84 at 11 (6/30/09 Dobbs Dep.).

The United States Court of Appeals for the Federal Circuit requires a litigant alleging an implied-in-fact contract to show "(1) mutuality of intent to contract; (2) consideration; (3) an unambiguous offer and acceptance[;] and (4) 'actual authority' on the part of the government's representative to bind the government."  *Schism* v. *United States*, 316 F.3d 1259, 1278 (Fed. Cir. 2002) (*en banc*).  The record in this case, however, does not evidence any of these requisites, with the exception of the CO's actual authority to bind the government to a contract.

For these reasons, the court has determined that there was no implied-in-fact contract between GSA and NCLN20 to extend the Battle Creek Contract, and therefore there was no breach thereof.

**6.  Interest On Withheld Payments to NCLN20.**

The final issue to be resolved is whether any interest is due to NCLN20 on four Battle Creek invoices.  *See* Amend. Compl. ¶¶ 97-103.  The Government does not contest that NCLN20 is due interest on these invoices, pursuant to the CDA, 41 U.S.C. § 611.  Gov't PT Br. at 65, 74.  The CDA allows for payment of interest on an "amount[] found due on claims . . . from the date the contracting officer receives the claim . . . until payment thereof."  41 U.S.C. § 611 (2006).  The court previously concluded that NCLN20 properly filed a formal written claim for the Battle Creek Contract on October 26, 2006.  *See NCLN20, Inc.* v. *United States*, 82 Fed. Cl. 103, 122 (2008).  Therefore, NCLN20 is entitled to interest on the Battle Creek invoices from October 26, 2006 until the time of payment on May 28, 2008 (invoice no. 3464) and June 9, 2008 (invoice nos. 3438, 3462, 3463), to be calculated in accordance with the interest rates established by the Department of the Treasury.  *See* Court Appendix.

## IV.  CONCLUSION.

For the reasons discussed herein:

1.  The Government's December 1, 2008 Motion For Summary Judgment is denied;

2.  Plaintiff's January 26, 2009 Motion *In Limine* is denied;

3.  The Government's February 20, 2009 Motion requesting that the court take judicial notice of Michigan state law concerning security licenses or certify the question to the Michigan  Supreme Court is granted-in-part and denied-in-part, because the court has determined that Michigan Law is clear and can be applied by the court;

4.  GSA's September 28, 2001 termination of the Michigan Guard Contract for default was unlawful because NCLN20 was not afforded the contractual ten-day period to cure required by FAR 52.249-8;

5.  GSA's September 28, 2001 termination of the Michigan Guard Contract for default was not justified based on anticipatory repudiation or later discovered evidence;

6.  GSA's September 28, 2001 termination for default and April 13, 2007 conversion to a termination for convenience did not evidence bad faith or an abuse of discretion;

7.  GSA did not violate the duty of good faith and fair dealing or act in bad faith in administering the Battle Creek Contract; and

8.  GSA did not enter into an implied-in-fact agreement with Plaintiff to extend the Battle Creek Contract.

Accordingly, the court has determined that NCLN20 is entitled to $46,856.00 in start-up costs associated with the Michigan Guard Contract and interest on this sum, pursuant to the

CDA, 41 U.S.C. § 611, from October 26, 2006 until the date that it receives payment.   In addition, NCLN20 is entitled to interest on Battle Creek invoices from the date of October 26, 2006, until the date that it received payment of these invoices on May 28, 2008 (invoice no. 3464), and June 9, 2008 (invoice nos. 3438, 3462, 3463).

**IT IS SO ORDERED.**

s/Susan G. Braden
**SUSAN G. BRADEN**
**Judge**

**Court Appendix: CDA Interest Rates**

| Period | Rate | Federal Register |
|---|---|---|
| 7/1/2006-12/31/2006 | 5.750% | 71 FED. REG. 37,638 (June 30, 2006) |
| 1/1/2007-6/30/2007 | 5.250% | 71 FED. REG. 78,513 (December 29, 2006) |
| 7/1/2007-12/31/2007 | 5.750% | 72 FED. REG. 35,742 (June 29, 2007) |
| 1/1/2008-6/30/2008 | 4.750% | 72 FED. REG. 74,408 (December 31, 2007) |
| 7/1/2008-12/31/2008 | 5.125% | 73 Fed. Reg. 37,529 (July 1, 2008) |
| 1/1/2009-6/30/2009 | 5.625%. | 73 Fed. Reg. 79,977-79,978 (December 30, 2009) |
| 7/1/2009-12/31/2010 | 4.875% | 74 Fed. Reg. 31,794 (July 2, 2008) |
| 1/1/2010-6/30/2010 | 3.250%. | 74 Fed. Reg. 69,379 (December 31, 2009) |
| 7/1/2010-12/31/2010 | 3.125%. | 75 Fed. Reg. 37,881 (June 30, 2010) |
| 1/1/2011-6/30/2010 | 2.625% | 75 Fed. Reg. 82,146 (December 29, 2010) |
| 7/1/2011-12/31/2011 | 2.500%. | 76 Fed. Reg. 38,742-38,743 (July 1, 2011) |